**In re Charles R. LAIR, Sharon W. Lair, Debtors.**

**Bankruptcy No. 96–12218.**

United States Bankruptcy Court, M.D. Louisiana.

June 21, 1999.

**4**

Michael J. Jefferson, Baton Rouge, LA, for debtors.

Stacy G. Butler, Kizer, Hood & Morgan, L.L.P., Baton Rouge, LA, for Hibernia National Bank.

### RULING

LOUIS M. PHILLIPS, Bankruptcy Judge.

Should this court, after re-opening this case, approve the Lairs' home mortgage reaffirmation agreement with Hibernia National Bank ("Hibernia") where (i) the Lairs have maintained, and continue to maintain, current status on the loan; (ii) neither the note nor mortgage instrument contain bankruptcy default clauses; (iii) the Lairs' timely filed Statement of Intention indicates an intent to reaffirm; and, (iv) the reaffirmation agreement—confected post-discharge and after the case was closed—is not executed timely?[1]

The formulation of this question from the facts before us compels us to stumble, fumble, slide, stride, and/or plunge into, and hopefully navigate our way through, the precipices, tar-pits, rapids, and sloughs that comprise the span of jurisprudence about 11 U.S.C. § 521(2) (West 1993).[2] For the reasons that follow (which supple-

---

1. Over this proceeding we have both original jurisdiction and authority to issue a final order. 28 U.S.C. § 1334(b); 157(a) and (b)(2)(A) (West 1993).

2. From this point forward citations to "11 U.S.C. § ____" will be shortened to " § ____."

ment a previous oral ruling of the court), we conclude, in light of the particular facts of this proceeding, that approval of the reaffirmation agreement should be denied. Along the way to our ultimate ruling, we have attempted to weave a viable analysis of what § 521(2) both means to and requires of debtors within the Fifth Circuit, in light of *Johnson v. Sun Fin. Co., Inc. (In re Johnson)*.[3] While we, of course, are "guided" by a wealth of case law and writing, we find ourselves, at the end of our trip, rather alone in our analytic approach, probably because of its simple-mindedness.

## INTRODUCTORY OVERVIEW

We are here, poised on a particular factual situation, which yields up § 521(2) of the Code as the nut to be cracked.[4] The debtors have at all times maintained current status on their home loan. The debtors (with help of counsel) and the lender (probably without the help of counsel) have been, it appears, consistent partners in an agreement that the home mortgage debt would be reaffirmed. However, the trustee administering the debtors' estate operated under a time-frame that resulted in the Lairs' case being closed upon the entry of discharge (the trustee having filed a Report of No Distribution, determining that there were not assets worthy of administration), before the reaffirmation agreement was executed.

So, the case was closed and there was no reaffirmation agreement, notwithstanding the parties' collective intent. We are not certain as to the factual particulars, but it appears as though the lender obtained a lawyer who advised that without a reaffirmation agreement, the debt might be in default, or that the entire obligation could not be enforced if there was a default down the road, or (maybe) that a large national lender was going to be unable to maintain the debt on its internal books as a discharged (therefore in rem) debt for purposes of enforcement of its lien rights in the event of future default so that the debtors' discharge was doubtless going to be violated by the lender in treating this home loan (post-discharge) just like any other home loan. Possibly, even, the lawyer advised the lender that the debtors' failure to comply with the debtors' own Statement of Intentions could be a ground for claiming default, but that the intelligent move would be to let the bankruptcy judge say so before going off to foreclose in state court.

Maybe some of this, maybe none. But we know that something was communicated to the Lairs' attorney, who subsequently moved this court to reopen the case for the purpose of allowing the belated reaffirmation agreement (negotiated with the attorney's assistance) to be filed, and therefore deemed approved, or ratified, or something.

It was at such a hearing that the evidence established: (i) as of the commencement of this case the debtors were current with the mortgage company; (ii) the debtors have been paying and the lender has been accepting the monthly payments

---

3. 89 F.3d 249 (5th Cir.1996).

4. **§ 521. Debtor's duties**
 The debtor shall:
 (2) if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate:
 (A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable,

specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property;
(B) within forty-five days after the filing of a notice of intent under this section, or within such additional time as the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph; and
(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title[.]

post-petition so that at hearing the mortgage debt was current; and (iii) that the mortgage loan documents (both debt and security) contained no bankruptcy default clause [5] (the Lairs personify the First Circuit's "extraordinarily rare debtor").[6] In light of these facts, and our understanding of the law applicable, this court concluded that the agreement would not be approved or ratified.[7] We have determined that because of the confluence of the case being closed (and therefore the property subject to the home loan mortgage having been abandoned by operation of law [8]), the debtors paying and creditor accepting payments during the course of the bankruptcy case, and the absence of a bankruptcy default clause within either mortgage or note, there is no basis in the law of the

state of Louisiana upon which the creditor can rely to enforce the security interest in, to, and upon the property. Because this personal obligation has been discharged, and because we cannot figure any basis under state law that would cause the Lairs to lose their home in a mortgage enforcement proceeding, it is not in the best interest of the debtors to reaffirm. Ultimate debt-free ownership of the property appears possible if the note is paid off according to its terms. Subsequent default under the note will trigger the right of the creditor to enforce the security interest upon the property but will not subject the debtors to personal liability.

To get to the question of whether state law provided a basis for post-discharge

---

5. Bankruptcy default clauses are at the heart of many § 521(2) disputes, and have provided the springboard for the most egregious legislation by courts. Several bankruptcy courts have invalidated such clauses, either pursuant to their "equitable powers"—§ 105(a)—or an executory contract provision—§ 365(e). For bankruptcy default clause invalidation see, *Riggs Nat'l Bank v. Perry*, 729 F.2d 982 (4th Cir.1984) (cited as the seminal case for bankruptcy default clause invalidation, actually seems to us to hold bankruptcy default clauses invalid for the duration of the automatic stay.); *Capital Communications Fed. Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43 (2d Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 1055, 140 L.Ed.2d 118 (1998); *Home Owners Funding Corp. of Am. v. Belanger (In re Belanger)*, 962 F.2d 345, 347–48 (4th Cir.1992); *Lowry Fed. Credit Union v. West (In re West)*, 882 F.2d 1543, (10th Cir.1989); *In re Stefano*, 134 B.R. 824, 826 (Bankr.W.D.Pa. 1991) (Bankruptcy default clause invalid, creditor enjoined from state law collection efforts, citing *Perry* ); *In re Hunter*, 121 B.R. 609 (Bankr.N.D.Ala.1990) (bankruptcy default clause invalidated by § 365(c)). For bankruptcy default clause validation see, *GMAC v. Bell*, 700 F.2d 1053, 1054 (6th Cir.1983) (Bankruptcy default clause valid after expiration of automatic stay); *In re Mayton*, 208 B.R. 61 (9th Cir. BAP 1997); *In re Gerling*, 175 B.R. 295, 297 (Bankr.W.D.Mo.1994) (Bankruptcy default clause valid—in *dicta* ); Ned W. Waxman, *Redemption or Reaffirmation: The Debtor's Exclusive Means of Retaining Possession of Collateral in Chapter 7,* 56 U.PITT.L.REV. 187, 198–202 (1994) (arguing that code provisions invalidating bankruptcy default clauses do not apply to security agree-

ments); Thomas J. Cunningham, *Postpetition Payments on Secured Debt: Ipso Facto Clauses and Their Relationship to Reaffirmation Agreements,* 20 CAL.BANKR.J. 213 (1992) (cases holding clauses invalid are without foundation and analysis); Aaron C. von Staats, *Ipso Facto Clauses and Chapter 7 Bankruptcies: Superfluous Contract Provisions, Enforceable Prenuptials, or Contrary to the Fresh Start,* 32 B.C.L.REV 703 (1991).

6. *Bank of Boston v. Burr (In re Burr),* 160 F.3d 843, 849 (1st Cir.1998). Though we do not suppose ourselves to be possessed of the broad-ranging vision of the First Circuit, it is the practical experience of this Court that many of the forms utilized by the mortgage industry now, in fact, do not have bankruptcy default clauses.

7. Although we have assumed that the Code would allow this court the authority to approve or ratify a post-discharge executed reaffirmation agreement, we note that this assumption is not borne out by the published opinions. *See, In re Gruber,* 22 B.R. 768 (Bankr.N.D.Ohio 1982); *In re Eccleston,* 70 B.R. 210 (Bankr.N.D.N.Y.1986) (and cases gathered therein).

8. *See* 11 U.S.C. § 554(c), which reads as follows:

(c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

enforcement of rights absent a bankruptcy default clause, assuming the maintenance of current status, we had to answer the following question: Does bankruptcy law give an independent basis for enforcement of security rights post-discharge and post-abandonment of the property to the debtors by § 554(c), though the debt in this case is not reaffirmed? Through the following opinion, we offer our answer: "No."

We wish to make as clear as we can, that in so concluding, we must also ask whether bankruptcy law provides a preemptive right to "retain" or to "reinstate" the loan. To this question we also answer, "No." We do not propose that the debtors have a federal right to "retain" property because of a provision of the Code or a federal rule of equity "designed" to actualize the conceptual and policy underpinnings of the bankruptcy process. Our conclusion is grounded in our interpretation of § 521(2), and our understanding of the relative places of state law and federal law within the bankruptcy process. The Lairs have by inaction chosen to rely upon (or simply have found themselves relying upon) state law rights as opposed to the express Bankruptcy Code` alternatives offered by § 521(2), because of the full administration of the property (by non-administration), which resulted in the return of the property to them pursuant to § 554(c) of the Code. We conclude that this is where the Lairs find themselves because their state law rights under the contracts (note and mortgage) and their ownership interest in the property **have passed through bankruptcy unaffected.** Note: We do not say that it was **necessary** for their state law rights under these contracts to so pass through; only, that in this case, they **have.**

To get to the conclusion that the debtors have retained their pre-bankruptcy state law rights in the agreements and to the property, we must address the question whether, by failing to perform their stated intention, the debtors have in fact "surren-

dered" the property (as the term is used in § 521(2)(A)), and whether "surrender" of the property operates to provide the creditor with rights in addition to those provided under the state law governing the contracts at issue. The debtors have not used any of the bankruptcy alternatives proposed by the words of § 521(2). They have not sought to avoid the mortgage lien under § 522 (which was not available under the provisions of § 522); they have not attempted to redeem the property under § 722 (which was not available under the provisions of § 722); and they did not properly effectuate reaffirmation under § 524(c). Though we will get into this later in some detail, we mention here that the three delineated alternatives are the only **express statutory alternatives** referred to in § 521(2), available to individual debtors within the bankruptcy process, as methods of "retaining" property that is collateral for consumer debt. For the moment we put aside discussion of the statutory alternatives available to parties other than the debtor—for example, the trustee and the creditor—though mention should (we guess) be made here that they are numerous (stay relief under § 362, disposition under § 725, sale or lease under § 363, abandonment under § 554(b) if the creditor can act quickly enough). It suffices on this score to point out that neither the creditor nor the trustee utilized any Bankruptcy Code right or power, while the property burdened by the security interest was property of the bankruptcy estate. The only Bankruptcy Code rights that ultimately came into effect, then, as regards the Lairs' home and the creditor's lien rights, were the automatic stay (which served no purpose as the debtors ignored the stay as it applied to this debt and this property) and abandonment by operation of law under § 554(c), (which, through express federal statutory provision effectuates the abandonment or transfer of the property from the bankruptcy estate back to the debtors).[9]

---

9. Other provisions of the Code, of course, came into effect concerning the Lairs, person-

We put a few words into the creditor's mouth at this point. "What about 'surrender'? That word is used in § 521(2)! Because the debtors did not use any of the expressly provided bankruptcy means of 'retaining' property, should not the creditor be entitled to some rights under the Bankruptcy Code, under or because of the use of the word 'surrender' in § 521?"

Good question (proven so by the extent to which courts are perplexed in coming up with an answer). However, as we hope to show, the creditor in this case and the debtors, for that matter, are, presently, firmly footed in the post-discharge, post-bankruptcy world of "surrender," as a result of the de facto "surrender" during the bankruptcy case, because of the Lairs' failure to effectuate their stated choice. In fact, both have "surrendered" as we interpret the word, because neither, as of the end moment of the bankruptcy case had exercised the federal rights or actions provided for in the Code. (We no not mean to imply that "surrender" applies to the creditor.) [10]

The debtors, in effect, by failing to perform their intentions, surrendered their rights to use the express bankruptcy alternatives provided for in § 521(2) as regards the property, and in so doing, surrendered to the full range of consequences of trustee administration of the property. The creditor, by accepting payments timely made, and by waiving its right to stay relief under § 362(d) and any other possible disposition(s) by the trustee while the property was property of the estate, (in effect) surrendered its right to use the Bankruptcy Code rights afforded it and consequently finds itself under the dictates of state law. It is clear also that the bankruptcy

process itself, by operation of its own terms, fully dealt with (administered) the property, ultimately sending it back to where it came from—to the debtors and the non-bankruptcy world—so that the rights and obligations concerning it (the property itself only, because the discharge does generate a lingering federal effect) can subsequently be sorted out. In other words, the bankruptcy process, once interested in the property (and the related claim of lien rights) because the property was property of the bankruptcy estate, is interested no longer. The property has been fully dealt with by the trustee; the property was in fact surrendered to the trustee by the debtors.

In other words, we have tried to figure out what the term "surrender" means as used within § 521(2). We think insufficient attention has been paid to the word and its meaning. We do not really know why; it seems obvious to us that the word "surrender" is one of the primary keys to unlocking the whole falderal over § 521(2), because (as we shall see), "surrender" along with "retention," are the only actions or rights referred to in § 521 that are not defined or specifically created/provided for by a Bankruptcy Code section. We do have a hunch as to why courts have not addressed the word head-on. Our hunch is that everyone assumes the meaning. We submit that this internalized assumption (we say "internalized" because it is rarely expressed, but when it is, our hunch is proven correct) is uniformly held by the adherents to all of the disparate lines of analysis. We also submit that this assumed meaning within the caselaw is wrong.[11]

ally, and other property. The primary examples that came immediately to mind are the exemption section (§ 522) and the discharge (§ 524).

10. It so happens that here the end moment coincided with the end of the case, but it need not—discharge and abandonment could meet while the case remains ongoing—(see § 362).

11. It seems perfectly clear to us that the only notion—the meaning of surrender—upon which all the disparate lines of analysis agree must, by virtue of the very fact of such agreement, be wrong.

We think, expressed or not, that the courts who have dealt with § 521(2) are set on the notion (along a spectrum running between queasy certainty and gleeful certainty, depending upon whether the debtor and debtor's fresh start are the good guys or the creditor and its need for recompense due to the unnatural insertion of the interruptive bankruptcy process upon the sanctity of its state law rights are the good guys), that "surrender" imposes a bankruptcy, or federal, downside upon the debtor and a concomitant upside for the creditor, affecting the post-bankruptcy rights of both parties. We think differently.

We think bankruptcy does affect state law rights, and that in connection with consumer debts secured by liens upon property, bankruptcy gives parties rights not available under state law. We think § 521(2) is perhaps poorly constructed but is not ambiguous. (Actually, the more we have thought about this, the more we are not even sure the statute is poorly constructed, though it is flawed in its directive that trustees oversee the performance of intentions.) We think that a debtor is called upon to make one of two basic choices by § 521(2):(i) to retain the property serving as collateral for the debt through the use of bankruptcy-afforded alternatives; or, (ii) to surrender the right to use these bankruptcy-afforded alternatives as the means of retaining the property. If the former be the choice, then the debtor should "check" the alternative (out of the three provided by the statute) that is applicable, because the three stated methods are the only alternatives available (to retain by use of the Bankruptcy Code). If the latter be the choice, the debtor should "check" "surrender." If "surrender" is "checked" the bankruptcy world is on notice that the Bankruptcy Code will not be used, that the debtor "surrenders" the property of the estate **to the estate** to be dealt with as the trustee sees fit. However, there is only this particular diminu-

tion of rights intended or suffered. "Surrender" does not mean that the debtor surrenders the property to the creditor, because the debtor does not have the option to surrender property of the estate to a creditor. "Surrender" does not meant that the debtor has legally rolled over and died regarding residual state law rights (under the contracts, regarding the right to state law due process, etc.), or even certain federal law rights (again, the right to federal Constitutional due process), that might be applicable after the close of the bankruptcy process because of the terms of the bankruptcy process itself (particularly § 554(c)).

We submit that while our analysis of the meaning of "surrender" might, at first blush, be hard to swallow (advising the client, say, in the position of the Lairs, that they should trustingly "check" the "surrender" box though they want to keep their house does seem slightly incongruous and probably would have been bad advice, as we attempt to show later). However, if our notion is correct (and is seen as correct), positive things (that we can think of) seem possible: first, no more published opinions on § 521(2).[12] Second, *all parties* will actually know what their options are and will be forced to make a real choice. Third, the relationship between state and federal law will be properly aligned (as we see it), during and after the bankruptcy case, regarding the rights, obligations, and property dealt with by § 521(2).

## ANALYSIS

(A) THE STATUTE, 11 U.S.C. § 521(2). WHAT DOES IT SAY?

The section reads, in its entirety, as follows:

### § 521. Debtor's duties

The debtor shall:

(2) if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate:

12. We think this would be a most welcome development.

(A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property;

(B) within forty-five days after the filing of a notice of intent under this section, or within such additional time as the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph; and

(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title[.]

Because of the almost laughable extent of uncertainty concerning § 521(2)—and the fact that this uncertainty seems to be on the rise at a rate determined precisely by the number of cases published on the subject [13]—we are tempted to take a page out of one of the U.S. Supreme Court statutory "interpretation" efforts, and declare that, because courts disagree on the meaning, the statute must be ambiguous.[14] However, because we are in the Fifth Circuit, we are covered by the interpretation of that court, as espoused in *Johnson*, that the language of § 521(2) is unambiguous and is to be interpreted according to its plain meaning.[15] "Plain meaning" does not mean "simple to understand." Several courts have used a "plain meaning" analysis to reach diametrically opposed interpretations of § 521(2). Further, no approach, "plain meaning" or otherwise, has interpreted the statute quite like we do. We have learned much from the various approaches to what § 521(2) means and what it does. To set our analysis we think it necessary first to provide an overview of the various ways courts have read the statute.

(B) THE INTERPRETATIVE APPROACHES, DELINEATING THE CAMPS

The slew of judicial and scholarly publication on the meaning of § 521(2) provides something for everyone, interpretative authority for almost every predisposition and interpretative bent. One line of authority—to which the Fifth Circuit subscribes—interprets that section according

---

**13.** In just the time period it took to edit this paper another case, *In re Donnell*, 234 B.R. 567 (Bankr.D.N.H.1999), and another law review article, Michael P. Alley, *Redemption, Reaffirmation, Exemption, and Retention in Chapter 7 Bankruptcy: Extinction Looms Near For The Free Ride*, 47 U.Kan.L.Rev. 683 (April 1999), were published.

**14.** *Dewsnup v. Timm*, 502 U.S. 410, 416, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). The exact wording is "[t]he ... contrasting positions of the [parties] demonstrates that § 506 of the Bankruptcy Code and its relationship to other provisions of that Code do embrace some ambiguities."

**15.** We have some concerns about the *Johnson* opinion, not the least of which (as we mention below) is that the court, apparently, had no jurisdiction over the interlocutory order it dealt with. Additionally, the court has recently, in the case *Davis v. Davis (In re Davis)*, 170 F.3d 475 (5th Cir.1999), pronounced a statute (§ 522(c)(2)) ambiguous just because it *is*, without the slightest analysis of how the provision is not susceptible of comprehension. We think it possible that *Davis* overrules *Johnson* on the issue of statutory interpretation, but we care not, being unable to anticipate the direction of the wind and preferring to stick with our baseline approach to statutory interpretation—can we understand the words according to their generally accepted meanings within the context of the particular statute in which they appear and as they and the particular provision fit with the statute as a whole.

to its purported "plain meaning." [16] The statute, says this camp, plainly requires the choosing of either: (i) surrender; or, (ii) retention by reaffirmation, retention by redemption, or retention by exemption and lien avoidance; and the subsequent performance of the choice.

Another line of analysis interprets the same language to allow the debtor to choose either to surrender or retain the property. If the debtor chooses one of the particular methods of "retention" (reaffirmation, redemption, or exemption and lien avoidance), thereby making the choice applicable, the debtor can choose the particular method of "retention" made applicable by the debtor having chosen it. By virtue of this rather circular approach to statutory interpretation, this second line of courts concludes that if none of the particular methods of "retention" are chosen, none are "applicable" (and therefore are not to be chosen, we guess because none were chosen), and the debtor can therefore simply retain the collateral by a means of the debtor's own fashioning (with help from the courts). This retention right usually takes the form of a federal rule of law or

equity or something, pursuant to which the debtor is allowed to maintain possession of the collateral while paying for it (surmising upon judicial economic analysis, that the creditor should be happy with the judicially promulgated rule).[17] Because this method of retention is allowed notwithstanding the existence of a bankruptcy default clause within the agreements, this camp is often referred to as the "reinstatement" camp, sometimes the "fourth alternative" camp (retention to be fashioned judicially after years of litigation is a fourth alternative (congressionally intended, we might add) to retention by reaffirmation, retention by redemption, and retention by exemption and lien avoidance). Surprisingly, or not so surprisingly, some "fourth alternative" courts purportedly rely on a "plain meaning" of the statute as well.

Finally, there is a third line of authority that can be described as "the statute as read and as interpreted is hard to understand so we will deem it absurd and treat it purely as a notice provision" camp. This line of analysis holds that § 521(2)(C) pre-

**16.** *In Matter of Edwards*, 901 F.2d 1383 (7th Cir.1990); *Taylor v. AGE Fed. Credit Union (In re Taylor)*, 3 F.3d 1512 (11th Cir.1993); *Johnson v. Sun Finance (In re Johnson)*, 89 F.3d 249 (5th Cir.1996); *Bank of Boston v. Burr (In re Burr)*, 160 F.3d 843 (1st Cir.1998); *In re Kennedy*, 137 B.R. 302, 304 (Bankr. E.D.Ark.1992); *Matter of Horne*, 132 B.R. 661, 663 (Bankr.N.D.Ga.1991); *In re Chavarria*, 117 B.R. 582 (Bankr.D.Idaho 1990); *In re Gregg*, 199 B.R. 404, 407 (Bankr.W.D.Mo. 1996); *In re Griffin*, 143 B.R. 535, 537 (Bankr.E.D.Ark.1991); *In re Gerling*, 175 B.R. 295, 297 (Bankr.W.D.Mo.1994); *In re Greer*, 189 B.R. 219, 221 (Bankr.S.D.Fla.1995); Ned W. Waxman, *Redemption or Reaffirmation: The Debtor's Exclusive Means of Retaining Possession of Collateral in Chapter 7*, 56 U.Pitt.L.Rev. 187, 198–202 (1994).

**17.** *McClellan Fed. Credit Union v. Parker (In re Parker)*, 139 F.3d 668 (9th Cir.1998) *cert. denied,* ── U.S. ──, 119 S.Ct. 592, 142 L.Ed.2d 535 (1998); *Capital Communications Fed. Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43 (2d Cir.1997), *cert. denied,* ── U.S. ──, 118 S.Ct. 1055, 140 L.Ed.2d 118 (1998); *Home Owners Funding Corp. of Am. v. Belanger (In re Belanger)*, 962 F.2d 345, 347–

48 (4th Cir.1992); *Lowry Fed. Credit Union v. West (In re West)*, 882 F.2d 1543, (10th Cir. 1989); *In re Harper*, 143 B.R. 682, 686 (Bankr.W.D.Tex.1992); *In re Stefano*, 134 B.R. 824, 826 (Bankr.W.D.Pa.1991); *In re Donley*, 131 B.R. 193, 195 (Bankr.N.D.Fla. 1991); *In re McNeil,* 128 B.R. 603, 608 (Bankr.E.D.Pa.1991); *In re Castillo*, 209 B.R. 59, 64 (Bankr.W.D.Tex.1997); *In re Doss*, 203 B.R. 57, 58 (Bankr.W.D.Va.1996); *Sears Roebuck & Co. v. Lamirande*, 199 B.R. 221, 223 (D.Mass.1996); *In re Parlato*, 185 B.R. 413, 415 (Bankr.D.Conn.1995); *In re Laubacher*, 150 B.R. 200, 203 (Bankr.N.D.Ohio 1992); *In re Parker*, 142 B.R. 327, 329 (Bankr.W.D.Ark. 1992); *Matter of Windham*, 136 B.R. 878, 881 (Bankr.M.D.Fla.1992); *In re Carpinella*, 201 B.R. 34, 35 (Bankr.D.Conn.1996); *In re McDaniel*, 129 B.R. 301, 303 (Bankr.M.D.Fla. 1991); *In re Shubert*, 147 B.R. 618, 619 (Bankr.N.D.Ga.1992); *In re Manring*, 129 B.R. 198, 199 (Bankr.W.D.Mo.1991); Julio M. Zapata, *Taming the Bankruptcy Code's Toothless Tiger*, 11 U.S.C. § 521(2), 72 Wash.L.Rev. 1195 (1997); 4 Collier on Bankruptcy, ¶ 521.10 (15th ed. rev.1998).

serves all of the debtors' rights, notwithstanding the apparent directives contained within § 521(2)(A) and (B).[18] Because the effect of this analysis is for § 521(C) to "cancel out" § 521(A) and (B), we refer to this line of analysis as the "nihilist" camp.

But the authority thus far published does not assuage the thrust of one camp—the "I want to know what the definition of 'surrender' is" camp. We are confused by the lack of a definition of "surrender" and remain convinced of its necessity. The question here, is it not, is whether state law, e.g., the parties contract, is preempted by § 521(2) in such a way as to prevent post-bankruptcy reliance on that contract? While "fourth alternative" courts answer this question in the affirmative, by conjuring a right of "retention" which necessitates the invalidation of a portion of those contracts, the "nihilist" courts answer the same question in the negative, by reading § 521(2)(A) and (B) into nullity so that the provisions can preempt nothing because they do nothing. And what do the "plain meaning" courts have to say? The importance of this question to a Fifth Circuit court is obvious.

We frankly are not certain what the Fifth Circuit component of this line of authority says, except that it denounces the "fourth alternative" camp's fashioning of a federal rule of post-bankruptcy retention. What we know is that certain of the "plain meaning" courts have fashioned their own federal rule of equity in response to the federal "reinstatement" rule, one that grants to the creditor a federal counterpoint to the right of reinstatement. Through our analysis, we have determined that at least the Fifth Circuit, in *Johnson*,

did not do this; however, the havoc wreaked by being seen as having done this has been problematic. As we mentioned earlier, all strands of "thought" assume a meaning of surrender, and what is more, may well assume (or be seen to assume) a federalization of the term which cuts off a debtor's state law rights post-bankruptcy and provides to the creditor the benefit of this Bankruptcy Code—inspired forfeiture. We think the assumed meaning of "surrender" is that if surrender is "chosen," the debtor loses all rights in, to and upon the property, to the creditor.[19]

■ It is this assumed meaning that underlies the fourth alternative fashioning of a federal rule to offset the harshness of this meaning of surrender, which has fostered the plain meaning reaction to the federal rule of retention, which has fostered the nihilist reduction of the statute to rubble. Before any more fostering, we propose to offer a suggestion that § 521(2) contains no federal overlay other than that specifically (and plainly) mentioned, and that "surrender" means nothing other than choosing not to utilize the bankruptcy alternatives of reaffirmation, redemption or exemption and avoidance. We propose that the "surrender" referred to in § 521(2)(A) is the same "surrender" referred to in § 521(4), and that the choice of "surrender" is nothing more than the choice (by foregoing the right to use the bankruptcy options to retain the property which can only be accomplished if the property is excluded, somehow, from the estate) to abide by the requirement that property of the estate be "surrendered" to the trustee. If "surrender" means what

---

18. *Mayton v. Sears, Roebuck & Co. (In re Mayton)*, 208 B.R. 61 (9th Cir. BAP 1997); *Bank of Boston v. Burr (In re Burr)*, 218 B.R. 267 (1st Cir. BAP 1998); *rev'd* 160 F.3d 843 (1st Cir.1998); *see, e.g.,* David J. Messina, *An Alternative to Redemption and Reaffirmation for Chapter 7 Debtors*, 40 LA.B.J. 447 (1992); *In re Weir*, 173 B.R. 682 (Bankr.E.D.Cal. 1994); *In re Tameling*, 173 B.R. 627 (Bankr. W.D.Mich.1994); *In re Irvine*, 192 B.R. 920, 921 (Bankr.N.D.Ill.1996); *In re Ogando*, 203

B.R. 14, 16 (Bankr.D.Mass.1996); *In re Schafer*, 215 B.R. 205, 207 (Bankr.D.Or. 1997); *In re Bracamortes*, 166 B.R. 160, 162 (Bankr.S.D.Cal.1994).

19. We cannot fathom a situation in which a rational person would actually make such a choice, especially when a debtor can choose reaffirmation, effectuate reaffirmation, and thereafter rescind reaffirmation.

we think it means, then the choice of "surrender" has no post-bankruptcy consequences if, after completion of the bankruptcy process, the property is deemed fully administered by means of operation-of-law abandonment pursuant to § 554(c). "Surrender," if thereafter the property be abandoned back to the debtor pursuant to § 554(c), does not affect a debtor's state law rights under the lien or as owner of the property. Because the Bankruptcy Code, properly read, does not expressly preempt state law rights post-bankruptcy (except the right to personal liability), we submit that courts that have fashioned an "equitable" preemption of rights (favoring either party) have violated the directive of the United States Supreme Court and have improperly injected themselves into a legislative arena whereby they seek to foster particular social objectives.

We start with a background discussion of the relationship between state and federal bankruptcy law, and of the jurisprudential progenitors of the present confused state of the law of § 521(2).

(C) OUR APPROACH

(1) The *Butner* Framework And Its Application Prior To § 521(2)

To answer the preemption question one must have a proper understanding of the relationship between the bankruptcy code and state law. From *Butner v. United States*[20] we get the overarching directive from the Supreme Court—in admittedly general, rough-cut terms—concerning the relationship between state law and bankruptcy law as far as property rights are concerned.

The actual issue in *Butner* is worth recapitulating. Mr. Butner was second mortgagee of a piece of mineral-producing real property. During an arrangement proceeding, an agent had administered the property under the direction of the bankruptcy court, which had ordered that the rents collected "be applied to tax obligations, payments on the first mortgage, fire insurance premiums, and interest and principal on the second mortgage."[21] The arrangement did not work out and the debtor was subsequently adjudicated bankrupt under Chapter 7 of the Bankruptcy Act. The agent was terminated at the inception of the bankruptcy trusteeship. The bankruptcy trustee picked up the administration of the property, but, rather than effectuate pay-down on the mortgage debts, was required to retain the rents subject to further order of the bankruptcy court. Mr. Butner subsequently purchased the property, with the recited sales price being paid by means of credit against the second mortgage debt owed to him. After the sale, Butner moved the bankruptcy court for an order recognizing a security interest, in his favor, upon the accumulated rents held by the trustee (in an amount slightly less than the balance remaining owed to him after the credit bid).[22]

The bankruptcy court denied the request, deeming Butner's remaining claim a general unsecured claim. The district court reversed, observing that while under North Carolina law an owner of mortgaged real property was entitled to the rents until dispossessed by an action to enforce the mortgage, the agent appointed in the arrangement constituted a surrogate for a state law receiver and evidenced sufficient dispossession. The Court of Appeals reversed the district court. It agreed that the agent had constituted a surrogate receiver but that the termination of the arrangement effectively returned possession to the surrogate debtor (the estate). "Because petitioner had made no request during the bankruptcy for a sequestration of rents or for the appointment of a receiver, petitioner had not, in the court's view, taken the kind of action North Carolina

20. 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

21. *Id.*

22. *Id.*

law required to give the mortgagee a security interest in the rents collected after the bankruptcy adjudication." [23]

The Supreme Court granted certiorari, it said, to "resolve a conflict . . . concerning the proper approach to a dispute of this kind." [24] According to the court, the conflict involved a dispute over the applicability of state law to resolution of the question.

The courts in the latter group regard the question whether a security interest in property extends to rents and profits derived from the property as one that should be resolved by reference to state law. In a few States, sometimes referred to as "title States," the mortgagee is automatically entitled to possession of the property, and to a secured interest in the rents. In most States, the mortgagee's rights to rents is dependent upon his taking actual or constructive possession of the property by means of a foreclosure, the appointment of a receiver for his benefit, or some similar legal proceeding. Because the applicable law varies from State to State, the results in federal bankruptcy proceedings will also vary under the approach taken by most of the Circuits. [25]

As described by the court, the minority view of the "title states" was that notwithstanding state law that would require possession before a mortgagee would be entitled to rents, a mortgagee should be automatically entitled to a security interest in rents without taking any action whatsoever in the bankruptcy case to obtain possession or recognition. This conclusion was grounded in the following reasoning. "[S]ince the bankruptcy court has the power to deprive the mortgagee of his state-law remedy, equity requires that the right to rents not be dependent on state-court action that may be precluded by federal law." [26]

■■■ As we all know, the court disagreed with the minority view. Though, of course, we start with perhaps the most often quoted citation of any Supreme Court bankruptcy decision, "[p]roperty interests are created and defined by state law," the opinion does not end there. [27] The court recognizes the power of Congress to preempt state law on any issue within the constitutional authority granted to establish "uniform laws on the subject of bankruptcies throughout the United States." [28] However, the court cites, for example, *Sturges v. Crowninshield,* [29] for the proposition that though state law that conflicts with laws of Congress on bankruptcies are suspended, ". . . state laws are thus suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress." [30]

■■■ Therefore, regarding the general framework for examining the propriety of establishing a federal rule of equity to supplant state law, the court says, "Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." [31]

The minority rule of equity granting automatic title to (or security interest in) rents to a mortgagee at the inception of a bankruptcy case is characterized as the adoption of ". . . a uniform federal approach to the question of the mortgagee's interest in rents and profits because of their perception of the demands of equi-

23. *Id.* at 51, 99 S.Ct. 914.

24. *Id.* at 52, 99 S.Ct. 914.

25. *Id.* at 52, 53, 99 S.Ct. 914 (footnotes omitted).

26. *Id.* at 53, 99 S.Ct. 914.

27. *Id.* at 55, 99 S.Ct. 914.

28. Article I, § 8, United States Constitution.

29. 4 Wheat. 122, 4 L.Ed. 529

30. *Butner,* 440 U.S. at 54, n. 9, 99 S.Ct. 914.

31. *Id.* at 55, 99 S.Ct. 914.

ty." [32] However (and we think this is important), though the equity power is important, ". . . undefined considerations of equity provide no basis for adoption of a uniform federal rule affording mortgagees an automatic interest in the rents as soon as the mortgagor is declared bankrupt." [33]

A rule of equity, such as had been fashioned, was deemed by the court to be unnecessary. While state law remedies are (in fact) suspended, the answer, says the court, is not an equitable rule effecting a transfer of title to property not subject to a security interest at the inception of a case. Rather the bankruptcy court should fashion a proceeding-specific remedy ". . . to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have had under state law if no bankruptcy had ensued." [34]

Now, we have worked hard on understanding the court's summation, for at first blush it appears to us completely wrong. We quote quite a bit:

> The rule of the Third and Seventh Circuits, at least in some circumstances, affords the mortgagee rights that are not his as a matter of state law. The rule we adopt avoids this inequity because it looks to state law to define the security interest of the mortgagee. At the same time, our decision avoids the opposite inequity of depriving a mortgagee of his state-law security interest when bankruptcy intervenes. For while it is argued that bankruptcy may impair or delay the mortgagee's exercise of his right to foreclosure, and thus his acquisition of a security interest in rents according to the law of many States, a bankruptcy judge familiar with local practice should be able to avoid this potential loss by sequestering rents or authorizing immediate state-law foreclo-

sures. Even though a federal judge may temporarily delay entry of such an order, the loss of rents to the mortgagee normally should be no greater than if he had been proceeding in a state court: for if there is a reason that persuades a federal judge to delay, presumably the same reason would also persuade a state judge to withhold foreclosure temporarily. The essential point is that in a properly administered scheme in which the basic federal rule is that state law governs, the primary reason why any holder of a mortgage may fail to collect rent immediately after default must stem from state law.[35]

What is the court saying here? Surely there are bankruptcy reasons not to allow collection of rents under a foreclosure of a valid mortgage (e.g. the creditor is oversecured and there is equity for the estate). Surely the court is not saying that unless there is a state law problem with your security interest, the right to obtain possession and therefore the rents must be granted.[36]

No, it is not. The court is delineating the creditor's interest that must be protected within the bankruptcy process. We now (since *Butner*) have become sophisticated, and talk in terms of adequate protection, of the necessity of protecting the value of the creditor's property rights (interests) created by the collateral interest in the debtor's property. What the court is doing, it seems, without specifically articulating it, is espousing the recognition that a mortgagee's interest in the real property derives a certain component of its value from rents, and that the value of the overall interest cannot be diminished by the bankruptcy process just because Congress had the power to supplant state law (substantive and procedural) by virtue of

---

32. *Id.*

33. *Id.* at 56, 99 S.Ct. 914.

34. *Id.*

35. *Id.*

36. *See, United Savings Ass'n of Texas v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), for the Supreme Court discussion of adequate protection of property interests that are security interests.

the bankruptcy power, unless Congress has actually done so. Because of this, and in light of the recognition that all actions in time take time, the court distinguishes the diminution of value that is inherent in the necessity of effectuating state law procedures from the ability of a bankruptcy court to cause diminution purely upon the existence of federal power.

■ The court is not suggesting that a bankruptcy court must allow sequestration of rents in a fashion that mimics the state law time-line, nor is· it suggesting that equity in property cannot be salvaged for the estate. In fact, if the rents are surplusage, given the relationship between the indebtedness and the value of the property securing payment of the debt, the mortgagee never needs the rents (we recognize this is rarely the case) and therefore is not hurt by a bankruptcy-imposed prohibition upon enforcement of the security interest.[37] However, if there is no statutory reason to deprive parties of their state law rights (and recall that by this we are talking about the property interest or right itself, or its value), or to grant rights not afforded by state law, "undefined considerations if equity" do not establish a ground for so doing.

One more point. The court seemed preoccupied with the question of whether Mr. Butner should be granted rights not afforded by state law simply because of bankruptcy. However, the concern can be seen from another angle. For every grant of right not provided for by state law to one party to a contract, there is likely to be a corresponding taking away of a right from the other party, again in a manner not provided for by state law. The effect of the court's decision is certainly recognition of this equation. If Butner is granted an automatic interest in the rents, though

not entitled to such under state law, is not the debtor, or the debtor's estate, losing state law rights that state law does not provide to be lost? The answer is "yes." And, what right is lost? The right to remain in possession until state (or federal) procedural vehicles are utilized to dispossess the owner (which must provide the process that is **due**), and while in possession to enjoy the entitlement to the rents.

Because the court is saying that there is nothing inherent in the bankruptcy process that provides the equitable basis to grant Butner additional state law rights, so it is also saying that there is nothing inherent in the bankruptcy process that provides the equitable basis for depriving the debtor of the debtor's (or estate's) version of the same state law rights. Not that bankruptcy statutory law cannot do this. However, without the express statutory law so doing, the equity power does not allow it to be done on the basis of "undefined considerations of equity."

In Mr. Butner's case, the Court recognizes that without taking action in the bankruptcy court, Mr. Butner is forestalled from using state law mechanisms for enforcing his interest in rents. What should he have done? It seems that he should have done more to protect himself. But, he did nothing. The court is faced with a creditor whose inaction outside bankruptcy would have generated exactly the same result as happened inside bankruptcy. The debtor (here the debtor's estate) would continue to collect the rents until dispossessed by Butner's enforcement action. Because bankruptcy (absent statutory directive) cannot harm your property rights as a secured creditor (understanding that "harm" means "hurt," not merely "hinder" without actual and nega-

---

37. We will not delineate the valuation that we have come to live and breathe, that is, the valuation of rate of depreciation in value compared to the rate of interest and accrual under § 506(b), which in combination with the beginning point—the petition date indebtedness amount—would generate the limits of

prohibition on foreclosure, rent sequestration, etc. Also, never being wrong a valuation leaves us unsuited to discuss the danger (afforded by the Bankruptcy Code valuation process) of having judges know best about valuation for purposes of determining when and how protection is "adequate."

tive consequences to the value of the security interest) for "bankruptcy reasons," the secured creditor need not receive additional rights "for bankruptcy reasons." Similarly, as the debtor (or debtor's estate), absent statutory directive, cannot enjoy state law rights not afforded under the law granting the rights, to the actual detriment of or harm to the property interest of the creditor,[38] neither does the debtor (or debtor's estate) lose rights granted under state law, absent statutory directive, "for bankruptcy reasons."

The *Butner* Court, then, overturns the "rule of equity" courts and rejects their observation as to the necessity of providing federal rules of equity designed to vary (add to and delete) state law rights where express bankruptcy law does not provide for variance. The court affirms the Court of Appeals, which recognized the automatic stay-imposed prospect of frustration of enforcement of security interests and recognized, also, the availability (through the bankruptcy process) of obtaining relief either to utilize or mimic state law process necessary to the enforcement of the particular interest at hand. Because Butner took no action, both the Court of Appeals and the Supreme Court saw his request for relief (entitlement to the rents) to be a request for bankruptcy-inspired grant of rights without a bankruptcy basis, because bankruptcy did not cause the problem of the debtor (or debtor's estate) having continued to collect the rents.

Outside of bankruptcy the debtor would have continued to collect the rents until Butner took possession of the property and would have had unfettered use of the funds. Because there is no bankruptcy reason (or state law reason) for a result different than Butner would have obtained under state law, Butner loses the rents.

Bankruptcy caused Butner to lose nothing that he had the right to obtain under

---

**38.** Remember, we are talking about real hurt, absent statutory directive. Read *Timbers* for the court's present-day discussion of what actual hurt because of bankruptcy is real hurt. *Timbers* is, for us, instructive, because it approaches the question of bankruptcy's effect upon the undersecured creditor (e.g. Mr. Butner) from a generalized perspective. We know, therefore, that the concept of "adequate protection" could be the codified response to the discussion in *Butner* of the right of the secured creditor not to have the secured interest hurt except for either reasons grounded in statute (allowable because of the preemption of congressional authority) or for state law reasons. For example, we learn from *Timbers* that notwithstanding a state law contract right to accrual of interest, the Bankruptcy code prohibits claims for unmatured interest, to the undersecured creditor as well as unsecured creditor because the collateral value of the undersecured creditor cannot pay the interest. Therefore, the undersecured creditor claiming interest is not claiming it on account of the collateral position, but on account of the unsecured claim. However, another example of post-Butner statutory fallout is the "adequate protection" Code provision. For the bankruptcy estate to retain collateral for its use, it must protect the right of the holder of the collateral interest to be paid from that collateral.

So, says the *Timbers* court, the creditor is to be assured that the value of that entitlement, to be paid from the collateral, is preserved without diminution. The pre-bankruptcy status quo is to be maintained for the time it takes to get to the paying stage of the case at which time other express codal provisions are triggered, establishing the requirements of confirmation of a Chapter 11 plan (as it might affect the holder of a claim secured by property of the estate). We cannot address the thousands of cases dealing with the protection to which a secured creditor is entitled, or the various forms it can take. We think it not too difficult to formulate a general proposition that the creditor's claim should not be diminished in value, by the fact of the bankruptcy process (automatic stay, time factors, etc.), than it would be by the fact of applicable non-bankruptcy law and the diminution that would result from the necessity of utilizing that non-bankruptcy law to enforce the secured interest of the creditor upon the collateral (the catch, of course, is that any proceeding attempting to attain mimicry of a hypothetical enforcement action is dependent upon fallacy of presentation and adjudication, in that the presenters and deciders are human). To the extent of the potential additional harm to the creditor's property interest in property of the estate, over that which the creditor would suffer anyway, the value of the property interest of the creditor must be protected, or put back to fill in the value hole caused by the bankruptcy process.

state law, at least concerning the value of his security interest. Inherent in the right to obtain protection of one's interest is the right to do nothing to obtain protection. The "do nothing" approach was Butner's chosen path, and as a consequence, the Supreme Court provided him with just what he would have received (on account of his security interest in the real property) had he chosen to do nothing under non-bankruptcy law. That is, nothing. In so doing, the court rejects the expansive notion that it is the business of federal judicial power to utilize undefined considerations of equity to enact general rules granting parties in bankruptcy cases rights in property that are neither provided for by statute, or necessary to the statutory process as a result of holes within the statutory process. In fact, the "equity rule" courts had it backwards. Because the processes of bankruptcy CAN (or have the power to) affect state law property interests adversely, the equitable administration of the bankruptcy court should entail that that court "take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued."[39] This directive (as interpreted through our discussion of the Code provisions providing for and requiring adequate protection) is still good law, and informs our continued analysis concerning § 521(2). To use undefined considerations of equity to grant or to take away (change) rights in property dealt with by state law in the non-bankruptcy world in situations where there is no express statutory basis for doing so runs afoul of *Butner* and without warrant inserts the federal judicial power into the legislative arena.

The proper balance between federal and state law is aptly demonstrated by pre-§ 521(2) "collateral rights" jurisprudence that we refer to as "the redemption cases." *GMAC v. Stewart (In re Stewart)*[40] is illustrative. The debtor in *Stewart* was delinquent in payments under his contract and sought to redeem the fair market value of his property in installments. The *Stewart* court concluded that redemption by installments was not contemplated by § 722 because installment redemption ignored the time value of money and was inconsistent with early case closure.[41] This situation was repeated in several cases over the next two years, usually with the same result.[42] In each of these cases the debtor sought modification of the underlying contract through redemption, i.e., to "cramdown" value, lower the rate of interest, make up missed payments or to escape a

39. *Id.* at 56, 99 S.Ct. 914.

40. 3 B.R. 24 (Bankr.N.D.Ohio 1980).

41. *Id.* at 25. We agree with the Stewart court—although our approach would probably entail a more textualistic bent.

42. *GMAC v. Miller (In re Miller)*, 4 B.R. 305 (Bankr.E.D.Mich.1980) (Debtor unsuccessfully sought to redeem vehicle at fair market value and prevailing interest rate); *In re Zimmerman*, 4 B.R. 739 (Bankr.S.D.Cal.1980) (debtor unsuccessfully sought to redeem several vehicles at fair market value and prevailing interest rate); *In re Cruseturner*, 8 B.R. 581 (Bankr.D.Utah 1981) (debtor could not redeem for fair market value in installments); *In re Hart*, 8 B.R. 1020 (Bankr.N.D.N.Y 1981); *Arizona Bank v. Carroll (In re Carroll)*, 11 B.R. 725 (9th Cir. BAP 1981), *rev'g In re Carroll*, 7 B.R. 907 (Bankr.D.Ariz.1981). *In re Whatley*, 16 B.R. 394 (Bankr.N.D.Ohio 1982) (Debtor in default under bankruptcy default clause could not redeem in installments. Debtor must invoke federal remedy or face foreclosure in state court.); *Chrysler Credit Corp. v. Schweitzer (In re Schweitzer)*, 19 B.R. 860 (Bankr.E.D.N.Y.1982) (Court refused to allow debtor to redeem in installments for the fair market value of his vehicle. Court then examined whether the debtor was in default under his contract that contained a bankruptcy default clause. Court held that the bankruptcy default clause was effective and that the debtor would need a federal remedy,); *but see, In re Davis*, 15 B.R. 118 (Bankr.C.D.Ill.1981) (redemption in installments allowable), *In re Hall*, 11 B.R. 3 (Bankr.W.D.Mo.1980) (redemption in installments allowable); *In re Carroll*, 7 B.R. (Bankr.D.Ariz.1981), *rev'd, Arizona Bank v. Carroll (In re Carroll)*, 11 B.R. 725 (9th Cir. BAP 1981).

bankruptcy default clause. The analytical ground of the debtor in these cases is two-fold: (i) Section 722 can be interpreted to allow redemption in installments; and, (ii) Alternatively, as a matter of equitable based bankruptcy policy (say, the further-ance of the debtor's fresh start, or some other meaningless phraseology), the courts should grant the debtor installment re-demption as a bankruptcy-based modifica-tion of the harsh and unfriendly state law requirement of redemption of the property by payment of the claim in full. These early cases, for the most part, clearly re-quire the proper use of a federal retention remedy if the debtor wishes to avoid state law foreclosure or the threat of state law foreclosure, and, we think, properly decline to legislate an equitable overlay onto debt-or/creditor relations in the post-bankrupt-cy world regarding state law redemption rights.

The final two "redemption cases" cited above—*Whatley*[43] and *Schweitzer*[44]—are noteworthy because they deal with debtors that are similar to the debtors found in

most of the subsequent § 521(2) cases, current on payments but in default pursu-ant to bankruptcy default clauses. The creditor in *Whatley*, BancOhio National Bank, had a stated policy of never allowing the reaffirmation of an installment con-tract. BancOhio sought abandonment of the fully encumbered asset from the es-tate. The debtor sought to compel a reaf-firmation of the debt or, alternatively, to label the contract executory, thereby inval-idating the bankruptcy default clause pur-suant to § 365(e).[45] The debtor's brief changed the reaffirmation issue to redemp-tion in installments. Citing *Stewart, Zim-merman, Miller*, and *Cruseturner*, the *Whatley* court had little trouble denying the debtors such a "redemption-reaffirma-tion" right.[46] The court relied upon the definition of "executory" espoused by Pro-fessor Vern Countryman, in deciding that BancOhio had insufficient performance due for the transaction to be termed "executo-ry."[47] The court then granted the debtor 10 days to redeem the vehicle by a lump-sum payment and noted that, otherwise, the property would be abandoned from the estate.[48]

\*\*\*

43. *In re Whatley*, 16 B.R. 394 (Bankr. N.D.Ohio 1982).

44. *Chrysler Credit Corp. v. Schweitzer (In re Schweitzer)*, 19 B.R. 860 (Bankr.E.D.N.Y. 1982).

45. § 365. Executory contracts and unexpired leases

\*\*\*

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking posses-sion by a trustee in a case under this title or a custodian before such commencement.

46. *Whatley*, 16 B.R. at 396.

47. We are not faced with a default clause. Therefore we need not deal with the argu-ment that § 365(e) precludes the enforceabili-ty of default clauses within debt and security agreement instruments. The argument is somewhat troubling, however, because of this court's concern that far too much weight is placed upon the definition of "executory," primarily within the "rejection" context. We have looked and found no cases that have dealt with the post-bankruptcy assertion **by a debtor** (as opposed to former debtor-in-pos-session or trustee) that the language of § 365(e)(1) should be interpreted to extend its protection against enforcement of *ipso facto* clauses to debtors who had no standing (in the case) to assume or reject. It is sufficient for our purposes to say that § 365(e)(1) is applicable to consumer debt and security agreements only if courts are willing to find such debt and security agreements to be exec-utory contracts subject to **all** of the provisions of § 365. We need not and do not say any such thing here.

The creditor in *Schweitzer* sought the "surrender" of its collateral, unless the debtor was willing to redeem (in lump-sum) or reaffirm the entire indebtedness. The debtor sought to cram-down the value of the collateral and redeem that amount in installments equal to his monthly contractual payment.[49] The *Schweitzer* court denied the request to redeem in installments, following the analysis of the previously discussed and cited courts.[50]

The court then moved to a more "fundamental question." Did the debtor, current on his contract payments, need to effect such a remedy, or could the debtor ignore his own filing and continue in possession of the collateral? Chrysler's first argument was that the presence of reaffirmation and redemption in the code raised a negative inference as to the right of the debtor to continued possession absent the exercise of one of these federal remedies. The court rejected this argument, reasoning that because the Code allows redemption and reaffirmation does not mean that the Code mandates, as a matter of federal law, that a debtor use one or the other to continue in possession post-bankruptcy.

Chrysler also suggested that the Court's denial of redemption in installments implicitly mandated the use of one of the two specified federal retention choices (redemption, by payment if full, or reaffirmation). To this argument the court responded in Butneresque fashion: "the rights and duties of the parties are to be determined, in the first instance, from their contract." The court continued:

> How much is owed; when is it due; who has the right to possession; what constitutes a default; how is it cured; what are the remedies? These are matters

which, with due regard for law and rule, presumably have been agreed upon by and between the parties. Accordingly, the threshold inquiry must be: to what have the parties agreed? Then if it has been determined that the debtor's rights and duties under the contract are properly inconsistent with his continued possession conditioned only on his unconsented to maintenance of the payment schedule, it would follow that the debtor, if he wishes to maintain such possession, must avail himself of an appropriate Code remedy exercised in the appropriate manner. However, if no provision of the contract properly gives the secured party the right to possession of the collateral or to change the contract payment schedule then, under the circumstances of the case, the debtor's continued possession by means of such payments is hardly a forced installment redemption, but rather is simply the contracted for performance.[51]

The court then moved forward to examine the efficacy of the bankruptcy default clause, within the context of a secured debt relationship, after bankruptcy. Noting several provisions relating to the abeyance of such clauses—§§ 363(c)(1), 365(b)(2), (c), and (f)(3), and 541(c)—the court held that there was no statutory authority for invalidating bankruptcy default clauses once "the asset is no longer part of the bankruptcy estate."[52] Although the court held that it was possible to refuse such a clause for equitable reasons, i.e., the debtor could not survive without the vehicle and the secured creditor unreasonable refused to reaffirm, the court found no such reason to do so in this case and directed the debtor to effectuate one of the code-

**48.** *Id.* at 397–98. Of course, § 722 requires that the property subject to redemption be either exempt or abandoned. In threatening the debtor with abandonment, therefore, the court shows its uncertainty about just how the redemption (and the abandonment) process works.

**49.** *Schweitzer*, 19 B.R. at 861.

**50.** *Id.* at 862–64.

**51.** *Id.* at 865.

**52.** *Id.* at 867.

based alternatives if they wished to avoid state law foreclosure.[53]

Closing out this string of "redemption cases" are two decisions that are well-known to students of § 521(2) jurisprudence—*GMAC v. Bell (In re Bell)* and *Riggs Nat'l. Bank of Washington, D.C. v. Perry (In re Perry).*[54] The debtors in both of these cases, as in *Schweitzer* and *Whatley*, were current on their payments but in default pursuant to bankruptcy default clauses. In both cases the debtors sought to redeem in installments, or in the alternative, for an order from the court directing that they be allowed to continue making monthly payments under their state law contracts, without reaffirmation (or redemption under § 722).

The Sixth Circuit in *Bell* dispatched the debtor's installment redemption argument, and denied the request.[55] More interesting for our purposes, the debtors also argued that because the property had been abandoned, the collateral had reverted back to the debtors, and that the debtors' right to keep possession (by maintaining payments) should be governed by the parties' state law contract (notwithstanding the bankruptcy default clause, the debtors characterized themselves as "current").

The court disagreed with the debtors, on the ground that the debtors' analysis of the effect of abandonment was incorrect and that bankruptcy law, in combination with the state law contract as issue, determined the debtors' rights in the collateral post-bankruptcy. According to the court, "it [had] been recognized" that the effect of abandonment was merely to allow the debtor more time to confect a redemption or reaffirmation. Cited for this "recogni-tion" is the following passage from *In re Cruseturner:*

> Accordingly, Section 362(a)(5) grants the debtor time to enforce rights in his property given him under Sections 722 and 524(c). The effect of Section 362(a)(5) is to provide the debtor with separate protection of his property. This enables him to exercise his right to redeem either by acquiring refinancing or by otherwise gathering the necessary funds, or to negotiate a reaffirmation. Unless earlier relief is requested by the creditor, the creditor may not repossess property, despite any abandonment by the trustee, until one of the three acts specified in Section 362(c)(2) occurs.... The application of Section 362 to exempt property and abandoned property is coextensive with the redemption right given in Section 722, for this right extends to exempt property as well as to non-exempt property which may be abandoned by the trustee. Likewise, the stay will cover property which may be the subject of reaffirmation agreements.[56]

We read the *Cruseturner* passage as a straightforward exposition of the interrelationship between stay relief and abandonment, setting out nothing more earth-shattering than that a debtor's interest in property (if any) is protected by the automatic stay until the automatic stay is lifted, either by court order (after motion) or operation of law—the occurrence the discharge (§ 362(c)(2)(C)) or the case closure (§ 362(c)(2)(A)). Abandonment of property from the estate does not, in and of itself (without discharge), grant the

---

53. *Id.* at 868. We disagree with the *Schweitzer* court's retention of the "equitable thumb" held over the creditor's head, as it represents the antithesis of the court's reasoning. In essence the *Schweitzer* court intimates the equitable authority to mandate reaffirmation "agreements" or to expand Code-based authority for equitable considerations. We see this portion of the opinion as a strong-arm threat to the creditor with no statutory underpinnings.

54. *GMAC v. Bell (In re Bell),* 700 F.2d 1053 (6th Cir.1983); *Riggs Nat'l. Bank of Washington, D.C. v. Perry,* 729 F.2d 982 (4th Cir.1984).

55. *In re Bell,* 700 F.2d 1053, 1056 (6th Cir. 1983).

56. *Id.* at 1057–58. *Quoting, In re Cruseturner,* 8 B.R. 581, 592 (Bankr.D.Utah 1981).

creditor the right to enforce a security interest. It also seems clear to us that the *Cruseturner* court had no quarrel with the notion that upon abandonment, the property reverts from the estate to the debtor. The debtors in *Cruseturner* sought authorization to redeem collateral in installments by paying the fair market value of the property. The court denied their request based solely on the redemption statute but clarified to the parties that the automatic stay continued in effect after the trustee's abandonment, allowing the debtor time to effect redemption or reaffirmation, i.e., the trustee's abandonment did not lift the stay. The *Cruseturner* court noted that "when the trustee abandons property, the property stands as if no bankruptcy had been filed and the debtor enjoys the same claim to it and interest in it as he held previous to the filing of the bankruptcy."[57] With this statement we are in general agreement, with a couple of qualifying observations. First, the court in *Cruseturner* did not deal with the fact or effect of a bankruptcy default clause in the security agreement; such a clause would have required the court to acknowledge that the return to pre-bankruptcy status was burdened by the fact of bankruptcy, to the extent that state law and a state court would enforce such a default mechanism. Second, we do not see the court as obviating the fact of discharge, as it expressly limits its remarks to "the property."

However, the *Bell* court does some interesting interpretative things. Rather than understanding abandonment as the mechanism by which property is jettisoned from the estate (back to the debtor), and the provisions of § 362 as the mechanism by which the debtor's interest in property is protected from abandon-

ment until discharge, we think the *Bell* court (misreading *Cruseturner*) decided that abandonment was the method of obtaining a "latency" or "figuring out" period, during which either redemption or reaffirmation could be confected.

This seems strange to us, but we think we are correct about what the court said. We remain uncertain as to what the court did (through this juncture of the opinion), but we try to capture it. The debtors want reversion back to state law rights (not really, we don't think, due to the bankruptcy default clause). The court declines this option because abandonment only provides a respite within which debtors can decide to redeem or reaffirm. Now, the trick part. What is *Bell* saying happens if the debtor does not redeem or reaffirm?

One of two things, it seems. Either that (i) the property continues to be owned by the estate; or (ii) the property has reverted to the debtors, but the former contract is preempted by the federal necessity of reaffirmation or redemption. We think this second alternative is closer to the answer. We think *Bell* takes the straightforward *Cruseturner* theory and, after a couple of turns, creates the following federal construct. Bankruptcy provides the automatic stay to protect one's right to redeem or reaffirm, and abandonment provides a grace period during which the debtor replaces the estate as owner, protected by the stay. This period represents the ultimate bankruptcy effect, for the debtor's interest in property during post-abandonment period, is not different from (in fact is synonymous with) the estate's interest pre-abandonment. The provisions

---

57. *In re Cruseturner*, 8 B.R. at 591. (Also citing Justice Cardozo from *Brown v. O'Keefe*, 300 U.S. 598, 57 S.Ct. 543, 81 L.Ed. 827 (1937): Whatever title or inchoate interest may have passed to the trustee was extinguished by relation as of the filing of the petition when the trustee informed the court that the shares were burdensome assets, and was directed by the court to abandon and disclaim them. In such case "the title stands as if no assignment had been made." A precise analogy is found in the law of gifts and legacies. Acceptance is presumed, but rejection leaves the title by relation as if the gift had not been made).

of the stay protect the debtor, who now has something to protect.

Before abandonment, recall, the debtor is protected by the stay, but, as regards the property subject to the lien (assuming it is non-exempt), who cares? The property is property of the estate, over which the debtor has no legal authority.[58] Seen in this light we can make some sense out of *Bell's* rather impractical bankruptcy world view. Creditors will not ask for stay relief; property will be abandoned before discharge, during which the debtor will be protected by the stay and owe no duty to the estate, regarding the property. During this time the debtor gets reacquainted with the property within the context of his new financial world—the world of the fresh start. Is the property as well-fitting with the debtor as the debtor remembers, or does the motor knock and air conditioner not work? What do the monthly bills look like now that the debtor is clear? Can money enough be obtained (family members, post-bankruptcy credit, etc.) to redeem? Is it worthwhile to explore reaffirmation? Meanwhile, the debtor owns and possesses the property protected as though the debtor was bankruptcy trustee of it. A good deal; according to *Bell*, the purpose of abandonment.[59]

But this doesn't answer the question of what happens if the debtor does not choose redemption or reaffirmation. We think *Bell* blows down the straw person it has constructed through its view of the function and purpose of abandonment. If abandonment functions to provide the grace period (by means of protection through the automatic stay) during which the debtor decides whether to choose to redeem or reaffirm, abandonment is the method of implementing these statutory alternatives. If the grace period to choose is what you get from abandonment, there are NO OTHER ALTERNATIVES if the specific alternatives are rejected. Within our linguistic context we would describe this process, or state of affairs, as the debtor's rights under the contract having been preempted by the redemption and reaffirmation alternatives implemented through the "grace" of abandonment. Now, we can say these words but cannot conceptualize the outcome. Does the debtor, then, have no rights? Does the creditor own the property (by operation of law)? If the creditor does not own the property, who does—the debtor? If the debtor owns the property, how has the debtor come to own the property? If the debtor has come to own the property because of the preexisting ownership interest, how so? Wouldn't it be through the mechanism of abandonment? If the debtor has come to own the property, how can we describe the creditor's rights? What interest does the creditor have? A security interest? Under what law can the creditor claim a security interest in the property owned by the debtor (who owns under state law)? Is it the same law that was the basis of the pre-bankruptcy security interest? If so, does state law say anything about the debtor's rights under their particular security interest? Does the debtor retain federal constitutional protec-

---

**58.** Of course, in the vast majority of the Chapter 7 cases, the debtor maintains practical authority over consumer property, even pre-abandonment.

**59.** We do not see why a creditor would not seek relief from stay, but we admit there is much confusion about a creditor's right to stay relief during this time period. That is not to say we are confused (we may not be right, but we are not confused), as we see no conflict between stay relief and redemption or between stay relief and reaffirmation. Why would a creditor want stay relief if the debtor could redeem? Maybe the debtor will not redeem. Why would a creditor want stay relief if the debtor could reaffirm? Same reason, only more so, given the debtor's right of recision. We see stay relief in the consumer case as hanging on whether there is equity in the property, nothing more (assuming a *prima facie* case of perfected security interest is established), because we do not see stay relief cutting off either the right to redeem or the prospect of reaffirmation (or avoidance under § 522, for that matter).

tion afforded owners of property such as those historically recognized? [60]

*Bell* doesn't know, because the *Bell* conclusion, that bankruptcy law specifically does not allow the debtor to retain state law contract rights, does not offer an answer to the question, "Then, what happens?"

However, *Bell*, in fact, sees this, and in that admitting it, understands that it has to figure a way out of its interpretative morass. Alternatively, says the court, the debtors are arguably no longer the "primary possessor" due to their default under the bankruptcy default clause (as, we guess, it would be interpreted under the state law applicable to the contract?). The logic here is that the debtors must be the "primary possessor" in order to "get back" their property through abandonment.

Further, a serious issue exists as to whether the debtors held the primary possessory interest in the Van upon abandonment. The security agreement authorized GMAC to immediately repossess the Van upon the filing of a bankruptcy petition (bankruptcy clause). While this bankruptcy clause was initially inoperative under § 11 U.S.C. 541(c)(1), and the Van had become property of the estate under § 11 U.S.C. 544 irrespective of such clause, the § 541(c) prohibition against such a bankruptcy clause has been held inoperable once the asset has been abandoned from the estate. Accordingly, the bankruptcy clause became effective upon abandonment, the debtors were in default of the security agreement and therefore no longer entitled to the primary possesso-

ry interest in the Van. Further, a discharge of the debtor's personal liability on the security agreement through bankruptcy constructively vitiated Paragraph 6 of the security agreement which provides that "buyer shall be liable for a deficiency." Negation of the creditor's right to seek personal liability precipitated a default so as to empower GMAC with the primary possessory right to the Van.[61]

What is the *Bell* court doing here? It looks like it is offering an extension of its improbable analysis of abandonment. However, something else may be going on. Remember the debtors? They had argued the entitlement to either redemption under § 722 in installments or, alternatively, the right to reversion to state law rights under the contract, **and an order of the bankruptcy court** directing that they be entitled to maintain payments notwithstanding a bankruptcy default clause. Did the debtors really want reversion to state law rights? Or, did the debtors want reversion to state law rights somehow modified by the fact of bankruptcy and the requested order? Probably the latter, through nobody seems to be discussing the state law issue.

If the default clauses referred to by the *Bell* court were effective under the applicable state law, the debtors did not want state law to control their rights post-discharge. The debtors then, were fudging. The actual request could have been described as a request for an order directing that as a consequence of bankruptcy, the debtors had obtained additional state

---

60. For example, *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313–314, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (pre-judgment replevin did not afford opportunity to be heard and therefore violated procedural due process); *Mennonite Board Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983).

61. *Id.* at 1058. We point out that "primary possessor" sounds like the person primarily

possessing, not the person with the greater right to primarily possess. But while we question the logic of this analysis, a subsequent change in the abandonment statute moots the issue. In 1984 section 554(c) was amended to specify that property abandoned due to case closure is abandoned to the debtor. Thus, under post–1984 law this "primary-possessor" argument, at least under the Bankruptcy Code, is nonexistent.

law rights through abandonment and discharge, and that the court could and should direct that the debtors retained all rights under the contracts plus the concomitant expansion of rights that resulted from the bankruptcy-caused limitation of the actionable events of default. Of course, what this means is that the creditor retains only the rights contained within the rewritten contract, and is now (for some reason) not entitled to rely upon the very state law rights upon which the debtors suggest that they themselves have the right to rely. *Bell* gets the ultimate answer right. These debtors obtain no additional rights post-bankruptcy because of the workings of the process through to discharge. However, the failure to see through the debtors' transparently phony position causes the reams of feeble reactionary argument and statutory interpretation contained within the opinion. The default clause is analyzed as a counterpart to the court's understanding of abandonment, with which the default clause acts to direct the property (we guess) to the creditor as "primary possessor."

What is going on here, an exposition of the federal common law of "primary possession?" Or, does abandonment somehow act to federalize state law to decide the question? Now, the court is analytically solid when in its description of the process by which a bankruptcy default clause is suspended at the inception of the case and comes out of suspense upon stay relief. However, with all the talk about abandonment and primary possessor rights as though the concepts are related, the court fails to see that it need only rule that there is no extra state law right afforded the debtors by their discharge, that does away with the bankruptcy default clause.

Once that step has been taken, no others need be. "Motion Denied," would have sufficed to send the parties back to state-law-land, where the default clauses pointed out by the court could be interpreted and (if enforceable) enforced, by the state courts.

What conceivably happened, however, is that the court, in denying extra rights than those expressly provided by state law under the contracts to the debtors (who chose not to utilize the federal alternatives), gave the creditor who chose to forego obtaining stay relief (one of the express federal remedies offered by the Code) extra rights that could not have been obtained if the creditor had gotten stay relief (and the right to enforce its security interest under state law in a state court, which would have generated a ruling on the bankruptcy default clause under state law). In other words, the debtors were asking that the court create an incentive for not choosing either redemption or reaffirmation, by adopting a federal rule of equity that preempts state law bankruptcy default clauses in security interests and promissory notes. All the court had to say, under *Butner* (and the Code), was "No." Not seeing this, the court went to the other extreme along the debtor/creditor spectrum, and provided the creditor, through the adoption of the federal rule of primary possession-hood, the perverse incentive **not** to obtain stay relief to utilize state law contract provisions as ground for enforcing the security interest. This is exactly what *Butner* tells us courts cannot do, because it is adding to the rights afforded under state law though there be no federal law so requiring, merely because of the happenstance of bankruptcy. This judicial fiat insures that the creditor who does nothing in a bankruptcy case is treated better than one who uses the bankruptcy procedural mechanisms (stay relief, as the court in *Butner* directed that Butner should have done) to obtain the use of state law rights of enforcement. Mr. Butner now gets his title to rents because of the filing of the bankruptcy case. This is wrong.

The creditor in *Perry*[62] also sought relief from the stay to enforce its bankruptcy

---

**62.** *Riggs Nat'l. Bank of Washington, D.C. v. Perry (In re Perry),* 729 F.2d 982 (4th Cir.

default clause in a mortgage contract, arguing, in effect, that the bankruptcy default clause primed the automatic stay, and precluded the estate or the debtor from exercising any authority or control over the property. The court denied relief, citing *Cruseturner* for the proposition that the bankruptcy default clause was invalid **during the pendency of the automatic stay.**

> An alternative theory of Riggs postulates that to maintain possession of the collateral, a Chapter 7 petitioner must either reaffirm ... or redeem the collateral.... Although another Federal Circuit Court [*Bell*] has concluded that a debtor may not retain possession of collateral after filing under Chapter 7 absent reaffirmation or lump-sum redemption ... we do not reach the issue of whether these provisions are mandatory or elective. Rather, we only observe that the section 362(a) stay continues to run until discharge is granted or denied, and that Perry has the option of exercising his right to reaffirm or redeem until the expiration of that stay.... [63]

The concurring opinion makes it clear that the holding only applied to the period of time in which the stay was effective, and that the creditor was free to pursue its state law remedy post-bankruptcy:

> One further thing needs mentioning. Our holding that the due on bankruptcy clause in the security agreement is not enforceable extends, of course, only to enforcement proceedings in bankruptcy and not as to its ultimate validity which will have to be determined under state law. The stay presently in force under § 362(a)(5) remains in force only "until the earliest of—(A) the time the case is closed; (B) the time the case is dismissed; and [obviously meaning or] (C) the time a discharge is granted or denied." At such time, then, the existing

stay will terminate and the bank will be left free to foreclose its lien.... In any proceedings which may result under Maryland law to foreclose the lien of the security instrument at issue in this case, the parties will be able to have determined the validity of the due on bankruptcy clause.[64] Remember *Butner*? Mr. Butner suggested that he have automatic entitlement to rents due to the fact of bankruptcy because of the impediment generated by the automatic stay. The creditor in *Perry*, reacting to the debtors' implausible request, seeks to take Mr. Butner's argument a step further. The argument is that the state law default clause provides an immediate ground for stay relief, without consideration of the debtors' right to § 722 redemption, the prospect of reaffirmation, or (if applicable, we think) the right to exemption and lien avoidance. Taken to its logical extent, the creditor's argument would entail the creditor prevailing over a trustee seeking to sell the property for the equity (if any), and would have the practical effect of overriding § 541(c)(1). The creditor is arguing that state law rights preempt the specific Bankruptcy Code provisions that intersect with the particular state law rights. This is an argument specifically done in by the court in *Butner*.

*Perry* is oft cited for the proposition that the debtor can retain collateral absent redemption or reaffirmation, and that bankruptcy default clauses are invalid as a matter of law.[65] But *Perry* holds, we think, only that a creditor is precluded by § 362 from acting upon a default while the stay is effective, and that the fact of a bankruptcy default clause is not, in and of itself, ground for obtaining relief from the automatic stay. Further, in light of our understanding of the scope of the holding in

1984).

63. *Id.* at 985–86.

64. *Id.* at 987–88.

65. *See, e.g., Lowry Fed. Credit Union v. West (In re West),* 882 F.2d at 1546, n. 5 (10th Cir.1989).

*Perry,* we think the opinion stands for the proposition that once the stay is terminated, the parties are left to sort out their rights to the collateral under their state law contracts according to state law, assuming no redemption, reaffirmation, or exemption and lien avoidance.

Thus, on the eve of the enactment of § 521(2), with possible exception of *Bell* (depending on how that case is viewed), the debtor either redeemed, reaffirmed, or operated pursuant to her state law contract. Debtors were not allowed to "federalize" their state law contract by remaining current, nor did debtors sacrifice any and all rights they possessed prior to bankruptcy if they did not exercise a federal remedy.

### (2) Our Analysis of the Three Interpretative Camps

Section 521(2), quoted above, became effective in 1988 and quickly became the "battleground" for disputes over collateral. The eight circuit opinions that have issued are evenly split between the "fourth alternative" and the "plain meaning" rules. The most recent § 521(2) decision rejects both the "fourth alternative" and "nihilist" camps for that of the "plain meaning." We move forward to examine the three theories beginning with the "fourth alternative."

### (a) The "Fourth Alternative" Camp

The first circuit opinion to issue on § 521(2) was *Lowry Federal Credit Union v. West (In re West).*[66] The Wests financed a vehicle through their federal credit union (Lowry). According to the terms of the financing agreement the Wests were required to stay current in their payments and to maintain insurance on the collateral—both of which they did. The financing agreement contained a default clause, operational when "something happens which significantly reduces the

credit union's ability to realize on any property you have given as collateral." According to the district court opinion the default clause also contained a bankruptcy default clause:

> Default—You will be in default if you do not make a payment of the amount required when it is due. You will be in default if you die, *file for bankruptcy,* or become insolvent, that is, unable to pay your obligations when they become due. You will be in default if your ability to pay what you owe or to perform your other obligations under this Plan is significantly reduced. You will also be in default if something happens which significantly reduces the credit union's ability to realize on any property you have given as security.[67]

Relying on the non-bankruptcy default clause, Lowry threatened foreclosure if the Wests did not reaffirm or redeem. The Wests sought declaratory and injunctive relief in the bankruptcy court. The bankruptcy court concluded that the debtors' discharge in bankruptcy did not create a default under the non-bankruptcy default clause and either ignored, forgot, or assumed invalid the bankruptcy default clause. Evidently the creditor relied on the loss of a possible deficiency judgment as the grounds for "something happening."[68] The district court affirmed along the same rationale.[69]

The Tenth Circuit began by examining what it considered the "mandatory" language of § 521(2)(A) and (B), stating that such an interpretation was obvious:

> To escape the mandatory language of the section, debtors argue the "if applicable" phrase gives a debtor some form of option. We are unpersuaded by that argument because it is inconsistent with the plain meaning of the statute. The words "if appropriate" are gratuitous and do not affect the mandatory duties

---

66. 882 F.2d 1543 (10th Cir.1989).

67. 101 B.R. 648 (D.Colo.1989) (emphasis added).

68. *Id.* at 650.

69. *Id.*

prescribed by the statute. The plain English of the section requires every debtor in possession of collateral to make an election whether to retain or relinquish that property. If the debtor decides to retain, the debtor is required to elect whether to redeem or reaffirm. The section also requires the choice be effected within 45 days no matter whether the decision is to retain or relinquish. No other meaning can be gained from the precise terms of the statute, and nothing suggests the debtor can simply elect to retain the property and ignore the other duties required by § 521(2).[70]

Thus, the Tenth Circuit is the first of several court to interpret § 521(2) as:

[T]he debtor shall file ... a statement of his intention with respect to the surrender or retention of such property, and, if applicable [to the surrender or retention of such property], specifying that the debtor intends to [exempt, redeem, or reaffirm the property].

But the court was more concerned with enforcement of these requirements, as section 521(2) did not bestow upon the creditor any remedy to ensure its enforcement (that power was granted upon the Chapter 7 trustee):[71] "In short, there is a gap between the trustee's duty to obtain compliance and the trustee's power to enforce that duty because Congress provided neither a penalty for a debtor's failure to comply with § 521(2) nor a specific remedy for a creditor as a consequence of such a failure."[72]

We find the next portion of the *West* decision so vexing that we quote the paragraph in full.

The next question is whether 11 U.S.C. § 521 must be read to limit a debtor's right to retain possession of collateral to redemption or reaffirmation. While a debtor may redeem property, subject to 11 U.S.C. § 722, or reaffirm a debt, subject to 11 U.S.C. § 524(c)(4), nothing within the Code makes either course exclusive. We, therefore, cannot conclude the bankruptcy court acted without jurisdiction in this case.[73]

Having previously thought that this step in the court's analysis was decided upon their "obvious reading" of § 521(A), we can only suppose that they arrive at this conclusion due to the lack of available remedy to enforce the requirements of § 521(B).

The court ruled that the discharge did not violate the non-bankruptcy default clause. The court was careful to point out that it was not invalidating *ipso facto* clauses, only ruling that this one was not in default. The court concluded by affirming the lower court's injunction and declaratory judgment that the debtors could retain possession of their vehicle so long as they were not in default.

In sum, although we regard as mandatory the provisions of Code § 521(b), we do not believe those provisions make redemption or reaffirmation the exclusive means by which a bankruptcy court can allow a debtor to retain secured property. When the state of the evidence indicates neither the debtor nor the creditor would be prejudiced, a bankruptcy court may allow retention conditioned upon performance of the duties of the security agreement as a condition of retention.[74]

How this can be justified in light of the obvious bankruptcy default clause we are not sure. In ignoring, or invalidating, the obvious *ipso facto* clause, the *West* court mutates the *Perry* decision and creates exactly the type of federal "rule of equity"—a "fourth alternative"—prohibited by *Butner*. The debtor receives new "equita-

---

70. *West*, 882 F.2d at 1545, n. 2.

71. "The trustee shall ... ensure that the debtor shall perform his intention as specified in section 521(2)(B) of this title," 11 U.S.C. § 704(3).

72. *West*, 882 F.2d at 1546.

73. *Id.* at 1546.

74. *Id.* at 1547.

ble rights" and the creditor loses prior contractual rights.

The debtors in *Home Owners Funding Corp. of Am. v. Belanger (In re Belanger)*[75] filed a Statement of Intention indicating that they wished to retain their mobile home but did not indicate a method of retention. The Belangers were current on their payments and no bankruptcy default clause was introduced at trial.[76] The mortgage company sought to compel the Belangers' reaffirmation, redemption, or surrender. Both the bankruptcy[77] and district[78] courts ruled in favor of the Belangers.

The Fourth Circuit began its analysis by criticizing an earlier decision—*In re Edwards*[79]—for its reliance on *Bell*, which the Fourth Circuit considered to be in conflict with its pre- § 521(2) *Perry* decision. The *Edwards* court interprets *Bell* as holding that a debtor may not redeem in installments **and** that a bankruptcy default clause defeats the debtor's possessory interest (in favor of a possessing—or repossessing—interest on the part of the creditor). According to the *Belanger* court, the Fourth Circuit had previously held, in *Perry*, that "default-on-filing clause[s]" are unenforceable so long as the automatic stay is pending. Therefore, the court concludes that *Edwards*, because it relies upon precedent that is in conflict with Fourth Circuit precedent, cannot be followed in the Fourth Circuit. Because the stay remains in effect until lifted, either by operation of law or court order, even if abandonment has been ordered, *Perry* conflicts with *Bell*.

The court secondly suggests that the interpretation by the *Edwards* court of § 521(2)(A) renders "if applicable" superfluous. The court argues that if the statute is rewritten by deleting the "if applicable" language (i.e. "the debtor shall file . . . a statement of his intention with respect to the retention or surrender of such property, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property"), it is apparent that no meaning is attributed to "if applicable" by the *Edwards* court.[80]

> Collier's interpretation of § 521(2)(A) complies with the canon that courts should give effect, if possible, to every word in a statute. The phrase "if applicable" is redundant if, contrary to Collier and the district court, the options given to the debtor are considered to be exclusive. If this were so, § 521(2)(A) would have simply provided: "and specifying that such property is claimed as exempt, that the debtor intends to redeem such, or that the debtor intends to reaffirm debts secured by such property." The fact that the statutory options are stated in the disjunctive shows that the words "if applicable" are unnecessary under a construction of the statute that makes the options exclusive. But if the phrase "if applicable" is given effect, it plays an important role. As Collier points out, the debtor must specify a choice of the options if applicable. But if these options are not applicable, the debtor need not specify them.[81]

As pointed out in our discussion of *West*, the *West* court characterizes the "if appli-

---

**75.** 962 F.2d 345 (4th Cir.1992).

**76.** *Belanger*, 118 B.R. at 369, n. 1.

**77.** *Belanger*, 118 B.R. 368 (Bankr.E.D.N.C. 1990).

**78.** *Belanger*, 128 B.R. 142 (E.D.N.C.1990).

**79.** *In Matter of Edwards*, 901 F.2d 1383 (7th Cir.1990) (first "plain meaning" case, precur-

sor to *Taylor* and *Johnson* ): *see, infra,* "Plain Meaning" cases.

**80.** We mention that the criticism of the *Belanger* criticism of the *Edwards* plain meaning reading of § 521(2)(A) applies equally to the reading of the statute by the *West* court, which is ultimately in agreement with *Belanger*.

**81.** *Belanger*, 962 F.2d at 348.

cable" phrase as "gratuitous," but is not bothered by this conclusion (probably because it knew that in only a few paragraphs it was going to render the entire statute gratuitous). The *Belanger* court's interpretation of § 521(2)(A) breaks the statute down to read:

> [T]he debtor shall file . . . a statement of his intention with respect to the surrender or retention of such property, and, if [exemption, redemption or reaffirmation are] applicable, specifying that the debtor intends to [exempt, redeem, or reaffirm the property].

Most courts interpret *Belanger* as the classic "fourth alternative" decision, allowing retention of collateral post-bankruptcy so long as the debtor is current. This result suffers from the same "federal rule of equity" as is found in *West*.[82]

In *Capital Communications Fed. Credit Union v. Boodrow (In re Boodrow)*,[83] the debtor's credit union sought stay relief because the debtor had not performed his stated intention (reaffirmation). The debtor was disabled but his disability insurance was paying the vehicle note. The bankruptcy court adopted the statutory interpretation of *In re Belanger*, and refused to attribute an "injury in fact" to the debtor's failure to reaffirm for the purposes of § 362.[84] The bankruptcy judge carefully limited his ruling, by means of the final paragraph, by pointing out the short duration of the stay and that the creditor was free to seek enforcement of his bankruptcy default clause once the protection of the stay was gone:

> In any event, a secured creditor's substantive rights are not prejudiced by

continuance of the stay in a Chapter 7 case. Although a secured creditor may not repossess collateral absent an order terminating the stay under Code § 362(d), the stay (as it applies to property of the estate) terminates by operation of law upon the closing of the Chapter 7 case or sooner if the property is affirmatively abandoned by the trustee. Nationally, the average time between the commencement of a Chapter 7 case and its closing (see Code § 350(a)) is 4.8 months. During the pendency of the stay the secured creditor is entitled to receive proof of adequate insurance and timely payments required under the loan documents. Upon closing of the case or abandonment of the collateral the stay terminates and the secured creditor's substantive in rem rights remain intact. Therefore even where there has been no prejudice to the secured creditor shown, the stay will terminate, at the latest, on the average of 4.8 months later when the case is closed.[4] Thus, while the filing of a Chapter 7 petition may be an event of default under the prepetition loan documents, a "technical" default does not constitute "cause" under Code § 362(d)(1) warranting termination of the stay. In the instant case no other grounds exist justifying termination of the stay in view of the fact that Capital concedes that, as of the petition date, it enjoyed a ten percent equity cushion, that is, the value of the vehicle exceeded the debt to Capital secured thereby. Accordingly, Capital's interest in the ve-

---

**82.** We point out, however, that *Belanger* can also be interpreted in light of *Perry*. Assuming that the *Belanger* court is correctly interpreting its own circuit law, *Belanger* may hold that the debtor may, while the stay is pending, retain collateral so long as they are not in default. Once the stay is lifted, bankruptcy default clauses are no longer stayed and the debtor would be free to foreclose upon their collateral absent redemption or prior reaffirmation. While there is room for argument that the *Belanger* court would have "permanently" invalidated a bankruptcy default clause had there been one present (there was not), the *Perry* decision is inconsistent with such a prospect. This is, however, granting the *Belanger* court a benefit of the doubt that no subsequent appellate court has granted.

**83.** 126 F.3d 43 (2nd Cir.1997).

**84.** *In re Boodrow*, 192 B.R. 57 (Bankr. N.D.N.Y.1995).

hicle is adequately protected pursuant to Code § 362(d)(1).

---

4. However the court is unaware of a single reported New York state court decision in which a secured creditor has successfully sought to replevin an automobile securing a debt based upon a debtor's prior bankruptcy filing as the sole and exclusive event of default under the prepetition loan documents.[85]

On appeal the credit union argued that non-compliance with § 521(2) was cause to lift the stay. The debtor argued that he could retain and pay according to the underlying contract and that the credit union alleged no affirmative harm to justify lifting the stay.[86]

Noting the varying resolution of the "if applicable" language, the *Boodrow* court found the statute to be ambiguous. Resorting to the legislative history, the court found § 521(2) to be a notice provision, and, in light of the policy concerns underlying the debtors "fresh start," held that the debtor was not limited to the three alternatives stated in the statute.[87] We pause to point out the vagueness, even vapidness, of the oft-mentioned "policy considerations underlying the debtors' fresh start." What are they? What, even, does the statement mean? We have a Code. The Code provides for a discharge. The Code provides the effect of a discharge. Why are courts so willing to muse about the "policy concerns" underlying the debtor's fresh start? Aren't the "policy concerns" (whatever that means) subsumed by, contained within, and reflected by the statute? Meaningless phrases. Meaningless phrases.

The Second Circuit seems to depart from the limited holding of the bankruptcy court, defining the "remedy" judicially fashioned in terms of "reinstatement" which the court defines as follows:

To qualify for reinstatement, debtors cannot be in default, except for technical defaults such as bankruptcy default clause defaults, and must pay the entire debt in accordance with the contract. This right is called reinstatement because it prevents foreclosure and reinstates the contract.[88]

Now, let us break this down. Despite our search, we have found no reference to a right of reinstatement (or, and you can even say this with a western movie twang while looking out toward a glorious sunset, a "right-called reinstatement"), within the Bankruptcy Code. Nor have we found any within the legislative history to which courts such as those in the *Boodrow* claim are so quick to resort. The court, in fact, manufactures a "remedy" in the form of a newly vested "right." Because there is no such thing as a right to reinstatement to be found in the Code, such a judicially-created right must have a definition. So, the redactor of the right makes up the definition, which, once made up, gives substance to the right (the right must exist because it has a definition). Of course, what is a right, even if defined, without a proper name? So (it must be Tuesday), sayeth the court, "The right is called 'reinstatement'." The name is a good name because of the good work it does—"it prevents foreclosure and reinstates the contract."

What could be more offensive to the *Butner* directive? This federal court, operating rogue-like outside the statutory realm, posits as the basis for this flagrantly legislative act the "undefined consideration of equity" only described as policy considerations underlying the debtors' fresh start. Upon this unarticulated equitable consideration (or concern), we have a federally created rule of equity that is given flesh, bones, a name, a function and

---

85. *Id.* at 60.

86. *In re Boodrow*, 126 F.3d at 47–8.

87. *Id.* at 50.

88. *See, id.* at 49; *citing* Joann Henderson, *The Gaglia–Lowry Brief: A Quantum Leap from Strip Down to Chapter 7*, 8 BANKR.DEV J. 131, 137 (1991).

a broad-ranging (post-bankruptcy) effect. The federal rule is the right of reinstatement that operates (any only operates) outside the realm of the bankruptcy estate and case.

Now, as might be obvious, we have a couple of concerns about *Boodrow*. First, does the debtor who is "only" in technical default have a right of reinstatement if there is equity in the property available for the estate?

Second. By the way, what is "only a technical default"? Is the requirement to maintain insurance at all times, covering the creditor's interest a technical obligation? Where would one look to do research on the federal law of technical default as that term applies to state law contracts?

Third. Suppose the creditor determines, after the bankruptcy case is closed (property is abandoned, etc.) that there has been a default that is not a "technical" one. How does the debtor answer the state law lawsuit by which the creditor seeks to enforce the security interest? (i) with a notice of removal because there is federal question jurisdiction due to the federal right of reinstatement? (ii) with a notice of removal because there is bankruptcy court jurisdiction due to the bankruptcy-related federal right of reinstatement so that this is actually a claim arising under the Bankruptcy Code? (iii) with an injunction complaint in bankruptcy court because of the jurisdiction vested by the federal rule of reinstatement? (iv) with a pleading in state court suggesting that the creditor's lien claim has been modified by the federal rule of reinstatement and that the action must be determined by the state court under the federal laws of reinstatement and technical default?

Fourth. We are not fans of the Supreme Court's *Dewsnup* opinion,[89] but how can the underlying premise of *Dewsnup*, which we articulate as something like liens upon property not affirmatively administered in

a Chapter 7 case pass through bankruptcy unaffected, be maintained by the *Boodrow* court. The *Dewsnup* court forbade the use of what we think is a rather obvious Bankruptcy Code provision for the purpose of affording a debtor (as opposed to the estate) relief from the state law effects of a lien. Why? Because the Bankruptcy Code should not be interpreted to allow the modification of a state law lien due to strong policy that favors liens passing through bankruptcy unaffected. We think *Boodrow*, which manufactures the right of reinstatement modification of (or affect over) the creditor's lien rights contravenes not only the *Butner* directive, but also the (more specific to lien rights) directive of *Dewsnup*.

Fifth. Does the debtor even need the protection afforded by the fashioning of the federal rule of equity? Arguably not. What about a Chapter 13 case? We must assume the *Boodrow* debtor would have qualified for Chapter 13 (we have few facts on this), but we allow ourselves this assumption. Would Chapter 13 have allowed the *Boodrow* debtor to do what he wanted to do (have the note paid according to its terms by the disability policy while he keeps the car)? YES. Does Chapter 13 act to deprive this debtor of a discharge? NO. Does Chapter 13 impose upon this debtor obligations more onerous than Chapter 7? Let us assume "yes," that the debtor has a source of income that would require higher repayment to unsecured debt than would occur through Chapter 7. It seems likely that the *Boodrow* debtor seeks Chapter 7 because of the hope that the car creditor will be paid by the disability policy, and that any post-petition income will be the debtors', not subject to the scrutiny of the trustee. This is the only reasonable conclusion to draw, because if the debtor only receives enough to live on, there would be no required payments to unsecured creditors because there would be no disposable income (unless there is a liquidation value, but the liquidation value

---

**89.** *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

presumably goes to the creditors in Chapter 7). We are well aware of the prohibition against involuntary Chapter 13 cases. But does this prohibition mean that there are no adverse consequences that befall a debtor who chooses Chapter 7 relief over Chapter 13? NO. The *Boodrow* court is in fact creating this federal rule of equity to provide a Chapter 7 debtor (who chose Chapter 7 relief over Chapter 13) with the same right to retain the vehicle while payments are made by the insurance as would have been available under Chapter 13 of the Code. The right of reinstatement, then, is fashioned by the court, in fact, as a reward for choosing Chapter 7 over Chapter 13, wherein, had it been chosen, the very relief fashioned, is available.[90] We think this act to be indefensible.

The fourth alternative camp develops this alternative from rather disparate strands of analysis. Section 521(2)(A) is plainly read to require a particular choice among the alternatives set forth, if the debtor elects to retain, but these choices are not exclusive, due to the court's power to authorize a rule of retention. (*West*). Section 521(2)(A) is plainly read to require the choice of one of the three alternatives, if the debtor seeks to retain the property, only if (by the choice itself) one of the three choices is applicable; the three alternatives are to be seen as partners of a fourth federal rule allowing retention by maintaining payments (*Belanger*). Section 521(2)(A) is ambiguous, is nothing but a notice provision, and because of policy considerations (yet not comprehended by the author of this opinion) is to be seen as (only) mentioning three (non-exclusive) alternative means of retention of property, but, also, establishes the basis for the extra statutory fashioning of the federal rule of the right of retention (*Boodrow*).

Were we cruelly objective we would suggest that the development of a federal rule of retention (or right of reinstatement) from three mutually exclusive analytical grounds establishes the emptiness of the exercise and shows that the federal rule has been promulgated upon nothing more than the fact that the authors of the opinions could write words on paper. We prefer to put it another way. Regardless of the approach to statutory construction, the fourth alternative courts in no way rely upon statutory authority for the right of retention. Vague policy considerations, undefined equitable considerations, yes. Statutory authority, no.

The debtor in the final "fourth alternative" case, *McClellan Federal Credit Union v. Parker*,[91] applied to the bankruptcy court for its approval of his proposed reaffirmation agreement. Noting that the debtor was current in payments under his contract, the bankruptcy court refused to ratify the reaffirmation, finding that the agreement was not in the debtor's best interests because of the fourth alternative right to retain the property and continue making payments on the loan after discharge. The credit union promptly appealed to the Ninth Circuit BAP who declined the appeal finding that there was no standing. The Ninth Circuit found that there was standing and examined the merits.[92]

The Ninth Circuit began its analysis by examining the jurisprudential camps. The court recognized the "nihilist" approach used by its own BAP in the case, *In re Mayton*, but considered the language of § 521(2)(A) to be susceptible to a "plain reading":

> Our interpretation of that language is that the only mandatory act is the filing

---

**90.** We will here briefly point out that such an incentive seems to contravene a rather widely seen codal incentive *in favor of Chapter 13* that is so generally recognized that we do not deem citation necessary. We mention, however, the expanded discharge of § 1328 as one of the specific reflections of the Congres-

sional intention to favor Chapter 13 by providing positive incentive.

**91.** 139 F.3d 668 (9th Cir.1998).

**92.** *Id.* at 669–70.

of the statement of intention, which the debtor "shall" file. Then, "if applicable,"—that is, if the debtor plans to choose any of the three options listed later in the statute (claiming the property as exempt, redeeming the property, or reaffirming the debt)—the debtor *must so specify in the statement of intention.* The debtor's other options remain available, as unambiguously stated in § 521(2)(C): "[N]othing in subparagraph [ ](A) . . . shall alter the debtor's or the trustee's rights with regard to such property under this title." [93]

Thus, the *Parker* court finds that the "plain meaning" of § 521(2)(A), and the protections afforded the debtor by § 521(2)(C), allow the debtors the federal right to retain their vehicle so long as they continue to make their contractual payments. In addition to those previously noted conceptual difficulties we have with the "fourth alternative" cases, we point out that this court misconstrues the "nihilist"-based opinion of its BAP—*In re Mayton.* According to the Ninth Circuit "[r]elying on subparagraph (C) the BAP [in *Mayton* ] thus reached the same result as the Second, Fourth, and Tenth Circuits." Although we realize that we have not yet discussed the "nihilist" camp cases,[94] the approach has little in common, and is highly critical of, the "fourth alternative." Under the "fourth alternative's" "right of reinstatement" the creditor is not afforded the opportunity of state law foreclosure unless the debtor fall behind on payments. Under the "nihilist" theory, the parties are left to their state law rights after bankruptcy, but are not granted a federal right of reinstatement. It is easy to deduce from the refusal to ratify the reaffirmation agreement that *Parker* joins in the promulgation of the "reinstatement" rule of equity; otherwise it would have been necessary for the court to satisfy itself that the contract was not in default (no bankruptcy default clause, no cross-collateralization clause with the unsecured debt), or refuse to allow the reaffirmation for other grounds.

We mention the *Parker* case not for its analytical content, but because it was decided. No other discussion appears, to us, warranted.

### (b) The Plain Meaning Camp

The Seventh Circuit decision, *In Matter of Edwards,* dealt with a debtor who was current on her vehicle note during the bankruptcy case, evidenced an intention to reaffirm, but failed to execute a reaffirmation agreement before expiration of the time for performance under § 521(2)(B). The trustee filed a "no asset report" "and abandoned the secured collateral from the bankruptcy estate." [95] Subsequently, Ms. Edwards amended the statement of intentions to suggest the intention to retain the collateral without reaffirmation. The lienholder sought to compel the performance of her intention, as originally stated (to reaffirm). The bankruptcy and district courts refused to compel the reaffirmation, but ordered the debtor either to reaffirm or surrender the vehicle. Ms. Edwards appealed, contending that the three options delineated in § 521(2)(A), redemption, reaffirmation, or exemption and lien avoidance, were not the exclusive means of retention and that she could "reinstate" the loan by continuing her timely payments.[96]

By way of introduction, the court offers its interpretation of § 521(2). The statute . . . directs a debtor to file a statement of intention of his or her plans for keeping or relinquishing property abandoned from the estate or exempted from discharge. The Bankruptcy Code provides a debtor with three clear options in this regard. First, a debtor may choose to surrender the collateral to the

---

93. *Id.* at 673.

94. *See infra,* p. 48.

95. *Edwards,* 901 F.2d at 1384.

96. *Id.*

creditor. If a debtor goes this route, the amount by which the debtor's obligations exceed the value of the collateral, if any, will be discharged. If, on the other hand, a debtor chooses to retain possession of secured collateral, he or she may choose to reaffirm the debt and enter into a new agreement with the creditor for repayment, 11 U.S.C. § 524(c), or the debtor may redeem the collateral by paying the creditor the amount of the secured claim or the fair market value of the collateral, whichever is less, 11 U.S.C. § 722.[97]

This explanation of both the bankruptcy process and § 521(2) sets up and informs our interpretation of what the court is getting at in posing the question it sees itself facing.

The question presented by this case is whether a debtor who files for relief under Chapter 7 ... must make the choice provided in § 521. Must the debtor, as a condition of retaining the property which secures an installment loan, either redeem it by paying for it lump-sum or expressly reaffirm the debt underlying the collateral—even though the debtor has performed, and continues to perform, all of the obligations of the installment loan?[98]

The court points out that the case relied upon by the debtor—*In re Perry*—does not decide the issue of whether a debtor can retain property after the stay has been lifted or after discharge. *Perry*, says the court, only holds that bankruptcy default clauses are ineffective until the stay is lifted,[99] and does not address whether § 521(2) is exclusive (and mandatory) regarding property that has been abandoned (or "excepted from discharge"). Relying upon *In re Bell* and the text of § 521(2),

the court concludes that the requirements of § 521(2) are mandatory and exclusive, and that a debtor who wishes to retain property after it has been abandoned must either redeem or reaffirm the debt.

In answer to this question, the Sixth Circuit has held that a debtor who wishes to retain secured property must redeem or reaffirm, and that redemption cannot be accomplished through installment payments. We think this conclusion is correct. The language of § 521 is mandatory ("The debtor shall ..."). Moreover, the statute clearly contemplates performance—within a specified period of time—of the alternatives outlined by it. ("The debtor shall ... perform his intention ...").[100]

Thus, the Seventh Circuit finds that the debtor is limited to surrendering, reaffirming, redeeming, (or exempting) property subject to § 521(2). "Absent reaffirmation [or redemption, or exemption/avoidance] and after discharge in bankruptcy, ... Edwards would no longer be personally liable in case of default. The creditor's only recourse in such a case would be to seek repossession of the collateral."[101] Recall that § 521(2) was promulgated after the *Bell* decision. The *Edwards* court (unnecessarily, it seems, since it sees the statute as unambiguous) draws analytic solace from this fact, deriving a basic "slant" from the legislation on how the issue before it should be viewed.

The 1984 Consumer Finance Amendments to the Bankruptcy Code were intended, *inter alia*, to protect creditors from the risks of quickly depreciating assets and to keep credit costs from escalating because of the **too-ready availability of discharge** .... This leg-

---

97. *Id.* at 1385 (footnote omitted). Anticipating our discussion of "surrender," we note that the *Edwards* court misconstrues the word. Because the choice of surrender involves property of the estate, the debtor who chooses "surrender" cannot "surrender the collateral to the creditor," but chooses to surrender the property to the trustee.

98. *Id.* (footnote omitted).

99. *Id.* at 1385–86, n. 7.

100. *Id.* at 1386.

101. *Id.* at 1384, n. 3.

islative purpose speaks strongly against permitting debtors to improve their position dramatically against secured creditors by relieving them of personal liability. When a debtor is relieved of personal liability on loans secured by collateral, the debtor has little or no incentive to insure or maintain the property in which a creditor retains a security interest. The value of the collateral may fall below the level of the loan, leaving the creditor undersecured and driving up future costs of credit.[102]

(emphasis added).

Does the Seventh Circuit interpret § 521(2) to preempt state law on the question of whether, post-abandonment, the parties remain bound by the contracts and law applicable thereto? As we see it, yes. In a footnote, the court diverges from *Bell* on an important matter. "*Bell* also holds 'default-upon-filing' clauses to be enforceable against property that has been abandoned from a debtor's estate. This additional holding has no bearing on our analysis as we are in no way predicating our conclusions on the enforceability of 'default-upon-filing' clauses."[103]

The court is not predicating its conclusion on the enforceability of default clauses because such clauses are rendered irrelevant by its analysis (it thinks). The irrelevance is grounded in the "exclusive" federal methods of retaining collateral after abandonment which, for policy reasons believes the court, necessitate the federalization of "surrender" to strip from the parties' state law contracts the state law content.

It is clear that *Edwards* does away with state law as a residual bundle of rights to which the parties return post-abandonment if none of the federal retention mechanisms are chosen. It is also clear to us that the statute, itself, does not compel such a result. Why, then, does the Seventh Circuit end up where it does, enacting

a federal rule preemption of state law where there is no conflict? One word— POLICY.

The policy considerations driving the Seventh Circuit emanate from the polar opposite end of the political spectrum as those driving the fourth alternative courts. The fourth alternative courts construct debtor-friendly equitable considerations to preempt state law rights to the detriment of **creditors'** state law rights; the Seventh Circuit provides equitable solace to the downtrodden and put-upon creditors, which requires construction of equitable considerations denuding the **debtor's** state law contract rights. Two questions. (1) How convincing is the Seventh Circuit's version of rule promulgation upon equitable considerations? (2) How, even if the court could do what it says it is doing, would what it says it is doing work? We attempt to answer.

First of all, the court is startlingly (and almost embarrassingly) unconvincing. The "id" part of the analysis breaks through to reveal what is really going on. We see the court chagrined at the thought of the debtor improving its position "dramatically" against the secured creditors; we see the court offering its reactive aversion to the statutory construct (promulgated by Congress, the body with authority to pass laws) as the basis for its understanding of Congressional intent—Congress intended "to protect creditors from the risks of quickly depreciating assets and to keep credit costs from escalating because of the too-ready availability of discharge."[104] Let us stop here a moment. Is stripping off state law rights a mechanism necessary to insure that a debtor's position is not "dramatically" improved? No. What about the too-ready availability of discharge? Let's see. Congress promulgates the Bankruptcy Code which contains the discharge and law relevant thereto (including

102. *Id.* at 1386 (footnote omitted).

103. *Id.* at 1386, n. 8.

104. *Id.* at 1386.

who can get one and how). Is it reasonable to believe that Congress needed to protect its law from the effect of its law? Why did Congress not merely change the too-ready availability of discharge to a "not-so-ready availability of discharge" if there was a social problem caused by the legal fabric?

The short answer is that the complaint about the "too-ready availability of discharge" is a social complaint from the judicial branch, that has no place in an opinion purporting to decide a case or controversy. Further evidence of the social/political basis of the court's opinion is the pseudo-scientific/economic analysis that underlies the political viewpoint. Social horrors occasioned by discharge include: (1) "the debtor has little or no incentive to insure or maintain the property on which the creditor maintains a security interest"; and (2) "the value of the collateral may fall below the level of the loan, leaving the creditor unsecured and driving up the future costs of credit."

We question whether the court had evidence supporting the fact of this double feature horror movie, or whether the court simply knows these things. If there was evidence, it is not mentioned, and if the court just "knows" these things, we offer a couple of observations. First, why couldn't the credit/security agreement contain a bankruptcy default clause and, as well, a requirement that insurance be maintained (which would give rise to an additional event of default)? Or did they? Second, is it not possible (probable) that the loan (we are in bankruptcy here, and the property has been abandoned) is already greater than the value of the collateral so that the state law state of affairs (pre-bankruptcy) was such that the collateral value

would not cover the debt? [105] Third, are not all creditors who face an undersecured situation facing the prospect, that after foreclosure (under state law) and obtaining a consequential deficiency judgment (including foreclosure costs, attorney's fees, etc.), the debtor will seek discharge of this personal liability? If we can be so bold as to venture into the realm of offering (crackpot) economic analysis, shouldn't the general cost of credit have built into it the fact of the bankruptcy law, and doesn't the particular credit agreement have built into it the risks of default (as can best be gotten at through the information obtained at the time of making the loan)? If so, then the driving up of the cost of credit is already done, the risks already factored in.[106] Again, though, the real problem facing the Seventh Circuit (as it is with the fourth alternative courts), along with the statutory language which actually obviates the possibility that the court is correct, is *Butner*.

The non-statutory policy "analysis" is in actuality an attempt to insure the necessity of fashioning an equitable rule upon a set of "policy considerations," that while different from those used by the fourth alternative courts, are just as unnecessary and wrong. Regarding the fourth alternative argument put forth by the debtor, the court can "just say no." (There is nothing in § 521(2) that offers the "right of reinstatement.") To both parties the court could have said that because the property has been abandoned (and presumably discharge has been entered), the parties are left to state law rights, to be determined without the interference of the bankruptcy court (or any federal court without an independent basis of jurisdiction). *Butner* would be complied with. Neither party is

---

**105.** If the Seventh Circuit can do it, so can we (i.e. "just know things"). We think most lenders on consumer items are undersecured at the commencement of the case, which seems to us to provide all the more reason for creditors either to utilize the bankruptcy process (trustee disposition, etc.), to make sure the security agreement has a default clause,

or to file a claim for any unsecured deficiency if there be assets.

**106.** We recognize the superficial allure of the suspicion that those (of us) who pay our debts underwrite those who don't, but we have never bitten at the bait, finding the suggestion much more superficial than alluring.

hurt (recall that the creditor continued to accept payments after the bankruptcy case had been filed. Was this necessary? We think not.). The creditor has suffered, necessarily, only the delay to stay relief hearing, and possibly the wait until discharge and case closing, without prejudice to the right of requiring adequate protection (never seen in the Chapter 7 arena that we are aware of) or emergency relief if the collateral interest is clearly in danger (we do this all the time). The "considerations" offered by the Seventh Circuit are those emanating from its political and social perspective. But they are undefined (and probably do not rise to the level of equitable in nature), and therefore cannot, under *Butner*, stand as the basis for the promulgation of an equitable rule that state law rights must be eviscerated post-bankruptcy.[107]

Finally, how does the thing the court has done actually work? Say the debtor chooses reaffirmation, but within the recission period rescinds the agreement? What happens then? Suppose the debtor chooses "surrender," files the statement and the case is closed? What, in fact, happens? What, in fact, happens? What, in fact, happens? While we are at this, let's make it a bit more complicated. The debtor keeps paying and the creditor keeps accepting the amount due under the note, in the face of the "surrender" choice. Has there been an act translative of title, from the debtor to the creditor arising from the surrender choice? If so, under what law (the federal bankruptcy law title transfer statutes? If so, where are they, please?)? Is it necessary for the creditor to make a claim in a court? If so, which one? And, what is the claim that is made? Does the debtor retain any interest in the property (that has been abandoned back to the debtor), and, if so, under what law? Or, has the debtor lost all interest (and, if so, what does the abandonment statute mean) so that the debtor is, post-abandonment, a thief? If the debtor has no interest in the property, can the creditor go to state court and ask for an injunction to compel the give-back of the creditor's property? What is the law of the give-back (or, put another way, how does one research the state "give-back" law)?

Is the debtor is responsible for delivering the property to the creditor? By the way, does the debtor, whose name is on the automobile title (but who loses all interest in it) have an insurable interest in the property? Maybe all of these questions can be side-stepped by implying within the federal statute an obligation to turn over (deliver) the cars, VCR's, stereos, boats, furniture, in each and every case where there is "surrender," to the office of the Chapter 7 trustee so that the Chapter 7 trustee (who is closing, nationwide, and average of 98% of Chapter 7 cases without administering one stitch of property) can deliver it to each and every creditor holding collateral. Oh, by the way, does the trustee in this situation bear the risk of loss, so that the trustee is responsible for any damage to the (823) cars parked in the trustee's parking lot (what if the trustee has no parking lot)?

It is getting pretty ridiculous here, but not, we think, because of our analysis. Clearly, trustees would revolt at the prospect of being the middle persons in this scrum.

So, let's analyze the inner-workings of the debtor being liable for the delivery as a result of the federalized evisceration of state law contract rights. Same questions: (1) does the debtor deliver? (2) does the debtor bear the risk of loss? (3) What of the costs associated with transport, say, of a several-ton air conditioning unit—does the debtor bear the cost of disassembling and transportation? (4) Where is delivery to be made—to a regional resale lot of the creditor's choosing, to the loan office, or to an equitably-arrived-at location that recognizes the interplay between the necessary loss by the debtor of any and all rights in,

---

**107.** Also, remember *Dewsnup;* liens pass through bankruptcy unaffected?

to, and upon the property abandoned to the debtor, and the financial fresh start? (5) Is the bankruptcy court the court that issues the directive as to where the property is to be delivered? If so, what factors are utilized to reach its equitable determination?

We do not know the answer to any of these questions, but can project, regarding the difficulty of trying to get to answers. Certainly (with respect to each item of collateral), the bankruptcy court would have to conduct a hearing during which it would have to weigh and analyze (and we can see it now) something to be described as "the various factors and intersecting policies with full recognition that though it might cost the debtor something, it should not be too much and though the creditor need suffer no cost, it might have to suffer some." In furtherance of its equitable analysis, it would seem that the court would have to focus upon the type of property—is it big, little, weatherproof (or not), furniture, electronics, vehicles (running or not), transportable without assistance (or not).[108] Would the court find a usable body of legal authority on the issue of whether, even in the case of the VCR (easily transportable, etc.), the debtor would have to make a special trip to deliver it or could drop it off during a grocery store run that would bring the debtor closest to the delivery point with the least inconvenience?

Now, we have said that trustees would revolt if called upon to effectuate the "distribution" of property that the Seventh Circuit thinks it has required. Realizing that the Seventh Circuit probably cares little about the bankruptcy courts' perspective as to their job responsibility, is it rational to conclude that the same Congress that promulgated § 554(c) intended for the bankruptcy courts to be the traffic police, post-bankruptcy, for the distribution of personal property back to secured lenders so that secured lenders would not be subject to the same state law upon which the original contracts were confected? NO. In light of *Butner*, of course, NO.

The Seventh Circuit did not think its way to the end of its pronouncement. Problematically, this seems to be a recurring consequence (recall the fourth alternative courts) of making (up) pronouncements. *Edwards* postulates a groundless equitable (federal) rule to fill the non-existent holes in the statutory scheme as a reaction to the same exercise performed by the fourth alternative courts at the other end of the political/social spectrum. Neither hold water.

*Taylor v. AGE Fed. Credit Union (In re Taylor)*[109] comes after *Edwards*. The debtors in *Taylor* sought to retain vehicles mortgaged to their credit union. The debtors were current on their monthly payments but were in default pursuant to a bankruptcy default clause in their financing agreement. Marking "retain" on their Statement of Intention, the debtors failed to specify a particular method of retention. The credit union and thereafter the trustee filed motions to compel the debtors' compliance with § 521(2). "The bankruptcy court entered an order compelling the Taylors to enter into a reaffirmation agreement or redeem the property."[110] The *Taylor* court interpreted the "plain meaning" of § 521(2)(A) as requiring an election of either redemption, reaffirmation, exemption or surrender and § 521(2)(B) as requiring the effectuation of that election within the allotted time period. The Court ordered the debtors to reaffirm, redeem, or surrender the property.[111]

---

108. It is one thing to transport a VCR, clearly another to disassemble the air conditioning unit, hire a truck and helpers to load and transport the freezer, refrigerator and dinette set.

109. 3 F.3d 1512 (11th Cir.1993).

110. *Id.* at 1514.

111. *Id.* at 1513–14.

The primary basis for the *Taylor* holding is its interpretation of "if applicable," which, we think, makes sense. The terms "surrender or retention" are disjunctive. The list of federal options following "if applicable" are methods of "retention." The court concludes, therefore, that "if applicable" modifies "surrender or retention," i.e., the options are applicable to either "surrender or retention." The question, then, is whether the federal choices are applicable to the initial, basic choice—to "surrender" or to "retain."

> Referring to the language preceding the phrase "if applicable," it is clear when the options of redemption and reaffirmation would not be applicable. This language does not apply to a debtor's surrender of the property; it therefore must apply to a debtor's retention of property. If a debtor retains secured property, then the options of redemption and reaffirmation are applicable and the debtor is required to redeem or reaffirm.[112]

In addition to its "clear reading" of § 521(2), the *Taylor* court also notes that "retention" does not satisfy the "performance" requirement of § 521(2)(B) because "retention" can not be completed within 45 days and does not need to be "performed":

> The plain language of section 521(2)(B), which requires a debtor, within forty-five days of the filing of the statement of intention, to "perform his intention with respect to such property ..." indicates that the debtor must perform some act with respect to the property within a specified period of time. An option to retain and keep current is not an act capable of performance within forty-five days. This option provides that the debtor's performance not be concluded until the expiration of the contract, a

period of time ordinarily beyond the forty-five day limit. Additionally, retention is not a duty that the debtor needs to "perform," as the debtor already has possession of the property.[113]

The court cites with approval the following passage from the bankruptcy court's opinion:

> '... If Debtors intend on remaining current in their obligations under the contract, they may negotiate a reaffirmation agreement with the creditor. Allowing retention of the property without reaffirmation or redemption would be tantamount to forcing the creditor into a *de facto* reaffirmation agreement with no recourse against the debtor.... Furthermore, the debtors would have no incentive to keep the property in good condition or to continue making payments if the value of the collateral declined below the amount of the debt or was destroyed. Such an arrangement is contrary to the language of the Code.'[114]

Following the bankruptcy court's lead, the Eleventh Circuit pulls out a shameless old saw with which to pound (or, we guess, to carve up) the debtor:

> Allowing a debtor to retain property without reaffirming or redeeming gives the debtor not a 'fresh start' but a 'head start' since the debtor effectively converts his secured obligation from recourse to nonrecourse with no downside risk for failing to maintain or insure the lender's collateral.[115]

Before we discuss *Taylor* further, it will be helpful to look at the district court opinion (which reversed the bankruptcy court and was) reversed by *Taylor*.[116] According to the district court, the question before it "is whether § 521 provides that the debtor who wishes to retain encumbered property must redeem the property

---

**112.** *Id.* at 1516.

**113.** *Id.*

**114.** *Id.* at 1516.

**115.** *Id.* We have become weary of courts purporting to issue sensible rulings by means of snappy sound bites.

**116.** 146 B.R. 41 (M.D.Ga.1992).

or reaffirm the obligation or may the debtor simply retain and remain current on the existing contractual obligation.⁴" [117] In footnote 4 of its opinion the district court shows the distance between the analyses we are looking at and the one we, by this opinion, advance. According to the district court, "The surrender portion of § 521 is not at issue in this appeal and the court will not address it in this order." [118]

The reason the district court believes itself not to be involved with the surrender portion of § 521 is two-fold. First, the court, without saying so, believes "surrender" to mean lose **ALL** state law rights to and assume the responsibility of delivering up the property. Second, the court (rationally) extends the fourth alternative cases (which are embraced) to invalidate bankruptcy default clauses as a matter of (federal) law.[119]

The statutory interpretation format used by the district court is that espoused by *Boodrow*, which allows the district court to conclude that the statute (§ 521(2)(A)) is ambiguous and therefore can be rewritten to include the fourth federal alternative.

We see the *Taylor* case as containing the essence of the problem inherent in the analyses that have preceded us. The surrender "part" of § 521 is not at issue in the district court, only the "retain" part. Because of this we get the issue discussed in terms of having to make up a fourth alternative (because no one would ever choose "surrender" without it) or requiring that retention can be exercised only through redemption, reaffirmation, or exemption/avoidance (because no one would choose these alternatives if there was a fourth, non-surrender alternative). The tension is between the political ends of the aforementioned spectrum, with each end trying to maintain the viability of its social preference through statutory interpretation. The funny thing is that the word "surrender" is effectively read out of the Code, certainly is read out as a viable, practical alternative. Who in their right mind would ever choose "surrender" when one could choose "reaffirmation," sign the agreement and then "rescind it"?

A couple of additional observations about *Taylor*. It is clear that both the bankruptcy court and the Eleventh Circuit are disdainful of the prospect of a forced federal right of reinstatement (so are we). But is it necessary to be regaled about the prospect of debtors who, notwithstanding that they are current on their obligations and whose payments have been accepted by the creditor right along, yearn to embark upon unbridled collateral dissipation once, by the discharge, their liability becomes *in rem* (such a cause for celebration!)? NO. In fact, these speculative assertions are just that—speculative assertions. And, while it does seem appropriate to offer the suggestion (to the fourth alternative courts) that mention of the federal right of retention is tantamount to the creation (from the atmosphere) of a federal equitable, involuntary *in rem* reaffirmation, it is not necessary to expound half-baked social and economic theory. Though we care not about the debtors' post-abandonment predilections (for collateral dissipation, ice cream before breakfast, or whatever), we point out a frequent fault found in the plain meaning type of social theorizing—it's probably wrong.

The debtors have been paying. The creditors have been accepting. The creditor faces, usually, an undersecured position and a dischargeable deficiency. The debtors have maintained insurance. Most importantly, the debtors need a car. The debtors have a discharge so that the in-

**117.** *Id.* at 43.

**118.** *Id.*

**119.** The invalidation, of course, proceeds upon sections of the Code which specifically invalidate bankruptcy default (or *ipso facto*) clauses (e.g. § 363, 365(e), 541(c)). Of course, to use specific instances of statutory invalidation as a basis for generalized non-statutory invalidation is at least curious; at worst, backwards.

debtedness that pushed them into bankruptcy presumably can push no more. Is it in the debtors' best interest to flaunt insurance (which should be required by every security agreement) so that if there is an accident that does extensive damage, the debtor will have no car? We think that it is at least a speculative toss-up—but maybe, just maybe, it is the having of a car on a daily basis rather than the daily consciousness of the prospect of a deficiency judgment that keeps people keeping up their cars.

We simply do not know enough to be able to espouse these universal truths about human nature (which seem controverted by the facts), nor do we see the need for such a complicated reaction to the fourth alternative courts. As we said above, begin by just saying "no" (to the fourth alternative), and explicate, by reference to the statute and *Butner*.

Finally, we observe that *Taylor* probably did not go as far as *Edwards* in confecting a reactionary federal rule of equity to fill a non-existent statutory hole. Recall the footnote in the Eleventh Circuit opinion regarding surrender, which off-handedly suggests that the debtor surrenders "the collateral to the lienholder who then disposes of it pursuant to the requirements of state law." [120] What does this mean? We think there is room to interpret this statement to mean that the debtor surrenders, ultimately, to the creditor's state law rights regarding the property, and that the creditor is free to exercise its state law rights over the property, once the bankruptcy process is complete. The "requirements of state law" would presumably include the requirement that the agreement be in default under state law. If so, then *Taylor* has properly pulled up short where *Edwards* blundered on.

Our interpretation of *Taylor* on this score makes sense (at least to us). The district court opinion, remember, expressly invalidates the bankruptcy default clauses contained in the agreements (the question was briefed to the district court). In light of the issues on appeal, the "surrender" description can be read to overrule the invalidation of default clauses, so as to leave the creditor (in the event of "surrender") entitled to rely on such a clause (under state law) to enforce the security agreement. Reliance upon state law to enforce the security agreement normally takes the form of a constructive "surrender" of the property, to the creditor (perhaps through a custodian appointed through state law process).[121] We are satisfied that the description of "surrender" in *Taylor* does not necessitate the problematic "surrender" as contemplated by *Edwards*, and in fact contemplates the retention by the creditor of state law rights to enforce the security agreement (under state law) to obviate the various ills that would be occasioned by the forced "head start" of the fourth alternative camp.[122]

---

120. *Id.* at 1514, n. 2.

121. We note here that under Louisiana law, for example, it is possible to obtain an Order of Seizure and sale through executory process, if the agreements contain a "confession of judgment" in the event of default. *See* La.Code Civ.Proc.Ann. art. 2631, 2632 (West 1999). The debtor in the agreement can also waive demand for payment, which entitles the creditor to an immediate Order of Seizure and sale upon presentation *ex parte* of the note. collateral documents and other records. La.Code Civ.Proc.Ann. art. 2634–2640 (West 1999).

122. Again, anticipating our own interpretation of "surrender," we point out that we do not think the word "surrender" as used in § 521(2)(A), refers to surrender to the creditor. Rather, it refers to surrender to the trustee. We are attempting to show in this discussion here that the *Taylor* court has left room for an understanding of "surrender" that does not impose upon the debtor (in favor of the creditor) either post-bankruptcy obligations of delivery, etc., or a loss of state law rights in the collateral. We do not think the *Taylor* court thought of our interpretation of "surrender," but point out that the consequences of our interpretation of the statute do not differ from what we understand the *Taylor* court to be laying out.

However, we must note that this is our interpretation of *Taylor*, and acknowledge that in the flurry of counterpoint reaction to the classic fourth alternative camp expression of the district court, the Eleventh Circuit did not go so far as to say clearly what we think it was contemplating. This, as well as the perception (because the definition of "surrender" is assumed to mean what the fourth alternative camp is afraid it means) that the term "retention" refers to both the bankruptcy and non-bankruptcy world (so that to "retain" collateral after bankruptcy one must choose one of the federal alternatives), has generated the interpretation that *Taylor* stands for the proposition that § 521(2) preempts state law rights that might be asserted after bankruptcy by a debtor under a contract. We do not agree that *Taylor* should be so read, but do agree that such a reading of it is a problem.

Clearly the focus of the Eleventh Circuit is on the word "retention." Though the district court did not see "surrender" as even implicated in the arguments presented, the Eleventh Circuit does touch on its interpretation of "surrender": "Surrender provides that a debtor surrender the collateral to the lienholder who then disposes of it pursuant to the requirements of state law." [123] We say, again, that we think the *Taylor* court does not go so far as to follow *Edwards* in its promulgation of a federal rule (of equity) whereby "retention" and "surrender" are given such post-bankruptcy effect as to preempt state law concerning the post-bankruptcy lien rights (though, as mentioned, we are shaky on this).

From the brief reference to "surrender," we get confirmation of our conclusion that there are residual state law rights applicable to contracts (the "lienholder then dis-poses of it pursuant to the requirements of state law") and confirmation of our conclusion that the *Taylor* court has misconstrued the terms "retention" and "surrender." As with the *Edwards* court, the Eleventh Circuit erroneously understands "surrender" to refer (or relate) to the debtor's relationship with the creditor ("surrender provides that a debtor surrender the collateral to the lienholder"). This misconstruction requires that the Eleventh Circuit see "retention" as referring, at least in part, to the post-bankruptcy world, which it does not. To the credit of the Eleventh Circuit, however, it realized (whether it knew it realized this or not) that the federal rule of *Edwards* created a legal vacuum that could not (rationally) exist. Therefore, the court allows for the continued existence, post-bankruptcy, of some residual state law rights and obligations regarding the property. It does not delineate or explain, because it cannot, given the analytical box into which it has put itself (arguing itself right up to the conclusion that the § 521(2)(A) "retention" is the repository of the exclusive means of retaining ownership—or even possession—post-bankruptcy, but recognizing, like a bell clanging off in the distance somewhere, that the Code has not done away with all state law rights). What it could do was rail against the fourth alternative and quit before it pronounced. And, we think that is what it did.

We move now to the Fifth Circuit case *Johnson v. Sun Finance Co. (In re Johnson)*.[124] A troublesome case on may fronts, but a case, in our opinion, which opens the door for our opinion. The debtors in *Johnson*, unlike the debtors in all the cases previously mentioned, were not current on a loan secured by a camcorder.[125] The debtors filed a Statement of

---

123. *Id.* at 1514, n. 2.

124. 89 F.3d 249 (5th Cir.1996).

125. The *Johnson* case is illustrative of the extent to which the § 521(2) "controversies" can verge on the utterly absurd (as opposed to the just plain absurd). This is an opinion, at the circuit court level, about a camcorder worth, maybe, $150 (at most). The opinion reflects no stay relief motion by the creditor (who obviously cared nothing about the property at issue—we wonder what the value of the camcorder was after the two years worth

Intention, but the opinion does not indicate whether the debtors indicated "retain" (but that the three alternatives were inapplicable) or simply indicated that all choices were inapplicable. In fact, the opinion says "[t]he debtors did not give any indication on the form as to their intentions with respect to the camcorder, and the debtors have not otherwise informed Sun of their intentions as to the camcorder."[126] We assume that the debtor either marked "retain" and further indicated that none of the "retain" alternatives were applicable, or indicated no intention with respect to the camcorder. We admit to being puzzled by *Johnson* because the court and debtors seem to be relating to one another as do skew lines—moving in different directions on different planes. The court sets up the argument of the parties as follows:

> Sun argues that 11 U.S.C. § 521(2) requires the debtors to elect one of the three options set forth in the statute and on the statement of intention. The debtors argue that the three options set forth in Section 521(2) are not exclusive, and that the debtors are entitled to retain the camcorder until any of the following occurs: (1) a request for turnover from the trustee; (2) seizure of the property pursuant to state court process; or (3) rescission of the contract of sale by Sun for non-payment of the purchase price under Article 2013 and 2018 of the Louisiana Civil Code.[127]

The court perfunctorily reviewed the conflicting appellate jurisprudence, describing the plain meaning camp as holding "that debtors must choose to reaffirm the debt, redeem the property, or surrender the collateral, and nothing else." [128] The fourth alternative camp is broken out circuit by circuit. *Belanger* is described as holding "that the three options set forth in Section 521(2) do not prevent the further alternative of retaining the property and remaining current on the debt." *West* is described as holding "that Section 521(2) prescribes only three options, but that under the facts of the case in which neither the debtor nor the creditor would be prejudiced, the bankruptcy court could allow retention of the property 'conditioned upon performance of the duties of the security agreement as a condition of retention.' " [129] From here the court mentions *In re Gerling*[130] for the proposition that bankruptcy and district courts are also divided. From here, and we are a bit confused by this, the court says:

> Another option discussed in the decisions is whether the debtor may retain the property without either reaffirming or redeeming, and stay current on the payments owed. The decisions all involve cases where the debtor is not in default for failure to keep the payments current.[131]

We are confused because this last reference to "another option" seems to refer back to the fourth alternative courts previ-

---

of litigation that culminated in an order directing the debtor to check a box on a form). As we point out above, absurdity breeds absurdity—the debtors here describe an intention to surrender, but won't check the box; the creditor who cares nothing for the property says that the debtors should lose their discharge for not checking a box or should have the case dismissed (so that the creditor could, we guess, proceed under state law to foreclose upon the camcorder—which it always could have done had it only asked, but apparently didn't want to); the Fifth Circuit takes jurisdiction over an appeal of an order that requires that the debtor sign a form (what is the controversy that has been decided by the lower court to generate a final order?).

**126.** *Id.* at 250–251.

**127.** *Id.* at 251. It is from this passage that we conclude that the debtors in fact checked "retain," but also marked "n/a" by the three retain alternatives.

**128.** *Id.*

**129.** *Id.* (citations omitted).

**130.** 175 B.R. 295, nn. 1 & 2 (Bankr.W.D.Mo. 1994).

**131.** 89 F.3d 249 at 252.

ously mentioned and not, in fact, to constitute "another option."

Now, the argument is set, the caselaw is mentioned; it is time to choose. Before the choice, though the court recasts the debtors' argument:

The debtors in the case at bar have not kept current on the payments, but nevertheless argue that they may keep the property until the trustee requests turnover, the property is seized pursuant to state court process, or Sun rescinds the contract.[132]

Now, let's stop. Is this what the debtors really argued, or has the court left out something? We think that the court, in recasting the debtors' position, left out the crux of the debtors' argument. We think the debtors' argument, properly stated, was not that they could keep the property until someone came and got it. We think the debtors' argument, if seen in the context of its original exposition, was that they had the right, under § 521(2)(A), to indicate the intention to "retain" the property but were not required to indicate one of the three methods articulated within the subsection. In other words, the debtors argued that they had a fourth alternative "retain" right. The court's response to the debtors' "argument" convinces us of the correctness of our interpretation:

The court disagrees with the debtors' position. The clear language of Section 521(2) states that 'the debtor *shall* file with the clerk a statement of his intention.' Filing a statement of intention indicating that none of the three statutory alternatives are applicable, and failing otherwise to inform Sun of their intention is not in compliance with Section 521(2). This court adopts the reasoning of the Eleventh Circuit in *Taylor*, and holds that the debtors are limited to the three options set forth in the statute.[133]

The particular disagreement of the court indicates that it is the debtors' determination to choose "retain," but none of the specified alternative methods; to embrace this, says the court, would leave the creditor in the dark. It is within the context of the **choice of "retain"** that the debtors "are limited to the three options set forth in the statute."

In addition to the court's focus upon the notice provided to the creditor by a properly executed choice of alternatives on the statement, we find support for our interpretation of the court's opinion from the observation, "If the payments are in default as the Sun affidavit shows, Sun can always move to lift the stay in order to foreclose."[134] Certainly this observation (in light of the court's decision not to dismiss the case as too harsh a remedy) must be understood to have been made upon the assumption that the debtors were going to abide by the directive that they properly state their intention regarding the camcorder. The right afforded the creditor then (in the event the debtor chooses either to reaffirm, redeem or surrender) is relief from stay to foreclose (under state law) upon the property. The use of stay relief and foreclosure presumes the existence of state law (substantive and procedural) being the ultimate arbiter of the parties' rights to the property. This is correct. The opinion, then, as we read it, deals with whether a debtor who wishes to state the intention to retain collateral must choose one of the three specified methods—redemption, reaffirmation, or exemption/lien avoidance. That is, we read the opinion as rejecting the fourth alternative camp promulgation of the "right of retention," in favor of a reading of the statute that limits the alternative methods of "retention," as that word is used in § 521(2)(A), to those specifically mentioned in the statute. We agree with the *Johnson* court as far as it goes, though we think the recasting of the debtors' arguments as we have mentioned could cause

132. *Id.*

133. *Id.*

134. *Id.*

confusion, could generate the perception that the Fifth Circuit (in adopting the bankruptcy court opinion as its own) in fact disagreed with the proposition that a debtor to whom property has been abandoned can keep possession and ownership of property subject to a security interest until a party with a greater right under state law enforces that right. This (we say again) is not what the Fifth Circuit disagreed with; debtors who indicate the intention to retain under § 521(2)(A), however, must choose one of the exclusive, listed methods.

We have suggested in our introductory remarks that the Fifth Circuit missed an opportunity to bring some order to the morass that is § 521(2) jurisprudence. We meant it. Also, the arguments raised by the parties evidence the need for further analysis of the section (521(2)), about what it means, what it requires, what it doesn't cover.

The debtors in *Johnson* say that they are advancing a right to retain that is covered by the "retention" or "retain" choice within § 521(2). We see it differently.

Are not the debtors, in describing their "right to retain" actually describing "surrender"? We think so. According to the affidavit of default referred to by the bankruptcy court, the debtors made no further note payments after the commencement of the bankruptcy case. They did not claim that the property was exempt. They had no intention of paying any more note payments. They evidenced no intention to interfere with the trustee administering the camcorder (probably the last thing that would have occurred to the trustee), and no intention to defend a stay relief action or subsequent foreclosure by state law process.

The debtors were in fact describing "surrender" as we see it. The "retain" or "retention" contemplated by § 521(2) is applicable only to the bankruptcy world, because it must be understood to exist only through application of the specified bankruptcy alternatives. "Surrender" is the choice not to "retain" through the bankruptcy-provided mechanisms. "Surrender," as we will show, is the choice to abide by the statutory requirement that property of the estate be surrendered **to the trustee.** "Surrender" does not relate to the interest of the creditor in the property. Trustee can have it. There will be no reaffirmation. There will be no redemption. The property is not exempt, so lien avoidance is not possible. Period.

However, time does not stop with the choice not to use the bankruptcy methods of retention. The Bankruptcy Code provides for this by offering the creditor stay relief, trustee disposition, etc. If these alternatives don't occur, time still moves on, until the case is closed. At this moment on the case administration time spectrum the Code causes, by operation of law, the abandonment of all property not administered back to the debtor. As of the moment of abandonment, the property has passed through the bankruptcy process without the process having been used to assist the debtor in keeping it, or the creditor in getting it. The property has been surrendered (we know that it is surrendered constructively) first, to be dealt with however it can be within the bankruptcy process. If not to be dealt with through the process, the unadministered (undealt with) property is deemed fully administered by virtue of the operation-of-law abandonment occurring under § 554(c). Thereafter, § 521(2) having no further effect, the property and lien rights and ownership/possession rights are to be dealt with under applicable non-bankruptcy law.

Now, we understand that we cannot ignore the fact of discharge. Yes, the personal obligation is discharged, so that the resulting liability is *in rem*, limited to the property. So what? The discharge does not interfere with the enforcement of state law security interests. All rights in, to, and upon the collateral are maintained by

the creditor in the face of the discharge. Does the discharge come into play at all? Well, we are fudging a bit. It comes into play a little bit. Remember the creditor in *Johnson*, the creditor who fought over making the debtors properly declare intention regarding a camcorder for over two years. Why was that?

We can figure at least one response. It had nothing to do with the camcorder, in connection with which the creditor had taken no action (no stay relief, nothing). What was the creditor after? We think a directive to the debtors to state the intention to "surrender" the property. Why? Because we think the creditor was going to follow up the motion to compel the proper selection of an intention with a motion (or, complaint) to compel the debtors to deliver the property to the creditor so as to save the creditor the costs of exercising the state law rights of foreclosure and, more importantly, we think, to place the debtor into the position of either complying with a court order, suffering a discharge complaint under § 727(a)(6)(A),[135] or a discharge revocation complaint under § 727(d)(3).[136]

We conclude that the *Johnson* creditor, then, was after bigger fish, was after a circumvention of the discharge through the creation of a post-bankruptcy obligation that could be used to lessen the costs of enforcement bargained for under state law, or as ground for relief from the discharge, itself. There is no other reason for such hard-fought camcorder litigation (of course, the debtors should have just reaffirmed, signed an agreement, and then rescinded it if they were worried about what "surrender" meant). So, we come to the ultimate irony. The creditor in *John-son* was pushing for an *Edwards* federal equity rule promulgation, in the name of "limiting a debtor to a fresh start, not a head start"! In throwing out this bait, hoping for a mullet strike, it was the creditor who was trying to do away with the effect of discharge under the guise of protecting the sanctity of creditor rights in the face of discharge. For "surrender" to mean what the *Johnson* creditor insisted it to mean, the court would have been forced to impose upon the debtor the post-bankruptcy obligation of effectuating return, delivery, etc. All the questions we have asked earlier would have to be resolved (at expense to the debtor), just to determine how much it should cost the debtor, personally, to comply with the imposition of this post-bankruptcy (usually post-discharge) obligation. What is so unconscionable is the sanctimoniousness with which the creditor goes about its business, trying to protect the "system," have the debtors "do right," while all the while hoping to circumvent the discharge by the addition of delivery/return costs, or even better, to generate the situation whereby the debtor could be compelled by a bankruptcy court to deliver property (at debtor's cost) or suffer loss or revocation of discharge.

We think this is what the *Johnson* creditor was after, but to the credit of the *Johnson* bankruptcy court (and the adoptive Fifth Circuit), the creditor did not get what the creditor wanted.

Did the *Johnson* debtors lose? Not really. They were never *really* intentionally asking for the federal retention right. What they were really asking for was our interpretation of surrender. What they got was, in essence, a directive to surrender

---

**135.** 11 U.S.C. § 727(a)(6)(A) reads as follows:
(a) The court shall grant the debtor a discharge, unless—
. . .
(6) the debtor has refused, in the case—
(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify;

**136.** 11 U.S.C. § 727(d)(3) reads as follows:

. . .
(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—
. . .
(3) the debtor committed an act specified in subsection (a)(6) of this section.

(or make a deal to reaffirm), and what the creditor got was the observation that if the debtors remained in default the stay could be lifted (or would be lifted by operation of law) and the creditor could foreclose. No federal surrender. No federally required incurrence of post-discharge costs of delivery of the collateral to the creditor at the risk of losing discharge, no federally required loss of due process rights.

In *Johnson*, the Fifth Circuit endorses the "plain meaning" interpretation of the language of § 521(2)(A), and does it correctly. In so doing, it refutes the possibility of the "fourth alternative" right of retention. However, and we hope the creditor understands this, the court refrained from rejecting one groundless creation of a federal rule of equity by creating another, just as groundless.

*Bank of Boston v. Burr (In re Burr)*[137] is the last circuit court opinion published on the proper interpretation of § 521(2), and is the example of the extended version of the plain meaning analysis, providing specifically for the promulgation of a reflexive federal rule of surrender to render into oblivion both the fourth alternative cases and what we have termed the nihilist camp cases. After much thinking (we are at times quite slow) as to how structurally to discuss *Burr* within this opinion (because it is responding to a nihilist opinion and we haven't yet talked about the nihilist cases), we have decided to pause. To place *Burr* into its proper developmental context, we need to talk about the nihilist cases, including the one *Burr* reverses, because the First Circuit, seeing itself beset not only by the fourth alternative rule

promulgation but also the nihilist statutory nullification, has offered the most strongly worded federal rule of "equity" supporting the creditor side of the political/social spectrum. We can only guess that it concluded that the "laying down the law," so to speak (after promulgating it, of course), was necessary if the mongrel horde was to be beaten back, and that in so doing, it was fully supported by the *Taylor* and *Johnson* courts. We will get back to *Burr*, but here set the stage by discussing the intervening nihilist analysis.

### (c) The Third Approach Emerges—The "Nihilist" Camp

As previously mentioned, the "nihilist" argument relies heavily on § 521(2)(C) in reasoning that § 521(2)(A) and (B) were only meant to notice secured creditors and not to alter (i.e., enlarge or diminish) substantive rights. According to these cases, both the "plain meaning" and "fourth alternative" approaches impermissibly alter the debtor's rights in the collateral. Under the "plain meaning" approach, § 521(2) is seen by the nihilists to diminish the debtor's state law rights in the collateral (because the meaning attributed to "surrender" is "to turn-over" the collateral). Under the "fourth alternative" approach, § 521(2) is seen to enlarge, or even codify, the debtor's state law rights in the collateral by ignoring contractual defaults possibly enforceable under state law. The "new path"[138] purportedly cut is to allow the parties to rely on the terms of their underlying state law agreement.[139] The problem with the new path, as cut by the nihilist courts, is that in failing to give meaning to the mandatory provisions of

---

137. 160 F.3d 843 (1st Cir.1998).

138. *In re Burr*, 218 B.R. 267, 270 (1st Cir. BAP 1998) (Describing *In re Mayton* as a "third path.")

139. We point out as well that some not so new opinions and articles were on this track several years ago; *see, e.g.*, David J. Messina, *An Alternative to Redemption and Reaffirmation for Chapter 7 Debtors*, 40 Louisiana Bar Journal 447 (1992); *In re Weir*, 173 B.R. 682

(Bankr.E.D.Cal.1994); *In re Tameling*, 173 B.R. 627 (Bankr.W.D.Mich.1994); *In re Irvine*, 192 B.R. 920, 921 (Bankr.N.D.Ill.1996); *In re Ogando*, 203 B.R. 14, 16 (Bankr.D.Mass. 1996); *In re Schafer*, 215 B.R. 205, 207 (Bankr.D.Or.1997); *In re Bracamortes*, 166 B.R. 160, 162 (Bankr.S.D.Cal.1994). What these writings and opinions missed was the statutory ground for getting to the post-bankruptcy application of state law that is, we submit, plainly and clearly in the statute.

§ 521(2), the statute is rendered meaningless. We think that one of, if not the, basic flaw which generates the nihilist argument is the failure to consider the meaning of "surrender."

The leading "nihilist" case is *Mayton v. Sears Roebuck & Co. (In re Mayton)*[140] The debtor in that case indicated "N/A" to the entire statement of intention (probably because she was unaware of the purchase money interest claimed by Sear's), but admitted at her § 341(a) Meeting of Creditors that she still possessed personal items purchased from Sear's on the debtor's Sear's account. Sear's subsequently sought to compel the debtor to amend her statement of intention to delineate treatment of their claim.[141]

After examining the "plain meaning" and "fourth alternative" lines of analysis, the *Mayton* court found that § 521(2)(C) preserves the debtor's bankruptcy rights and that §§ (B) and (A) were "subservient" to it. Additionally the court opined that "it is also clear that 521(2) does not diminish the debtor's rights under the Code generally."[142] From this premise the court articulates an opinion that due to the voluntary nature or reaffirmation and redemption, the selection of those choices could not be compelled under § 521(2). This left, of course, surrender. The *Mayton* court found it unlikely that "surrender" nullified the automatic stay.

> [I]t would be not be appropriate to infer that Congress by its use of the term 'surrender' intended to nullify the provisions of § 362(a) together with the contract rights under state law of the consumer relative to retention or surrender of collateral in which the creditor has a purchase money secured interest.[143]

Thus, says the *Mayton* court, after the stay is lifted the creditor may foreclose in state court. The court added that to equate "surrender" with "foreclosure" would abrogate the automatic stay to the detriment to other classes of creditors, a result that should require a more explicit statement in light of § 521(2)(C).[144] Since § 521(2)(C) mandated that §§ (A) and (B) could not modify the debtor's rights under title 11, the court relegated § 521(2) to the innocuous status of providing notice, summarizing:

> As matters now stand, the estate has no interest in this proceeding. This is a contest between a secured consumer creditor and a debtor. Section 521(2)(C) does not permit involuntary redemption or reaffirmation. As indicated, surrender could have been and can be pursued, in appellant's [Sear's] discretion, by foreclosure proceedings under state law.[145]

In other words, the *Mayton* court refuses to require the debtors to do anything, notwithstanding the mandatory provisions of § 521(2)(A) and (B) and limits the notion of surrender to the choice to be made by **the creditor.** We think, that notwithstanding the court's description of the creditor's rights in the event of surrender and the suggestion that surrender does not equate to immediate stay relief and foreclosure, the court was, shall we say, afraid to pull the trigger—afraid to make the debtor choose "surrender." Why? We think it was because, even through the court's own words, the court could not convince itself that a debtor choosing "surrender" did not lose some residual rights, would not be held (somewhere down the road) to account for its "surrender" of the property.

The First Circuit Bankruptcy Appellate Panel relied heavily upon *Mayton* for its analysis of § 521(2) in *First National*

---

140. 208 B.R. 61 (9th Cir. BAP 1997).

141. *Mayton,* 208 B.R. at 62–63.

142. *Id.* at 66.

143. *Id.*

144. *Id.* at 66–67.

145. *Id.* at 68.

*Bank of Boston v. Burr (In re Burr)*.[146] The secured creditor in *Burr* sought to compel the reaffirmation, redemption or surrender of its collateral. The debtors were current on the underlying obligation, but the contract contained a bankruptcy default clause. The bankruptcy court held that § 521(2) only required that the debtor state whether they intended to retain or surrender the collateral, and did not require the further choice of method of retention from the limited alternative set forth in the statute.[147]

The First Circuit BAP thus framed the issue before it as whether § 521(2) required the selection of either retain or surrender, or the additional selection of reaffirmation, redemption, or exemption.

The court declined to choose between the fourth alternative approach favored by the debtor and the plain meaning approach advanced by the creditor. Instead, it ventures its own statutory analysis, beginning (logically) with the language of the statute itself but concluding, quickly, that the statutory language, because it contains inherent contradictions, is hopelessly ambiguous. Noting the mandatory (and fairly clear) provisions of §§ 521(2)(A) and (B), requiring choices and performance (within a time limit), the court points out that "subsection (C) provides that 'nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title' rendering it unclear what the debtor must do, and just when he or she must do it."[148] Finding no help in the legislative history, the court refocuses upon the words (it says, each and every one) and draws the interpretative conclu-

sion that "by virtue of self-contradictory provisions, Congress must have required performance while leaving the debtor's options unrestrained."[149]

Because performance of one of the intentions would serve to limit a debtor's options to choose another option, the court cannot figure out how to require debtors to do anything. The equipoise, to the First Circuit BAP, must be perfect, and must affect all parties who might have rights. "Given that no alternative is permitted, neither can the debtor's nor the trustee's rights in the property be enhanced. And, since the creditor's rights in the collateral are the counterpoint to the debtor's and the estate's, we may conclude that, aside from the substantive (e.g., §§ 522, 544, 548, 722) and procedural (e.g., § 362) rights conferred by the Code, the creditor's rights remain static, as well."[150]

From the perch of this statutory self-abrogation, it is easy for the BAP to decline the fourth alternative approach, which (as we have mentioned) has resulted in the promulgation of the right of reinstatement (i.e., embraced debtor rights). Alas, the BAP understanding of the meaning of "surrender," its view that § 521(2)(C) overrides the entirety of the statute so as to render it to mean no debtor must (or even can) make any choices (as such a choice might preclude others),[151] and its (proper) interpretation of *Edwards* and (probably over-extended) interpretation of *Taylor*, precludes adoption of what is understood by the court to be the plain meaning approach. We focus upon the court's understanding of "surrender": "Admittedly, compelling the surrender of collateral when the debtor fails to

---

146. 218 B.R. 267 (1st Cir. BAP 1998); *rev'd* 160 F.3d 843 (1st Cir.1998).

147. *In re Burr,* 218 B.R. 267, 268–69 (1st Cir. BAP 1998).

148. *Id.* at 271.

149. *Id.* at 272.

150. *Id.*

151. The court finds support for its notion that requiring a choice of options would cause a loss of rights in the *Mayton* focus upon the voluntary nature of the options provided in the statute. "Because redemption and reaffirmation are 'voluntary procedures' ... requiring the debtor to do either would also violate § 521(2)(C)." *Id.* at 272.

perform his or her duties under § 521(2)(A) or (B), causes a similar problem in light of the automatic stay's independent protection."[152]

The changes wreaked upon all parties' rights, which the court sees as precluded by § 521(2)(C), requires the rejection of prior approaches and the adoption of what we have termed the nihilist approach. The rejected approaches

> operate so bluntly as to override § 521(2)(C)'s directive. The "Fourth Alternative" cases "bless" the "continuing payment" option as substantially permissible—without regard to the fact that bankruptcy itself (or some other aspect of a debtor's conduct) might constitute an actionable breach under the parties' contract and state law. Certainly nothing in the Bankruptcy Code establishes a debtor's right to discharge personal liability, maintain payments and retain collateral instead of redeeming the collateral or reaffirming the contract. The "Plain Meaning" cases say that the debtor's *only* alternatives are redemption, reaffirmation or surrender (and that the court may enter orders compelling their performance) without regard to what the actual terms of the debtor/creditor relationship may be. . . . It is at least conceivable, if unlikely, that a collateralized loan ... might lack an bankruptcy default clause or be nonrecourse. If such were the case, dictating redemption, reaffirmation or surrender as *exclusive* options could effect a substantial alteration of the parties' rights.[153]

It is clear that because of its notion of what it would be doing if it ordered the debtor to choose surrender (give up all non-bankruptcy rights), or to choose redemption/ reaffirmation (venture into the abyss of involuntary reaffirmation), the BAP has fashioned a problematic method of statutory construction: **Call the statute ambiguous and do away with it.** The consequence of this approach is the rather disheartening sight of a federal court concluding (notwithstanding some pretty straightforward statutory wording) that debtors need do nothing.

The BAP concludes, then, that the debtor must indicate an intent to retain or surrender—and nothing more.[154] As we will see, the First Circuit repudiates the nihilist view of the BAP, with fervor.

### (d) Back to Plain Meaning, With a Vengeance

#### In Re Burr

To the First Circuit all three camps made their appearance—for the first time.[155] The debtor and the National Consumer Law Center (writing as *amicus*) argued both the "fourth alternative" and the "nihilist" theories. The creditor urged the "plain meaning" approach. The court rejected out of hand any argument that § 521(2) unambiguously (or, ambiguously) contemplates a non-specified—i.e., reinstatement—option. The court so concluded by following in the footsteps of many before it: reinstatement is not an act that can be completed within the time period allotted by § 521(2)(B)'s perfor-

---

**152.** *Id.* (citation omitted). In fact, this sentence refers to a footnote that looks to *Mayton* for support for the court's conclusion that "surrender" (because of what it must mean) either means something different (which is not explored—we wish it would have been) or cannot be a choice the debtor can be compelled to make. Because we think the court cannot see its way to understanding "surrender" as meaning something other than a required delivery of property by the debtor to the creditor, the court (and the nihilist approach) uses the assumed meaning of "sur-

render" as ground for its argument that a debtor cannot be made to do it (and therefore cannot be made to do anything).

**153.** *Id.* at 272 (footnotes omitted).

**154.** *Id.*

**155.** The nihilist argument is mentioned in *Parker*, insofar as that case cites *Mayton*, but that is about as deep into the "nihilist" analysis as the Ninth Circuit was willing to travel.

mance requirement.[156] Also, the court reads the language of §§ 521(2)(A) and (B) as unambiguous in the directive that the choices provided in § 521(2)(A) are exclusive, and only applicable if the debtor chooses "retain." "While the point might be obvious, the phrase 'if applicable' makes it completely explicit, that in the event of a surrender of collateral, exemption, reaffirmation, and redemption will have no application." [157]

Having rejected the "fourth alternative" camp, the court examined the two remaining methodological alternatives. While its interpretation of § 521(2)(A) and (B) tracks the BAP approach (recall that the BAP as well rejected the fourth alternative camp's analysis of the words of the subsections before it ran out of steam and allowed § 521(2)(A) and (B) to collapse into and be subsumed by § 521(2)(C)), the First Circuit rejects the nihilist reading of § 521(2)(C). Framing the issue as "whether 11 U.S.C. § 521(2)(C) should cause us to decline to enforce the objectives of § 521(2)(A) and (B)," [158] the court rebukes the BAP for its improper extension of the effect of § 521(2)(C) to cover all rights of all parties under all law.

> Section 521(2)(C) merely acts to make supreme over the directives of § 521(2)(A) and (B) rights conferred upon the trustee and debtor elsewhere in the Bankruptcy Code.... When this is properly understood, any appearance of self-contradiction evaporates. Chapter 7 debtors do not, of course, enjoy a freestanding right under the Bankruptcy Code to retain property securing a consumer debt merely by keeping cur-

rent on their payments under old loan agreements. Nor do they maintain a freestanding right under the Code to maintain with their secured creditors advantageous arrangements in place prior to filing. For this reason, we see as beside the point the BAP's concern that giving effect to § 521(2)(A) and (B) might alter the rights of those extraordinarily rare debtors with consumer loan agreements that are either nonrecourse or that lack ipso facto clauses. **After all, any such rights altered by operation of the directives of § 521(2)(A) and (B) do not derive from the Bankruptcy Code; they are enforceable only under state law. And the loss of such state law rights is one of the costs of a chapter 7 discharge.**[159]

The court also concluded that enforcement of § 521(2)(A) and (B) will not convert the redemption or reaffirmation process into an involuntary one. We have some difficulty following the court's argument because it mostly dribbles off into dicta. Debtors are never forced to reaffirm, there are other choices, etc. Also, "the fact is that most secured creditors in circumstances such as these will prefer to enter reaffirmation agreements containing identical terms to the old agreements over the costs associated with accepting back, and the disposing of, surrendered collateral. *See amicus brief* at 19–22 (acknowledging the incentives most creditors have to enter reaffirmation agreements)." [160]

The court offers a final bit of possibly comforting speculation to debtors within the First Circuit by suggesting that maybe a debtor just checking the "reaffirm" op-

---

**156.** The court effectively telegraphs its final holding here as to whether performance is a requirement.

**157.** *Id.* at 848.

**158.** *Id.*

**159.** *Id.* at 848 (emphasis added).

**160.** *Id.* In reviewing the appellate decisions in this area, we have become (and remain) wide-eyed amazed at the license taken. This state-

ment, purportedly of fact, cites to a passage from an amicus brief! Or, perhaps this statement is the circuit court referring to the amicus brief as the basis upon which it has derived its expert opinion. But can a court of appeal issue an expert opinion? Or, maybe the statement is a statement of underlying judicial/economic philosophy. But, should economic philosophy be offered as either fact or expert opinion? Or even offered at all?

tion would constitute performance sufficient to preclude the disaster of the "surrender" option (but again, the court says, maybe not).[161]

The First Circuit, in rejecting the BAP (nihilist) and fourth alternative approaches places itself within the plain meaning camp, as it understands it. Because it disagrees with the BAP view that § 521(2)(C) is all-encompassing in its protection (and therefore overrides § 521(2)(A) and (B)), the court joins the *Edwards* version of plain meaning, holding (it seems) that § 521(2)(A) and (B) preempt state law rights related to the underlying contracts between the parties, and that the federal doing away with of such rights is (because it should be) one of the costs of discharge. So, with the Seventh Circuit, the First Circuit has offered its own rule of equity (also absent a statutory directive to do so), one that is the polar opposite of the fourth alternative.

We try to open up the *Burr* opinion, which has through its critique of the nihilist approach to the relationship of § 521(2)(C) to § 521(2)(A) and (B), both exposed the flaws within the nihilist approach and offered the key to its own undoing. We disagree with the extension by the *Burr* court of the plain meaning analysis to require federal preemption of state law rights, for the same reasons we offered in response to the *Edwards* opinion.[162] However, our criticism is tempered because of our observation that the *Burr* court **at least tried** to perform an integrated interpretation of § 521(2) by folding in § 521(2)(C) as the basis for its conclusion that because of the preemptive effect of § 521(2)(A) and (B), both "retain" and "surrender" were to be given, outside of bankruptcy, a federal meaning and effect. As noted, we think the *Edwards* court simply made up its federal rule as a reaction to the fourth alternative

promulgation, without the slightest attempt to glean a statutory basis.

Though the First Circuit is correct that the BAP incorrectly attributes an all-subsuming and nullifying scope to § 521(2)(C), it is wrong in its conclusion that limiting the scope of § 521(2)(C) requires the preemption of state law rights. Because the court fails to consider the situation of the bankruptcy world within the state (non-bankruptcy) law world, and forgets to try to figure how the Bankruptcy Code, as a contextual whole, might address the proper interpretation of § 521(2)((A), (B), and (C)), the court erroneously expands the effect of § 521(2)(A) and (B) to the post-bankruptcy world, providing a non-statutory "equitable" effect of discharge (preempting state law lien rights, post-bankruptcy).

Absent absurdity the Supreme Court instructs that we give effect to every word contained in a statute.[163] Pre-bankruptcy, the debtor and creditor have specific rights under the debt and security contracts under non-bankruptcy law. Once a bankruptcy case is commenced, there is added the bankruptcy overlay, which, we suggest, must be seen through the perspective of *Butner*. We agree with the First Circuit that sub-section 521(2)(C) in and of itself (read outside of the context of the Code as a whole) does not preserve a debtor's rights under non-bankruptcy law. If Congress had wished to reference the debtor's state law rights, it could have done so by omitting the phrase "under this title" from § 521(2)(C). Nihilist courts interpreting § 521(2)(C) as specifically preserving the debtor's residual state law rights render the limitation "under this title" superfluous.

Also, we think the First Circuit correctly observes that the absence of reference to a creditor's rights should not be seen as a vehicle for concluding that creditors' rights

---

161. *Id.* at 849.

162. *See* pp. 34–38, *supra.*

163. *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *United States v. Canada,* 110 F.3d 260 (5th Cir.1997).

are included in the reservation from language of § 521(2)(C). It simply is backward to argue that reference to a creditor's rights is made certain by the fact that there is no reference to a creditor's rights. The omission of such a reference can hardly be seen as accidental. Congress had a term—entity—predefined in § 101(15) [164] that includes creditors as well as debtors and trustees. If "entity" was over-inclusive, Congress could have easily included "creditor" in the list instead. Thus, it is hard to resist the implication that Congress specifically intended to omit a prohibition against the alteration of creditor rights.

However, practically speaking, we are not sure that the exclusion of "creditor" from the scope of § 521(2)(C) is all that meaningful. There is something to be said, in fact, for the proposition that if a debtor's and trustee's rights are preserved, there is some definite effect upon the secured creditor. Probably, the omission of creditor from the subsection is a recognition that inclusion is unnecessary, as long as the reference to "rights under this title" is adhered to.

Where the First Circuit BAP and the First Circuit diverge, though, is that the appeals court sees "rights under this title" as limiting the extent to which a debtor's state law rights are protected (because only bankruptcy rights are protected, state law rights need not be), while the BAP wishes that the protection of rights was not limited to bankruptcy rights (so it wills that it not be so).

In fact, because both courts were resolved in their understanding of "surrender" (the BAP struggling to keep it from happening, the First Circuit embracing it as what the debtor, who has debt discharged without reaffirming it, deserves), neither looks hard enough at what the Code actually has to say about the protection of all parties' rights.

In fact, the old "redemption" cases such as *Stewart* and *Cruseturner*, along with *Butner* and the Bankruptcy Code itself, illuminate. Under § 554, property not otherwise administered is "abandoned" to the debtor by operation of law upon case closure.[165] It could have been otherwise. It isn't. Section 554(c) is a "right" of the "debtor" in "such property" conferred by "this title," unless (pursuant to this title) it is ordered otherwise. Not only is the property abandoned to the debtor, but it is also, by operation of law, "administered for the purposes of section 350 of this title," which means that abandonment to the debtor is a codal recognition that the property (as estate property) has been "fully administered." Full administration has one primary consequence. The stay is lifted by operation of law as it applies both to the debtor and property that was formerly property of the estate.[166] A debtor's rights under the Code, then, include all rights inherent in this abandonment provision. As of the effectiveness of this opera-

164. **§ 101. Definitions**

In this title—
(15) "entity" includes person, estate, trust, governmental unit, and United States trustee[.] 11 U.S.C.A. § 101(15) (West 1999).

165. **§ 554. Abandonment of property of the estate**

(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
(c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.
(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.
11 U.S.C.A. § 554 (West 1999).

166. 11 U.S.C. § 362(c).

tion-of-law abandonment (the closure of the case), the creditor's rights are not limited, except by operation of the discharge.

Full administration has another significance. The bankruptcy case is over. The bankruptcy world, subject to the right to reopen the case under § 350, has ceased to exist. Any lingering or consequential effect of the bankruptcy process (one would think) would arise from operation of the Code. And the Code is clear that there are lingering consequences that affect the parties to the bankruptcy case post-bankruptcy. These include:

1. The effect of the discharge; [167]
2. The continuation of the protection against discriminatory treatment; [168]
3. The imposition of the prohibition upon obtaining certain types of discharge for certain periods of time or under certain conditions; [169]
4. Possibly the expansion of property, otherwise exempt under state law, that is subject to liens securing certain types of non-dischargeable claims.[170]

We may have missed a few of the lingering bankruptcy consequences upon state law rights (we have purposefully excluded avoided liens, etc. because the thing that happens in bankruptcy does away with the state law rights of the lienholders and therefore there would be no rights left upon which the bankruptcy process could have a continuing effect). However, we have missed none that require that § 521(2) have post-bankruptcy effect at odds with the specified post-bankruptcy effect of § 554(c).

To get through the process to the full administration of property and the beginning point of the lingering effects, it is useful to analyze what bankruptcy rights could have been utilized within the bankruptcy process by the parties holding them, but were not.

*Creditor:*

1. Stay relief under § 362(d) or, perhaps, § 362(c), and foreclosure against the estate's interest in the property;
2. Stay relief under § 362(c) after abandonment under either § 554(a) or (b), and subsequent foreclosure against the debtor's interest in the property;
3. Disposition of secured property by trustee under § 725;
4. Administration by trustee with creditor's lien attaching to proceeds of sale for payment of secured claim;
5. Negotiation of reaffirmation agreement with debtor.

*Trustee:*

1. Turnover by debtor to trustee for purposes of (3) or (4) above;
2. Sale of property and distribution of proceeds;
3. Determination of extent, priority or validity of lien to increase equity for estate;
4. Abandonment under § 554(a) or (b).

*Debtor:*

1. Exemption and avoidance of lien;
2. Redemption;
3. Reaffirmation;
4. Purchase of entirety of property from estate by debtor;
5. Receipt by debtor of residual equity in proceeds of sale of collateral after payment of all creditors;
6. Abandonment under § 554(a) or (b).

The bankruptcy process, as we see, has offered each party a significant number of choices, none of which has been selected.

**167.** 11 U.S.C. § 524.

**168.** 11 U.S.C. § 525.

**169.** 11 U.S.C. § 727(a)(8) and (9).

**170.** 11 U.S.C. § 522(c); *see Patriot Portfolio, L.L.C. v. Weinstein,* 164 F.3d 677 (3rd Cir. 1999); *Bruin Portfolio, L.L.C. v. Leicht,* 222 B.R. 670 (1st Cir. BAP 1998); *but c.f., Davis v. Davis (In re Davis),* 170 F.3d 475 (1999).

The Bankruptcy Code, therefore, requires that the property be sent from the estate back to where it came from (the debtor). We discern no basis upon which to conclude that the bankruptcy process must preempt state law if none of the bankruptcy alternatives available were utilized by anyone to affect the property. Because the Bankruptcy Code specifically protects the debtor's rights under the Bankruptcy Code, the rights inherent in the § 554(c) abandonment provision of the same Code are to be included within those rights protected "under this title."

We understand that we must fold into our analysis the word we have suggested is primary but overlooked. We must analyze "surrender." We offer the foregoing observations to suggest that both the BAP and the First Circuit were analyzing § 521(2)(C) in light of a presumed meaning of "surrender." One avoided the consequence of the meaning. One embraced it. We think we have approached the question from another way, one which ultimately will seek to define surrender within the overall context of the Code (as opposed to inserting a pre-determined meaning to the interpretation of one subsection of one section), the juxtaposition of the bankruptcy and non-bankruptcy worlds, and the directive of *Butner*. We think that neither the BAP nor the First Circuit looked hard enough at the Code to determine just what rights were being dealt with. We hope, by the time we get through with this, that we have.

### (e) Summing up the Three Approaches

The Fourth Alternative approach appears unredeemable. The fourth alternative courts do not offer a consistent approach to statutory construction, positing three interpretations of § 521(2), each exclusive of the others. To a varying degree, the fourth alternative courts promulgate a federal rule of equity on the basis of "considerations" of the most undefined sort, and grant debtors a federal right supplanting state law rights arising from the parties' state law contracts. Behind this enthusiastic approach to unbridled legislation in the guise of the exercise of judicial power is the "feeling" that the word "retention" must relate to the non-bankruptcy (or state law) world because the word "surrender" certainly does. Also, we sense a "feeling" that the fresh start granted by and delineated through the Code is insufficient, that there must be a further lingering effect to the bankruptcy case than that provided for by the Code. We think the fourth alternative courts have fashioned a retention answer to their (erroneous) understanding of the scope and meaning of the word "surrender." We conclude that they interpret the word "surrender" to mean the debtor giving up all interest, whatsoever, in, to, and upon the collateral property, and being obligated to take affirmative action to deliver the property to the creditor in performance of the "surrender" choice.

The nihilist camp is seen by us as having tried, unsuccessfully, to interpret § 521(2) in such a way as to leave undisturbed the state law rights of all parties if none of the (redemption, reaffirmation, or exemption and lien avoidance) alternatives are chosen and no other bankruptcy alternative comes into play. The pitfalls of such an approach are basically two: (i) the statutory alternatives among which the debtor shall choose if the debtor intends to retain the property and the statutory requirement of a choice to be performed, are read out of the statute; (ii) the nihilist alternative will, in all likelihood, not garner appellate court approval. The nihilist camp approach is correct in its conclusion that § 521(2)(A), read literally, limits the "retention" choices to those mentioned in the statute. It is also correct in its nagging understanding that interpreting such a limitation to preclude the post-bankruptcy reliance upon state law rights "just can't be right." However, the nihilist camp, in failing to tackle the meaning of surrender, runs afoul of *Butner* in a way different from the fourth

alternative camp; different, but fatal nonetheless. Recall, that in addition to the directive in *Butner* that federal courts are not free to promulgate federal rules upon undefined considerations of equity, the *Butner* Court points out that while "property rights are created and defined by state law," it is well within the power of Congress to modify, abrogate, or supercede particular state property right laws under its bankruptcy power.

The nihilist camp understands the word "surrender" to constitute such a modification, abrogation, or superceding, and therefore believes it appropriate to interpret the mandatory provision of § 521(2)(A) as meaningless, because of § 521(2)(C). However, once "surrender" is interpreted as the nihilist camp does, the nihilist courts should have recognized that the effect of such a meaning is simply one of the many ways Congress has modified, abrogated, and/or superceded state law, and should have been constrained to give effect to the Congressional intent. In addition to running afoul of *Butner* in this way, the assumed meaning of "surrender" hamstrings the nihilist courts a second way in their interpretative endeavors. Because "surrender" is assumed to mean a loss of state law right, the nihilist courts set themselves up to be interpretatively trashed by reviewing courts because of their misreading of § 521(2)(C).

Recall the First Circuit's summary rejection of the BAP misreading of this provision. Unfortunately, read alone § 521(2)(C) cannot be understood to mean what the BAP opinion in *Burr* says it means, but the BAP cannot interpret it any other way. Because "surrender" means loss of state law rights, and because such an effect is bad and must be read out of the Code, a vehicle must be found. Because of this assumed meaning, § 521(2)(C) must be misread, changed from:

(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title;

to:

*(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title, and any and all other rights under applicable non-bankruptcy, law;*

Congress, had it intended to write such a subsection, knew how to refer to applicable non-bankruptcy law.[171] It didn't, so it didn't.

Finally, because "retention" and "surrender" are understood expansively by the nihilist courts, "retention" to mean retention during and after bankruptcy and "surrender" to mean give up all rights state and federal during and after bankruptcy, the nihilist courts are blind to our suggestion that § 521(2) can be read as a coherent whole, and that § 521(2)(C) can be read in a way other than to nullify the preceding statutory provision. As we opine further on, "surrender," as the act of giving up one's rights to use the bankruptcy alternatives as the mechanisms for retaining property, generates a limited range for the word "retention" (the retention choice is the choice to retain property through the use of federal law), and likewise allows us to make sense out of § 521(2)(C) in a way that the First Circuit, in *Burr* for example, could not (we suggest) brush aside as easily as it could the rewriting proposed by the BAP opinion in that case. As we have mentioned, the Bankruptcy Code specifically provides for the effect of the closing of a bankruptcy case, on property not (actually) administered by the trustee. The property, according to 11 U.S.C. § 554(c), is abandoned to the debtor, and thereby, under the Code, fully administered. Likewise, it

---

171. *See, e.g.,* §§ 108(a); 363(f)(1); 365(h)(1)(A)(ii); 510(a); 522(b)(2)(B); 524(c); 541(c)(2); 552(b)(1); 723(a); 927, 943(b)(6): 1123(a); 1125(d); 1126(b)(1); 1142(a); 1222(d); 1322(c).

is now well settled that affirmative abandonment by the trustee pursuant to § 554(a) is an act by which property is jettisoned from the estate back to where it came from—the debtor.[172] The Bankruptcy Code, therefore, operates to provide the debtor with rights in, to, and upon property that was once property of the estate, but which through either action by a trustee or operation of law ceased to be property of the estate. Section 521(2)(C), then, does not need to be misread, if the terms "surrender" or "retention" are given their rightful seating, because the rights federalized by means of § 554 are, in fact, preserved by the provision. However, if the terms "surrender" or "retention" are given extra bankruptcy effect, then it is the Code itself that has changed state law, so that § 521(2)(C), cannot regenerate these rights taken away by the Code itself (the state law rights eliminated thereby are done for, and the provision purporting to leave rights under the Code unaffected cannot change that). In other words, the concept of abandonment assists us in rounding out our interpretation of § 521(2); it is meaningless to the nihilist camp courts within their interpretative context. Seeing no way out (or, no way to get to where they want to be) they have no alternative but to nullify a section of the Bankruptcy Code. As shown by the circuit court in *Burr*, the nihilist approach leads to the abrogation of itself, without defense.

Being a court in the Fifth Circuit, it is of course with the plain meaning camp that we are most involved. As we hope has become obvious, we believe that the plain meaning opinions have shortcomings, but that only two of the circuit court opinions (*Edwards* and *Burr*) actually succumb to the worst of them. We see the plain meaning courts as offering the correct reading of s 521(2)(A), concerning the necessity of choosing one of the three methods of "retention," if "retain" be the debtor's choice. We think the *Edwards* and *Burr* courts are wrong in their fervent promulgation of a federal rule to fill in for a non-existent problem; we think the *Taylor* and *Johnson* courts have offered insufficient and imprecise treatment of the meaning of the terms "surrender" and "retain," and have not at all dealt with § 521(2)(C). We do not read *Taylor* or *Johnson* as having created a federal rule of surrender, but we see that they are perceived as having done such. We are satisfied that the *Johnson* opinion provides room for our interpretative endeavor, because our conclusion, as to the limited choices facing a debtor who chooses to "retain" property, is consistent with the *Johnson* court. What we attempt to do, after this interlude, is to offer the specificity of definition and the overall construction of the statute (§ 521(2)) that *Johnson* lacks. We see the *Johnson* case as reactive in nature, reacting to the improper confection of a federal law of retention, reacting to the foolishness of the parties before it. Such reactions were necessary, but are seldom (and were not) sufficient. Inherent in the process of opinion as reaction is the problem of the probability that vision will be lacking, that the reactor will only react, not forge.

We think the Fifth Circuit missed one of two chances. Either the court had no jurisdiction due to the interlocutory nature of the order appealed, and missed the opportunity to tell parties similarly situated to go away until there was something justi-

---

172. It would be an arduous and unsuccessful search to attempt to find a court, now, that would interpret the process of abandonment as the *Bell* court did. *See* pp. 20–25, *supra*. As we have mentioned in another opinion (*see In re Carter Paper*, 220 B.R. 276 (Bankr. M.D.La.1998)), Chapter 7 case administration, nationwide, is in fact one gigantic process by which debtors get discharges and all property is abandoned by operation of law.

This Court presides over an asset administration ratio of between 22–28% of Chapter 7 cases. We understand the national average asset ratio to be something like 1.5% of all Chapter 7 cases. So, even this Court, presiding over an asset administration level some 12–15 times greater than the national average, generates in excess of 70% no-asset Chapter 7 cases, resulting in wholesale operation of law abandonment.

fiable on appeal, or, the court (if it had jurisdiction, which we doubt) could have made some sense of the mess that is § 521(2). Though we think the court missed on either score, we think it left room for sense to be made. In other words, the Fifth Circuit, in *Johnson*, did not make the same mistake as did the Seventh Circuit in *Edwards* or the First Circuit in *Burr*. Ultimately, its reaction was held in check.

(3) Our Camp, Lonesome In Our Focus Upon the Word "Surrender," As It Is Used in § 521(2)

We are satisfied, after surveying the different analytical approaches to § 521(2), that the word "surrender" is the key. Two reasons. The word "surrender" is found within § 521(2) and therefore should be worthy of having its meaning explicated. Second, if the word "surrender" is properly understood, the meaning of "retention" as it is used in § 521(2) can be properly understood.

We have offered our suggestions to the presumed meanings underlying the most problematic cases and the confused state of affairs resulting from *Taylor* and *Johnson*. It is now time for this Court to put up or shut up.

It is well established that, absent absurdity, statutory interpretation of the Bankruptcy Code begins (and, if possible, ends) with a term's "plain meaning." [173]

(4) Surrender, The Word

"Surrender" is defined by *Webster's Ninth New Collegiate Dictionary* as: "the action of ... giving up the possession of something esp. into the power of another; ... to give up completely or agree to forego esp. in favor of another ... [.]" [174] "Surrender" is defined in *Webster's II New Riverside University Dictionary* as: "[t]o relinquish possession or control of to an-

other as a result of demand or compulsion." "Surrender" is defined in *Webster's New World Dictionary, Third College Edition* as: "to give up possession of or power over ... [.]"

"Surrender" is defined by *Black's Law Dictionary* as:

> To give back; yield; render up; restore; and in law, the giving up of an estate to the person who has it in reversion or remainder, so as to merge it in the larger estate. A yielding up of an estate for life or years to him who has an immediate estate in reversion or remainder, wherein the estate for life or years may drown by mutual agreement between them. To relinquish, to deliver into lawful custody, or to give up completely in favor of another. [175]

"Relinquish" is defined by *Black's* as "[t]o abandon, to give up, to surrender, to renounce some right or thing." [176]

In isolation, the word "surrender" appears to mean the complete giving up of rights to a thing. It is also clear (plain) that the giving up of rights to a thing (or the giving up of a thing), if the thing is property or a property right, seems to involve not only the act of giving up, but the act of giving up in favor of another or **"into the power of another."** We think the next sentence will be the place at which we diverge from what we have determined to be the common understanding of the word "surrender" as it is used within § 521(2)(A).

The "other" to whom the debtor "surrenders" (if that be the choice) is **NOT** the creditor holding a security interest in the collateral, but rather is the **estate,** through its representative, the **trustee.** To choose "surrender" is to choose to forego the rights (and processes) made available by the Bankruptcy Code to effectuate Bankruptcy Code (a federal law)

---

**173.** *See, Nobelman v. Am. Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

**174.** Webster's Ninth New Collegiate Dictionary, 1118 (1990).

**175.** Black's Law Dictionary, 1444 (6th Ed.1990).

**176.** *Id.* at 1292.

grounded retention of the property, to give up the property to the trustee so that it can be administered (or not) according to the Bankruptcy Code process, free of the debtor's attempt to retain it from the effect of the bankruptcy process. If administration (full administration, in fact) is accomplished by means of abandonment under § 554(c), then the "surrender" is thereby complete, having come full circle so that the debtor re-acquires the pre-bankruptcy interest in the property (unless, pursuant to § 554(c), the court orders otherwise). Seen to mean this, "surrender" does not have a post-bankruptcy effect, does not affect the right to receive property by means of operation-of-law abandonment, which is expressly provided for by the Code. The symmetry is perfect. If (scheduled) property of the estate passes through the bankruptcy process unadministered, it is, by the terms of the bankruptcy process itself, fully administered. If the debtor chooses to surrender the property to the trustee for purposes of administration, free of the exercise by the debtor of any of the three options provided by the Code to "retain" the property, the trustee, who does not administer the property, fully administers it by giving it back to the debtor, shorn of bankruptcy effect.

We get support for our conclusion by the next step in our plain meaning analysis, which requires that we analyze the word "surrender" within the context, first, of the specific provision in which it resides, and second, within the context of the Bankruptcy Code as a whole.[177]

### (5) The Word Within the Code

#### (a) The Word Within § 521

We look again at the placement of the word "surrender" within the particular statute.

### § 521. Debtor's duties

\*\*\*

(2) if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate—

(A) within thirty days after the date of the filing of a petition under chapter 7 of this title ... the debtor shall file with the clerk a statement of his intention with respect to the retention or **surrender** of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property[.]

\*\*\*

(4) if a trustee is serving in the case, **surrender** to the trustee all property of the estate and any recorded information ... relating to property of the estate, whether or not immunity is granted under section 344 of this title[.]

 The word "surrender," then, is used twice within § 521, once as a general requirement affecting all property that becomes property of the estate (§ 521(4)) and once to delineate one of two choices provided to a debtor regarding particular property of the estate (§ 521(2)). When Congress uses a term repeatedly in the same statute we presume that "equivocal words have equivalent meanings."[178]

Our understanding that the "surrender" choice in § 521(2)(A) is a reference to the duty of surrender of all property of the

---

177. *See, Cohen v. Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *Fidelity Fin. Servs. v. Fink,* 522 U.S. 211, 118 S.Ct. 651, 139 L.Ed.2d 571 (1998).

178. *Cohen v. Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (phrase "debt for" as found throughout § 523 to be given parallel construction); *citing, Ratzlaf v. Unit-*

ed States, 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *see also, Davis v. Davis (In re Davis),* 170 F.3d 475, 480 (5th Cir.1999); *citing, Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990) ("identical words used in different parts of same act are intended to have the same meaning") (citations omitted).

estate (to the trustee for administration as property of the estate) is further supported by the plain language of § 521(2)(A), read even in isolation. Recall the introductory phrase of § 521(2): "if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by **property of the estate.**" Now, read it again, in combination with the pertinent part of subsection (A), "within thirty days after the date of the filing of a petition under chapter 7 of this title ... the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender **of such property** and, .... "

The pre-condition for the filing of the statement of intentions is the scheduling of consumer debts secured by **property of the estate.** The basic choice (the retention or surrender) is to be made with respect to **such property.** The statute is dealing with property of the estate. The choice, retention, or surrender, is to be made with respect to **such** property, that is, property that **is at the moment of the choice, property of the estate.** Given the timing of the choice, it is clear that there can be no surrender by the debtor of property of the estate other than to the trustee.

The "surrender" referred to is § 521(2)(A) is the same surrender referred to in § 521(4). The existence of the surrender requirement (at all) seems more formalistic than necessary (though it probably is simply the obligating mechanism for insuring the prospect of immediate transfer to the estate of the debtor's prepetition property). The use of the term "surrender" makes sense; a debtor who surrenders property (or who must surrender property) to the trustee has, during the bankruptcy case, no residual state law rights, given the preemptive creation of the estate.

 The absurdity of a "federalized" notion of "surrender," which extends the effect of surrender to the post-bankruptcy world, is exposed by means of the statutory scheme set up in § 521. A timeline is helpful in this regard. The creation of the estate and the appointment of a trustee effectively dispossesses the debtor, by preemptive federal law (§ 541), from rights in the property held pre-petition. To effectuate the disposition in favor of the entity created by the commencement of the case, § 521(4) requires that the debtor "surrender" all property of the estate to the trustee. There is no deadline within which this "surrender" is to be accomplished; it is a fact of bankruptcy life that all debtors must face. What was theirs is theirs no longer, unless the property is some way excluded from the estate by the workings of some section of the Bankruptcy Code. The property belongs to the estate and therefore must be surrendered. Now, recall a major premise of the "plain meaning" courts: "Reinstatement" is not a valid option because it is not a solution that is capable of being effectuated within the time frame mandated by § 521(2)(B). The debtor who "surrenders" has, in fact, by so choosing performed the choice because of the general duty of surrender. What the debtor cannot do, however, is perform surrender in favor of any entity other than the trustee (or estate). Without thinking through the inconsistency, the *Edwards* and *Burr* courts believe that the debtor must surrender to **the creditor,** that it is the creditor to whom the debtor relinquishes all rights (Taylor probably says something like this). This view of "surrender," however, would undermine the estate's authority (not to mention the Code itself). We agree that a debtor cannot simply "retain" property *vis a vis* the trustee; such a legal option is not susceptible of being performed while the property is estate property. However, neither can the debtor perform a "surrender" of estate property to anyone other that the trustee (the estate).

However, within § 521(2)(A), the Code contains a practical recognition that there is certain property that a trustee might not want to fool with, but that a debtor

might want to insulate from the bankruptcy process and the requirement of "surrender" (found in § 521(4)). Section 521(2) is mindful of the provisions of the Code, by which certain property might be insulated from the bankruptcy process, and even from the effect of state law rights. If one of these alternatives is to be chosen by a debtor, then the property subject to such a choice should not be included with the property subject to the general "surrender" requirement of § 521(4), if the alternative is in fact performed.

As well, it is recognized by § 521(2) that parties other than the debtor and trustee might have interests (in property of the estate) that might be affected by the alternatives available to a debtor as provided by other sections of the Code. The creditor holding a property interest in collateral securing its debt immediately comes to mind.

By the terms of the statute setting forth the bankruptcy right of redemption, we see that property subject to this right will not be administered by a trustee except by means of abandonment, which is a necessary pre-condition to redemption unless the property is exempt.[179] Given the general "surrender" requirement, § 521(2) requires a debtor to notify both the secured creditor and the trustee of the debtor's intention to redeem the property. The bankruptcy right of redemption, which if properly exercised, preempts state law rights of redemption, requires that the creditor get notice, **and** that the property be jettisoned from the estate by exemption or abandonment. The debtor makes the exemption claim; the trustee abandons; the creditor defends on the basis of valuation and payment amount.

By the terms of the statute setting forth the bankruptcy right of avoidance of liens covering exempt property, we see that property subject to this federal right might well be excluded from the estate, though not exempt under the terms of applicable state law due to a security interest, and that the federal law of lien avoidance will preempt state lien law in certain situations.[180]

**179. § 722. Redemption**

An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.

**180. § 522. Exemptions**

\* \* \*

(f)(1) Notwithstanding any waiver of exemptions, but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(A) a judicial lien, other than a judicial lien that secures a debt—

(i) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record. determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement; and

(ii) to the extent that such debt—

(I) is not assigned to another entity, voluntarily, by operation of law, or otherwise; and

(II) includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support; or

(B) a nonpossessory, nonpurchase-money security interest in any—

(i) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;

(ii) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or

(iii) professionally prescribed health aids for the debtor or a dependent of the debtor.

(2)(A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of—

We also note that certain other subsections of § 522 provide the debtor with avoidance powers regarding transfers of exempt property, etc. Given that the avoidance action is not property of the estate (but rather recovery pursuant to an avoidance power is property of the estate)—*see* § 541(a)(3), we will not address the extent to which § 521(2)(A) applies to these federal provisions.[181]

Given the general "surrender" requirement and prospect of a creditor losing state law granted lien rights through application of federal law, it is recognized as necessary that the trustee and creditor be notified of the debtor's intention to use federal law of exemption and lien avoidance as the basis for excluding the property from the estate and administration by the trustee (and therefore from the "surrender" requirement) and eradicating the effect of the creditor's state law property interest. In other words, contrary to the federal law requirement of surrendering property to the trustee, the debtor will use the Bankruptcy Code-based rights to retain the property, free of both the estate's and the creditor's interest.

By the terms of the statute (and the application of common sense), we understand that the Bankruptcy Code protects a debtor's right of discharge by limiting the means by which a debtor can be bound, post-bankruptcy, for a pre-bankruptcy debt.[182]

> (i) the lien;
> (ii) all other liens on the property; and
> (iii) the amount of the exemption that the debtor could claim if there were no liens on the property;
> exceeds the value that the debtor's interest in the property would have in the absence of any liens.
> (B) In the case of a property subject to more than I lien, a lien that has been avoided shall not be considered in making the calculation under subparagraph (A) with respect to other liens.
> (C) This paragraph shall not apply with respect to a judgment arising out of a mortgage foreclosure.
> (3) In a case in which State law that is applicable to the debtor—
> (A) permits a person to voluntarily waive a right to claim exemptions under subsection (d) or prohibits a debtor from claiming exemptions under subsection (d); and
> (B) either permits the debtor to claim exemptions under State law without limitation in amount, except to the extent that the debtor has permitted the fixing of a consensual lien on any property or prohibits avoidance of a consensual lien on property otherwise eligible to be claimed as exempt property;
> the debtor may not avoid the fixing of a lien on an interest of the debtor or a dependent of the debtor in property if the lien is a nonpossessory, nonpurchase-money security interest in implements, professional books, or tools of the trade of the debtor or a dependent of the debtor or farm animals or crops of the debtor or a dependent of the debtor to the extent the value of such implements, professional books, tools of the trade, animals, and crops exceeds $5,000.

181. We only mention them: § 522(g), (h), (i), (j), (k).

182. **§ 524. Effect of discharge**

\*\*\*

> (c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if—
> (1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;
> (2)(A) such agreement contains a clear and conspicuous statement which advises the debtor that the agreement may be rescinded at any time prior to discharge or within sixth days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim; and
> (B) such agreement contains a clear and conspicuous statement which advises the debtor that such agreement is not required under this title, under nonbankruptcy law, or under any agreement not in accordance with the provisions of this subsection;
> (3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that—
> (A) such agreement represents a fully informed and voluntary agreement by the debtor;

Though a debtor is free to sign a reaffirmation of an unsecured debt, the only reason for reaffirming a pre-petition debt recognized by § 521(2)(A) is to maintain an interest in property securing the debt post-bankruptcy, by contracting (in bankruptcy) upon the pre-bankruptcy contracts so that the reaffirmation agreement (as made in bankruptcy) will be enforceable by both parties post-bankruptcy. For this reason, the debtor is protected by the requirements of § 524(c). The primary effect of the reaffirmation agreement (debtor waives discharge and thereby remains personally liable post-bankruptcy) is balanced by the creditor foregoing (as long as the terms of the reaffirmation agreement are complied with) the exercise of contract rights to enforce the claim and security agreements as they may have existed before the (voluntary) execution of the reaffirmation agreement.

By the terms of the statute, the general surrender provision is not subservient to the reaffirmation agreement section of the Code (or the reference thereto found in § 521(2)(A) or (B)). Therefore, the debtor who determines to keep property that is collateral for debt must somehow effectuate the exclusion of that property from the bankruptcy estate; otherwise, the surrender of the property to the trustee will expose the property to trustee administration/disposition, which would undermine the whole reason for reaffirmation. Pulling the property out from that to be surrendered can be accomplished in one of a number of ways that quickly come to mind. First, if the property is properly claimed exempt, it is thereby pulled out of the estate, and the reaffirmation process can proceed free of the surrender requirement. Second, the debtor or the creditor (or both) could effectuate abandonment by the trustee under § 554(a) or could compel abandonment under § 554(b). Third, it might even be that there is equity in the property over and above the creditor's lien value that the debtor could purchase from the estate through action taken by the trustee (this does not circumvent the "surrender" requirement, but extracts the property from the estate after its surrender). Finally, the property could be so under water (value-wise) that the debtor and creditor, secure enough in the prospect that the particular property will not be administered except through § 554(c), could forego the effort to exclude the property from the estate prior to operation-of-law abandonment under § 554(c).[183]

The Code recognizes that there is inherent cost in a creditor exercising rights under § 362 but also that the trustee should be apprised of a debtor's intention to use the reaffirmation provisions so that the trustee can have the opportunity to analyze whether the estate should forestall or facilitate reaffirmation (by administering or not administering the property). Given the interestedness of the creditor and the trustee, the Code requires notice of the choice to use the Bankruptcy Code

(B) such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and
(C) the attorney fully advised the debtor of the legal effect and consequences of—
(i) an agreement of the kind specified in this subsection: and
(ii) any default under such an agreement;
(4) the debtor has not rescinded such agreement at any time prior to discharge or within sixth days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;
(5) the provisions of subsection (d) of this section have been complied with; and

(6)(A) in a case concerning an individual who was not represented by an attorney during the course of negotiating an agreement under this subsection, the court approves such agreement as—
(i) not imposing an undue hardship on the debtor or a dependent of the debtor; and
(ii) in the best interest of the debtor.
(B) Subparagraph (A) shall not apply to the extent that such debt is a consumer debt secured by real property.

183. Probably this is done much, especially in light of the fact that nationwide only 1.5–2.0% of Chapter 7 cases are actually administered.

reaffirmation provisions. This notice (which furthers the codified policy of insuring the voluntariness of the reaffirmation process, by insuring that it is the debtor who first makes known her desire to reaffirm) puts the creditor on notice that it might not be necessary to move forward with stay relief and an enforcement action. The notice also puts the trustee on notice that the debtor (who, by filing the case, is obligated to surrender the property) does not deem the property worthy of administration by the trustee, desires to utilize the bankruptcy alternative of reaffirmation as the mechanism whereby the creditor can obtain an enforceable post-bankruptcy obligation, and may be calling upon the trustee to abandon or otherwise transfer (or insure the transfer of) the property to the debtor.

 Through this discussion of the relationship between the three methods of retention set forth in § 521(2)(A), we have attempted to outline the general structure of the relationship between the general duty of surrender of the property (§ 521(4)) and the necessity to exclude property from this general "surrender" obligation to effectuate one of the alternatives. Before we move on, we stop to suggest that in addition to the plain language of § 521(2)(A), which we read the same way (regarding the exclusive methods of retention) as the plain meaning courts, our placement of the concept of "retention" within the context of the overall duty of surrender (§ 521(4)) is an additional basis for concluding that the plain meaning courts correctly limit the means of "retention" (as the term is used in § 521(2)(A) to those alternatives set forth in § 521(2)(A)). We have looked through the Code sections applicable to Chapter 7, trying to find other ways a debtor might avoid the surrender requirement of § 521(4), but cannot find any. Therefore, because "retention" must be understood as the process by which a debtor avoids the obligation to "surrender" property to the trustee, it is clear that there are only the

three mentioned methods of "retention" as that term is used in § 521(2)(A). Remember, though, that we interpret "retention" to be applicable only within the bankruptcy process.

From the words of the statute, which establish the choices and the timing of the choices, we conclude:

1. At the moment the choice is necessary, a debtor who chooses "surrender" can surrender **such property** to no one but the trustee.

 2. At the moment the choice is necessary, a debtor who chooses "surrender" is notifying all parties receiving notice of the choice that the debtor has opted for the "surrender" referred to as the general obligation of the debtor in § 521(4), and will not attempt to "retain" property through exemption/lien avoidance, redemption, or reaffirmation. By this choice the parties receiving notice are on notice that the debtor intends to take no action inconsistent with the general obligation of surrender of the property to the trustee, or full administration of such property (of the estate) by the trustee.

 Seen in this light, neither "surrender" nor "retain" (or "retention") has a post-bankruptcy effect because it is only within the bankruptcy estate administration world that the terms have meaning. The reason the three choices provided in § 521(2)(A) are exclusive is that the choices provided are the only methods by which a debtor, within the bankruptcy process, can (within the bankruptcy process) except property of the estate from the general requirement that a debtor surrender property of the estate to the trustee. There is no language whatsoever within § 521(2) that purports to extend the choices—retention or surrender—to the non-bankruptcy world. Remember *Butner*. Unless the bankruptcy world (by the terms of the statute creating it) specifically cares about the non-bankruptcy world judges (under the guise of equity) do not have the power to formulate the usurping

of the non-bankruptcy world. We submit that § 521(2), by its plain language, does not care about the non-bankruptcy world. There are (as we have pointed out) other provisions that do. Because of the plain language of § 521(2) (and § 521(4), with which it must be read to be properly understood), the interpretations of the words "surrender" and "retention" that we have discussed are wrong; the use of these incorrect interpretations as ground for extending the effect of § 521(2) to the post-bankruptcy world is contrary to the Supreme Court directive of *Butner*.

### (b) The Word Within Other Code Sections

The word "surrender" is frequently used by Congress to delineate debtor or trustee responsibilities elsewhere in the Code. In these other Code sections, Congress draws clear distinctions between the "surrender" of property and its dispossession or delivery. For instance, compare § 365(d)(4) [184] where the trustee is instructed to "immediately **surrender** such nonresidential real property to the lessor" with § 365(d)(5) [185] where the trustee is instructed to "immediately **surrender possession** of the premises to the airport operator." Another distinction is drawn in § 727(d)(2) [186] where

the debtor risks his discharge unless property acquired post-petition is **delivered** or **surrendered** to the trustee. Here the terms "deliver" and "surrender" are used in the alternative and we assume that Congress intended a distinction between the two. In fact, it is clear that § 727(d)(2) does impose two distinct obligations upon debtors who acquire (possession of) property of the estate. The first is to report the acquisition or entitlement and second, the surrender or delivery. The reporting and surrendering impose the obligation to advise the trustee and take no action inconsistent with the estate's interest. The reporting and delivery is a different obligation. The trustee, upon receiving notice of the acquisition or entitlement, makes an administrative determination and if in the best interest of the estate, demands that the debtor (who has surrendered the property) deliver the property to the trustee.

Other distinctions are drawn in the bankruptcy code concerning various parties' duties to the trustee. As mentioned earlier, § 521(4) requires that the debtor "**surrender** to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate. . . ." But § 542(a) requires that

184. (4) Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor. 11 U.S.C.A. § 365(d)(4) (West 1999).

185. (5) Notwithstanding paragraphs (1) and (4) of this subsection, in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is an affected air carrier that is the lessee of an aircraft terminal or aircraft gate before the occurrence of a termination event, then (unless the court orders the trustee to assume such unexpired leases within 5 days after the termination event), at the option of

the airport operator, such lease is deemed rejected 5 days after the occurrence of a termination event and the trustee shall immediately surrender possession of the premises to the airport operator; except that the lease shall not be deemed to be rejected unless the airport operator first waives the right to damages related to the rejection. In the event that the lease is deemed to be rejected under this paragraph, the airport operator shall provide the affected air carrier adequate opportunity after the surrender of the premises to remove the fixtures and equipment installed by the affected air carrier. 11 U.S.C.A. § 365(d)(5) (West 1999).

186. (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee[.] 11 U.S.C.A. § 727(d)(2) (West 1999).

any entity ... in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease ... shall *deliver* to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

From a practical standpoint, it seems to us to be well accepted (practically) that "surrender" as contemplated by § 521(4) is "constructive"—debtors do not show up at § 341 meetings with all of their possessions in tow. We distinguish this obligation imposed upon the debtor from that imposed upon other entities by § 542(a), which requires the actual delivery to the trustee of property of the estate, even that property which might be exempted by the debtor. Further, we note the requirement in § 543(b) that requires delivery to the trustee of property of the estate by a custodian in possession of such property as of the commencement of the case.[187]

### (6) What About the Bankruptcy Rules?

If we look further, to the Federal Rules of Bankruptcy Procedure ("FRBP"), we find no reference to the word "surrender," but we do find some rules relevant to our discussion.

First, what we do not find. We do not find a general delivery rule requiring debtors in Chapter 7 to deliver property to the trustee as a necessary component of the processing of every bankruptcy case (our guess is that if such a rule was proposed, there would be a nationwide trustee resignation ceremony, to protest), notwithstanding an entire section of the Rules (Part VI) entitled "Collection and Liquidation of the Estate." The debtors Statement of Intentions required by § 521(2) is required to be "served upon the trustee and the creditors named in the statement on or before the filing of the statement." [188] Schedules of assets and debts are to be filed.[189] Regarding estate administration, it is clear that delivery of property to the trustee is not necessary in all cases. In fact, "if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims." [190]

Though there is no general delivery requirement, the prospect of delivery is referred to. In Rule 7001, the adversary proceeding is defined (in part) as "a proceeding (1) to recover money or property, except a proceeding to compel the debtor to deliver property to the trustee ..." This Rule clearly does not refer to a proceeding to compel "surrender" of property, and clearly pre-supposes the prior "surrender" by the debtor as the basis for dispensing with the adversary proceeding process in favor of the contested matter proceeding.

"Surrender," when analyzed within the context of the particular subsection context (§ 521(2)), the particular section context (§ 521), and within the general context of Code and Rules, can only mean the con-

---

187. **§ 543. Turnover of property by a custodian**
 \*\*\*
 (b) A custodian shall—
 (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
 (2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

188. FRBP 1007(b)(2).

189. FRBP 1007(b)(1).

190. FRBP 2002(e). We think this Court is the only court in the country that does not open all Chapter 7 cases this way. We open none this way.

structive, operation-of-law relinquishment or giving up of rights in, to, and upon property that by commencement of the case becomes (immediately) property of the estate, in favor of the Chapter 7 trustee.[191] This overriding constructive surrender has, of course, long been understood as the focus (and ground) of the bankruptcy courts' equitable jurisdiction over the res (the estate property) that has historically been considered to be in the actual **or** constructive possession of the bankruptcy court.[192]

■ Our understanding, then, of the word "surrender" comports with the plain meaning of the Code. It comports with the basis for the equitable nature of the bankruptcy process. "Surrender" is, in fact, accomplished by the filing of the bankruptcy case. The obligation "to surrender" is elucidated to advise debtors of the by operation-of-law "surrender" so that no practical action will be taken by a debtor after the commencement of the case that conflicts with the surrender of pre-bankruptcy property to the estate. The required "surrender" is therefore probably best seen as a prohibiting obligation, the obligation not to ignore the legal fact of the creation of the bankruptcy estate. "Surrender" is not, within the bankruptcy context, synon-

ymous with actual delivery, but is better seen as a version of constructive delivery (to the estate). The word "delivery" is used in the Code to indicate actual delivery, which is only necessary in the event of actual administration by the trustee, as opposed to full administration by non-administration. This is what "surrender" means.

From the meaning of surrender we get, in an easy jump, to the meaning of "retain." As defined by *Webster's Ninth New Collegiate Dictionary*, "retain" means "1 a: to keep in possession or use ... *syn* see KEEP." "Retention" is defined that as "1 a: the act of retaining: the state of being retained." Within *Webster's II New Riverside University Dictionary*, "retain" is defined as "[t]o keep or hold in one's possession...."

(7) Retention or Surrender. Retention or Surrender.

If retention is chosen, the debtor is providing notice of her intention to circumvent the surrender requirement and to use one of the exclusive alternative methods of excepting property from the requirement that it be surrendered to the trustee. The choice to surrender is, simply, the choice not to utilize one of these alternatives, but

---

**191.** Oh, we almost forgot to mention the definition of the word "deliver." According to *Webster's Ninth New Collegiate Dictionary*, "deliver" means: "1: To set free ... 2.a: to take and hand over to or leave for another: CONVEY ([deliver] a package) b: HAND OVER, SURRENDER ( [delivered] the prisoners to the sheriff) ( [delivered] themselves over to God)." The *Webster's II New Riverside University Dictionary* defines "deliver" as: "1. To set free ... 3. To surrender to another: HAND OVER (*delivered* the suspect to the FBI) 4. To take to the intended recipient (*deliver* mail) ..." *Black's Law Dictionary, Sixth Edition* defines "delivery" as "[t]he act by which the res or substance thereof is placed within the actual or constructive possession or control of another." As noted in *Black's Law Dictionary*, delivery can be actual or constructive. "Actual delivery consists in the giving real possession to the vendee or his servants ... It is a formal immediate transfer of the property to the vendee." "Constructive

delivery is a general term, comprehending all those acts which, although not truly conferring a real possession of the thing sold on the vendee, have been held, by construction of law, equivalent to acts of real delivery." As we discuss for a moment above, there is room for both surrender (or constructive delivery) and actual delivery within the basic codal construct. Though "surrender" and "delivery" are often used interchangeably within the dictionaries, delivery when used within the context of a thing or a transfer, requires an object to receive the thing. Perhaps surrender is synonymous with constructive delivery, but it is not the same thing as actual, physical delivery.

**192.** *See* the jury trial cases *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 53 S.Ct. 50, 77 L.Ed. 185 (1932); *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391, (1966); *Granfinanciera v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26, (1989).

to abide by the underlying codal scheme as it concerns the property dealt with.

If the property is to be retained as opposed to surrendered, more must be done (to effectuate one of the alternative methods of retention). If the choice be to surrender (or, better put, not to retain), then the debtor has acquiesced to the processes of estate administration and will not attempt to interject the federal alternative rights to keep the property free of the estate's right to have it surrendered.

We are back at § 554(c), because this abandonment by operation-of-law provision is an integral part of the bankruptcy process to which the debtor has surrendered. If surrender is properly understood, we think it beyond argument that the debtor who surrenders does not give up any rights that may be inherent in or come her way by operation-of-law abandonment under § 554(c) (or, for that matter, abandonment of any stripe). It is the federal law to which the debtor has surrendered that provides the debtor with the rights (if any) through abandonment. "Retention," as a mirror image choice, might well require abandonment (redemption, reaffirmation) under § 554(a), (b), or (c), but the difference between "retention" and "surrender" is the existence of rights vis a vis the creditor party (and, perhaps to a limited extent, the trustee) that can be obtained in favor of the debtor **through the operation of the Bankruptcy Code.** These rights are not available to the debtor who in fact surrenders, and therefore the surrendering debtor obtains only the general rights provided to all debtors: automatic stay of limited duration, exemption rights, right to discharge, right to residual interest if the estate is solvent, and right to residual nonbankruptcy interests if property is abandoned by operation of § 554.[193] No federal redemption rights. No avoidance of liens. No bankruptcy contract of reaffir-mation that will act to supplant the pre-bankruptcy contract for purposes of enforcement by both parties.

In choosing not to use federal bankruptcy law to obtain the right to retain estate property free of the obligation to surrender it to the trustee, the debtor cannot look to the bankruptcy law for help with respect to the property, notwithstanding the "analysis" of the fourth alternative camp. However, the fact that the debtor can ask no assistance from bankruptcy law regarding the property does not require the conclusion that the debtor, to whom the bankruptcy law sends the property after the bankruptcy estate is fully administered, cannot ask of the state law upon which the rights and obligation are grounded for whatever assistance (or protection) there may be. It is on this point that the *Burr* and *Edwards* Courts are plainly wrong, that the *Taylor* Court falters, and that the *Johnson* Court has been misunderstood. The logic that correctly prompted the repudiation of the fourth alternative courts, that federal courts cannot create rules of equity upon general considerations because state law controls property rights unless supplanted by federal law, is ignored by either the fashioning of the opposition rule or the failure to pronounce a viable interpretation of the statute. Because the *Edwards* and *Burr* courts were more intent on pushing a social/political agenda in response to that pushed by the fourth alternative courts, they forgot to figure out that the same basis of precluding the preemption of state law rights (as a matter of "equity") through the creation of the "right of reinstatement" also precluded the preemption of state law rights through the extension of the meanings of "retention" and "surrender" to the post-bankruptcy world.

The debtor who successfully "retains" property may well affect, change, or modi-

---

**193.** We guess that the surrendering debtor also surrenders the right to compel abandonment under § 554(b), but because we are not faced with this question here, do not face it.

Also, we point out below that § 521(2)(C) reserves to the surrendering debtor the right to change her mind.

fy pre-bankruptcy state law rights because the exclusive means for retaining property, free of the obligation of surrender, may well preempt state law regarding the property. The debtor who "surrenders" may well lose the property to the workings of bankruptcy law, but, if the property is not somehow affected by the preemptive bankruptcy process during the administration of the estate, the process, itself, says that the property goes back. The discharge (presumably) is in place, but review of § 524 shows that the discharge relates to personal liability. There is no codal effect upon property subject to lien rights unless there has been one generated by the administration of the estate prior to closure of the case (by means of the "full administration" of the property).

At that point (the point of receipt-back through abandonment) the bankruptcy is finished. The parties are left to the law that they started with. Just as there is no basis for suggesting that federal law should allow the making up of a right of reinstatement, there is no basis for making up a loss of state law rights that should not be affected one way or another.

There can be no federal interest sufficient to pass muster under *Butner* because it is the federal law itself that creates the federal/state interplay. Read this way, the fallacy of the *Edwards* and *Burr* expansion of the effects of discharge so that all rights in the property are lost (forever) unless one of the (federal) retention alternatives are chosen, seems clear (to us). The discharge is the discharge, with its effects itemized in § 524. We cannot fathom the basis upon which these courts determined to promulgate additional effects (as a matter of "equity") in the face of the plain meaning of the statutory interplay between § 521 and § 554 and the express provisions of § 524. Simply put, the discharge is not relevant to the proper understanding of § 521(2). It has no bearing. There is no need to offer ungrounded hypothetical economics of the "situation." The discharge does what it does, but it

does not purport to effect lien rights. Some other provision of the Code would have to, but other than the provisions mentioned (§§ 722, 522, perhaps 524(c)), none do. The only provision we have found that is relevant to the post-bankruptcy world of lien rights that were not affected in/by the bankruptcy world is § 554. Section 554 is a bankruptcy/federal law that gives the property back if it has been scheduled but not administered. Gives it back to the debtor as though fully administered. The "equitable" realization of the discharge as a ground for doing away with state law lien rights cannot work, conceptually or practically. Not only can it not work, but such an "equitable" promulgation in fact contravenes the plain meaning of § 554(c). How could the Code provide to give property back to a debtor if another section of the Code took away all of a debtor's post-bankruptcy rights in the property? It couldn't.

Reading § 521(2) as we do, alone and within the context of the entirety of § 521 and the Code, creates no potential for internal conflict. It works. Non-bankruptcy law has its effect pre-bankruptcy. Bankruptcy law takes over at the commencement of bankruptcy. If bankruptcy law is not used to administer property or to reaffirm, extinguish, modify state law rights, then it is to state law that the lien and property rights return to after full administration of the bankruptcy case. No politics. No social theory. No economic espousals.

(8) We Try To Tie Up

■ We think we know what § 521(2) means. The debtor must choose either to retain property securing consumer debt through one of the exclusive methods listed in § 521(2)(A), which is tantamount to choosing not to surrender, or must choose to abide by the general law of surrender as required by § 521(4) (which is tantamount to choosing not to use any of the methods made available by the Code to exclude the property from the surrender requirement).

Section 521(2)(B) requires that the choice be performed. We submit that a timely reaffirmation attempt or timely redemption or lien avoidance motion (probably as required by Local Rule) constitutes performance of the intention to retain. There is probably no performance necessary to effectuate the choice of "surrender," because it has already been performed by means of the choice not to retain. The debtor has no basis upon which to rely upon the bankruptcy law to avoid the legal and possible administrative effects of the debtor's surrender to the bankruptcy process. If the trustee requests delivery, it shall be done.[194]

Section 521(2)(C) has definite meaning. The general meaning, of course, is that if the Bankruptcy Code provides either the trustee or debtor with any rights in the property, a choice does not do away with those substantive rights. This means, most generally, that a debtor can probably change her mind. Redemption can become reaffirmation, or (oops, we forgot we claimed it as exempt) exemption and lien avoidance or surrender. Surrender can become reaffirmation (by agreement) or redemption, etc. Second, the automatic stay remains in effect until modified by order or operation of law. Third, regardless of the debtor's choice, the trustee's administrative rights are not affected, so that if there is equity, the property can be liquidated for the equity. The trustee can object to the exemption. If there be some arrangement that the trustee wishes to make with the creditor holding the lien rights, the choice of the debtor does not preclude the trustee from doing so. The creditor is not mentioned in § 521(2)(C); the creditor need not have been. The creditor's rights regarding the automatic stay are set forth in § 362.[195] The creditor might have rights under § 523, can defend

under § 522 or § 722, and can refuse to agree to a reaffirmation under § 524(c). The creditor can file a claim. Presumably the creditor is a party with standing under § 727. The creditor can move under § 554(b) to compel abandonment. The creditor can attempt to effectuate disposition by the trustee directly to it pursuant to state law or § 363 or § 725.

Finally, § 521(2)(C) applies to protect the debtor's residual rights under § 554(c) in the event the property is not administered by the trustee. This right is a right provided under the Code. Presumably the creditor's rights in the lien will be whatever they will be under state law, once the bankruptcy process is finished. Again, there was no reason to include the creditor in § 521(2)(C), because it is the trustee and the estate with which the debtor is concerned, given the general surrender requirement of § 521(4).

This last point will be our last point here. The absence of reference to creditor is the final piece to our interpretive puzzle. We have argued that § 521(2) is concerned primarily with the question of whether the debtor will attempt to exclude property that otherwise must be surrendered to the trustee. The creditor is affected by the debtor's choice, perhaps. However, because § 521 deals with the debtor's duties to the estate (and trustee), the question of protecting rights is only relevant to the debtor and the trustee. The absence of creditor makes perfect sense.

The relations between the debtor and the creditor and between the trustee and the creditor, will be dealt with elsewhere. Section 521 sets out the baseline relationship between the debtor and the trustee. Section 521 is concerned with the bankruptcy administration that might or might not unfold from the commencement of the

---

194. Again we mention that surrender, in the vast majority of Chapter 7 cases (approximately 98%) has no effect *vis a vis* the trustee because the property is fully administered through non-administration and § 554(c) abandonment.

195. There are also the rights under § 361 to adequate protection.

case and from the moment by which the debtor has to choose, regarding this certain property of the estate. To the extent § 521(b) is concerned with the post-bankruptcy world, it is only through the express protection, found within § 521(2)(C), of a debtor's Code-given residual interest in property that might be abandoned by operation of § 554(c) and returned to the debtor, fully administered.

### (9) We Promised No More § 521 Opinions—How Can This Be?

### The Way Our Interpretation Works

The litigation that has arisen probably cannot be helped within the fourth alternative circuits, nor can it be helped in the *Edwards* or *Burr* circuits (without en banc review). We are primarily interested in being right, and secondarily interested in not being reversed. We do admit, however, to a tangential interest in the prospect of no more waste of judicial and client resources and seeing the recognition of the proper contextual placement of state and federal law.

Under our interpretation of § 521(2), there is no question that there is no bankruptcy-generated (or judicially made up) right of reinstatement. Also, there is no question that unless a debtor intends to abide by the "surrender" requirement that is effective upon the commencement of the case, there are only three methods by which the bankruptcy process can be used to effect retention by the debtor of property of the estate, free and clear of the obligation to surrender. The three methods are those listed in § 521(2)(A). However, our interpretation of the statute (we think), because it properly defines "surrender" and puts it in its proper context, should do away with confusion about what it means to choose "surrender." Debtors (if courts use our work here) can choose "surrender" without fear of post-bankruptcy consequences, except those that would

otherwise flow from the non-bankruptcy law rights and obligations arising from the contracts (and, if applicable, the fact of bankruptcy).

We harken back to the facts of *Johnson.* Remember the camcorder? Remember the debtors' argument, that they had the right to retain it until the trustee or some other party with the right to do so obtained possession? Because of the confused state of the law, the obvious intention of the creditor to impose post-bankruptcy obligations upon the debtor that would survive discharge, and the purportedly not confused (but nevertheless groundless) opinions promulgating the right of reinstatement, it was impossible for the *Johnson* debtors honestly (or accurately) to make their choice. The description of their supposed right was our definition of "surrender." Because "surrender" refers to the obligation to surrender property of the estate to the trustee, the *Johnson* debtors would have been absolutely correct in their explication of their right to remain in possession of the camcorder had they only chosen "surrender." Why did they not do so? Well, aside from the already mentioned "right of reinstatement" carrot, the debtors were a test case, made so by a creditor who likewise misread the law and believed that the choice of surrender by a debtor imposed post-petition bankruptcy-generated obligations upon the debtor, in favor of the creditor. The creditor believed that if it could press the debtors into a surrender choice, the choice could then be converted to a set of mandatory obligations (far outside of a creditor's state law rights and remedies) which, if not complied with, could bootstrap the creditor into a denial or revocation of discharge action (or at least the basis for a post-petition judgment of some sort upon the post-petition—i.e., not subject to discharge obligation).[196]

---

**196.** There is, in fact, a reported opinion dealing with a creditor's post-bankruptcy attempt

to impose a post-bankruptcy obligation upon the debtor because of the choice of "surren-

However, if "surrender" is properly understood, creditors like the one in *Johnson* will understand that the surrender choice is a choice between the debtor and trustee, and that in so making the choice the debtor does not lose the chance to change her mind, does not lose the protection of other substantive protections of the Code (automatic stay, for example), and does not lose any rights inherent in the prospect of abandonment by operation of § 554(c). The creditor therefore can undertake to obtain stay relief or deal directly with the trustee for disposition under § 363 or § 725, or can simply wait until the stay is lifted by operation of law (probably coincident with § 554(c) abandonment) and thereafter enforce whatever lien rights applicable non-bankruptcy law allows it to enforce.

Simple. What is more, the simplicity flows clearly from the plain meaning of the text of the statute. No playing equity god. No making up groundless rules. No use of the Bankruptcy Code as a leverage game. No waste of time or money.

Before we crow too loudly, though, we ought to address an anticipated criticism. "Why would anyone choose to reaffirm if § 521(2) means what you say it does?" Several reasons spring immediately to mind. First, the creditor does not have to keep taking the money from the debtor after commencement of the case, but can treat its claim as one against the estate, only.[197] Though this is true regardless of the debtor's choice, a creditor who understands our approach would understand that refusal to take the payments and a subsequent stay relief motion along with a proof of claim (or an attempt to effect disposition from the trustee of the estate property) would place a debtor in the position of making a real choice. "Do I want the property enough to reaffirm (assuming redemption and exemption/lien avoidance are not options)"? Second, if the security agreements contain a bankruptcy default clause that is enforceable under state law (or is even arguably enforceable under state law), debtors will not, under our analysis, be able to rely upon any federal-based right of reinstatement as ground for keeping the property post-bankruptcy, and would face the uncertainty of non-bankruptcy law rights applicable under the contracts even if payments are maintained during the bankruptcy case. This uncertainty would provoke debtors to make a

der." The case is *Green Tree Financial Servicing Corp. v. Theobald (In re Theobald)*, 218 B.R. 133 (10th Cir. BAP 1998). The Theobalds effected their noticed intention by physically surrendering their mobile home, but refused to execute documents that would allow Green Tree to dispense with state law foreclosure proceedings and immediately take "good" title to the property. Green Tree responded with a motion to lift the stay and to compel the execution of these documents. The bankruptcy court lifted the stay but refused to compel execution on the grounds that such a requirement would place the debtors in an "untenable position" were there multiple lienholders, and that the Bankruptcy Code "anticipated that surrender would be followed by the creditor exercising steps to foreclose on the lien or execute on the judgment." The Tenth Circuit Bankruptcy Appellate Panel ("BAP") agreed with the bankruptcy court. First, the court found no explicit language in § 521(2)(A) requiring the execution of such documents. Green Tree responded that such a requirement was implicit in that statute in order to "give effect" to the term "surrender." The court, however, rejected this argument based on the language of § 521(2)(C), that prohibits § 521(2)(A) and (B) from affecting rights under Title 11. Further, the court draws support from *Taylor* that surrendered property is to be disposed of under state law. The shame of a case like *Theobald* is that it ever happened.

**197.** Remember, *vis a vis* the estate, the creditor, even if current when the case is filed, has the right to file a proof of claim for the entire amount due, bifurcated into secured and unsecured. At the commencement of the case, the claim is no longer against the debtor but (only) one against the estate—the property is estate property, the debt is a right to payment, and therefore a claim against the estate. We know of no bankruptcy requirement that a creditor of the estate must continue to accept payments from a debtor who, as of the commencement of the Chapter 7 case, is a third party. Reaffirmation is a voluntary process.

real choice. "Should I continue to make the payments if my agreements contain a bankruptcy default clause even if to do so would insure current status upon § 554(c) abandonment? Is it worth it to forego reaffirmation only to face an enforcement action under non-bankruptcy law on the basis of the non-curable (except through the reaffirmation process) default caused by the fact of bankruptcy"?

Finally, we understand that we are a bankruptcy court, and that as the *Johnson* case shows, it is possible for debtors not to be current on payments on secured debt. If there is a default in payments, the only way the debtor could hope to obtain the right to keep the property post-bankruptcy is to reaffirm (assuming the beady-eyed creditor is willing to enforce the security interest during bankruptcy (after stay relief) or after bankruptcy on the basis of default).

There. There are three often-occurring situations, generating at least a real choice to be made—to reaffirm or not to reaffirm—with plenty of incentive (if the property is worth keeping for a debtor who can afford it) to reaffirm.[198]

Another question that could be urged as an attempt to trip us up is "what happens if a debtor does not perform the stated intentions; huh? huh?" Frankly, we care very little about this, but do have some observations. First. If our analysis is used, the surrender choices will be properly understood to have been made *vis a vis* the trustee and will not be seen as imposing any post-petition obligation to or loss of rights in favor of the creditor. Therefore, a debtor who understands the incentive to reaffirm but rejects it in favor of surrender will remain protected by the

automatic stay and will give up only what rights are generally given up by filing bankruptcy. If properly understood, "surrender" is, in fact, a choice that can be rationally made (as the term is understood by the caselaw we have discussed, it is "surrender" that a debtor would never choose). We therefore think that the "performance anxiety" would be greatly reduced; the choices would be clear. The making of the surrender choice is the performance of surrender, because the surrender choice is only the choice not to retain through the use of bankruptcy alternatives but to submit to the general requirement that property of the estate be surrendered to the trustee.

We think that there will be fewer performance problems rather than more, and we think that the failure to perform the reaffirmation, redemption, or exemption/lien avoidance choices are in fact self-curing in the bulk of Chapter 7 cases,[199] which are closed at a nationwide median age of approximately 120 days after filing. The real basis on which we think problems with performance will disappear is the absence of made-up rights favoring either debtor or creditor. We think this will result in true tension that will cause true weighing of alternatives and real choices. Litigating to attempt to have a court confect a post-bankruptcy set of obligations in place of applicable non-bankruptcy law under the guise of being interested in a debtor's choice about a $150 camcorder will not happen. Debtors can choose surrender and take their bankruptcy lumps (and if the property is returned by § 554(c), take their state law lumps). Creditors will have to face the fact of just what kind of loan they made;[200] debtors,

---

198. We have never trusted the "why would a debtor ever reaffirm" straw man. The problem is not debtors who do not want to reaffirm. The problem, as evidenced by the protections of § 524, is debtors who foolishly want to reaffirm notwithstanding the prospect of jeopardizing their fresh start.

199. How many trustees, nationwide, actually check to make sure intentions are performed?

200. We think this is at the bottom of the attempt to have a bankruptcy court effect the preemption of post-bankruptcy state law rights by misconstruction of "surrender." What creditor wants to be put into the position of having to enforce the state law rights

just how bad they want the property. The real tension contemplated by the statute, if allowed to operate, should produce results. Because of the current state of the law, it has never been allowed to so operate.

We look forward hopefully to the day when all that a creditor will have to complain about is the actual statute and the particular loan security agreement, and when all the debtor will have to complain about is the actual statute and the particular loan security agreement.

## WE FINALLY DO TIE UP. THE LAIRS AND THEIR HOME

■ The Lairs chose "reaffirm" as the method of retention, but did not perform before the entry of discharge and closure of the case. The property was abandoned to them, as property fully administered, pursuant to § 554(c). They made and the bank accepted payments on the loan throughout the bankruptcy case so that when the parties came before the court, the home loan was current.

■ The loan and security documents contain no bankruptcy default clause. The only default provided for is non-payment. Were there a default clause that was enforceable under Louisiana law, we would be faced with a different situation, as our analysis compels the conclusion that nothing in the Bankruptcy Code invalidates default clauses in loan or security agreements, and therefore they are enforceable unless some bankruptcy avenue (redemption, reaffirmation, exemption/lien avoidance) has had a preemptive effect or unless applicable non-bankruptcy law applied in a non-bankruptcy forum renders them unenforceable.

With no bankruptcy default clause presented here, we are faced, squarely, with the consequence of our interpretation of § 521. We think that the fact is irrelevant

to the question of whether the Lairs have a right to maintain the ownership and possession status that was returned to them by § 554(c). Our question is whether, given the absence of a default clause (within any of the agreements), it is in the Lairs' best interest for this Court to determine whether a post-discharge reaffirmation agreement is possibly enforceable. We conclude that it is not in their best interest for this Court to do so.

Because non-bankruptcy law provides no basis upon which the creditor can enforce the lien rights except for non-payment (perhaps other grounds, like failure to maintain insurance, etc., which are not relevant because we were not apprised of any such default), and because the Lairs were current as of the hearing, we can figure no basis upon which the bank can enforce the lien rights against the Lairs' property. If the Lairs subsequently default, the bank can proceed as it sees fit, subject to the discharge. If such a situation arises, the Lairs will be better off not having reaffirmed the debt because of the absence of personal liability. We offer no suggestion as to the social/economic pre-disposition of the Lairs regarding maintenance of the property, etc. It is not our place to argue their worthiness or worthlessness.

If the creditor (who doubtless controlled the format of the agreements) had wanted a bankruptcy default clause, one would have been contained in the agreements. If the creditor had wanted to provide practical incentive for timely reaffirmation, it would have (during the bankruptcy case) refused payments until an agreement was confected. Neither avenue was chosen, which is tantamount, in our way of thinking, to having made the choice to be exactly where the creditor is now—paired with a debtor who is liable in rem, but who is

according to state law procedures (and in conformity with constitutional protections) just to get back the camcorder? Well, probably none (certainly not the creditor in *Johnson,* who never asked the court to be able to do so). But isn't that the choice made by the

creditor at the moment of making the loan secured by the camcorder? Is this a problem—that it just doesn't pay to enforce the rights bargained for—that bankruptcy should care about? No.

current and can, under applicable non-bankruptcy law, maintain ownership and possession as long as the loan is not in default until the creditor, in the event of default, enforces lien rights under non-bankruptcy law.

Therefore, the case will be ordered closed, with the motion for approval of untimely reaffirmation agreement to be formally denied by separate Order, in conformity with these reasons.